Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **CONCERNED FRIENDS OF THE WINEMA, KLAMATH-SISKIYOU WILDLANDS CENTER, WESTERN WATERSHEDS PROJECT, OREGON WILD,** and **CENTRAL OREGON BITTERBRUSH BROADS of the GREAT OLD BROADS FOR WILDERNESS**, <br><br> Plaintiffs, <br><br> v. <br><br> **DOUGLAS C. McKAY,** District Ranger, Paisley & Silver Lake Ranger Districts, Fremont-Winema National Forests, **BARRY L. IMLER,** Forest Supervisor, Fremont-Winema National Forests, **U.S. FOREST SERVICE**, **LAURIE SADA**, Field Supervisor, Klamath Falls Fish and Wildlife Office, and **U.S. FISH AND WILDLIFE SERVICE**, <br><br> Defendants. | Case No. 1:19-cv-516-MC <br><br><br> PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT <br><br> EXPEDITED HEARING REQUESTED |

# MOTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Concerned Friends of the Winema, Klamath-Siskiyou Wildlands Center, Western Watersheds Project, Oregon Wild, and Central Oregon Bitterbrush Broads of the Great Old Broads for Wilderness hereby move to enjoin cattle grazing on the Chemult and North Sheep Pastures of the Antelope Allotment within the Fremont-Winema National Forest before the 2019 grazing season. Defendant U.S. Forest Service violated the National Forest Management Act by authorizing grazing on these pastures that is inconsistent with the Winema National Forest Land and Resource Management Plan and violated the National Environmental Policy Act by preparing an Environmental Impact Statement that is arbitrary and ignores the agency's own monitoring data. The Forest Service is also violating the Endangered Species Act by relying on Defendant U.S. Fish and Wildlife Service's unlawful Biological Opinion that failed to adequately evaluate grazing's impacts on Oregon spotted frog—a species listed as threatened under the ESA.

Grazing on these pastures threatens irreparable harm to unique and imperiled resources, including an isolated population of Oregon spotted frog and rare plant complexes. Thus, Plaintiffs request that the Court schedule an expedited hearing on this matter by June 7, 2019 and that prior to July 1, 2019—the start of the grazing season—enter a preliminary injunction that prohibits grazing on these pastures while this case is pending. Counsel for Plaintiffs has conferred with counsel for Defendants and they were unable to resolve this dispute. In light of the public interest nature of this case and the Plaintiffs, Plaintiffs request that this Court waive any bond under Federal Rule of Civil Procedure 65(c). *Cal. ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985).

# MEMORANDUM IN SUPPORT OF MOTION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

    I.    Threats to the Extraordinary Biodiversity of the Antelope Allotment ...................... 3

        A.  Oregon Spotted Frog ................................................................................ 3

        B.  Fens and sensitive plants ............................................................................. 5

    II.    Long-standing Problems with Livestock Grazing on the Allotment ......................... 7

    III.    The Forest Service's NEPA Process ......................................................... 9

    IV.    The Forest Service's Decision to Expand Grazing in Sensitive Riparian Areas ........ 11

    V.    FWS's Revised Biological Opinion ....................................................... 14

ARGUMENT ............................................................................................................ 16

    I.    PRELIMINARY INJUNCTION STANDARDS ..................................................... 16

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................. 16

        A.  THE BIOP IS ARBITRARY AND CONTRARY TO THE ESA ................ 16

            1.    The 2018 BiOp's Jeopardy Analysis Remains Flawed ......................... 16

            2.    The BiOp Relied on Ineffective and Uncertain Mitigation Measures ... 18

            3.    The BiOp Failed to Adequately Consider Effects of the Action ........... 20

            4.    The ITS Includes a Flawed Surrogate for Take of Frogs ...................... 22

        B.  THE NEW GRAZING SCHEME VIOLATES NFMA ................................ 23

            1.    The Forest Service Ignored the Forest Plan's Range Standards ............ 25

            2.    The Forest Service Did Not Ensure the Viability of Sensitive Species  28

            3.    The Agency Did Not Ensure Consistency with Other Plan Standards .. 29

    C. THE FOREST SERVICE's EIS VIOLATES NEPA ................................... 29

        1. The Agency Improperly Dismissed Reduced Grazing Alternatives ..... 29

        2. The EIS Did Not Take a Hard Look at Climate Change ...................... 30

        3. The EIS Relied on Faulty Assumptions, Data, and Mitigation ............. 31

III.     IMMEDIATE RELIEF IS NEEDED TO AVOID IRREPARABLE HARM............ 33

IV.     THE EQUITES TIP SHARPLY IN FAVOR OF AN INJUNCTION ...................... 35

CONCLUSION ................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*All. For the Wildlife Rockies v. Cottrell, 632 F.3d 1127*
    (9th Cir. 2011) ................................................................. 16, 35

*Amoco Prod. Co. v. Vill. Of Gambell,* 480 U.S. 531
    (1987) ................................................................................. 35

*Aqualliance v. U.S. Bureau of Reclamation, 287 F. Supp. 3d 969*
    (E.D. Cal. 2018) ................................................................ 31

*Buckingham v. Sec'y of the U.S. Dep't of Agric.,* 603 F.3d 1073
    (9th Cir. 2010) .................................................................. 22

*Cal ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency,* 766 F.2d 1319
    (9th Cir. 1985) .................................................................... i

*Concerned Friends of the Winema v. U.S. Forest Serv.,* Case No. 1:14-cv-737-CL, 2016 WL
    10637010, (D. Or. Sept. 12, 2016) .................................. passim

*Concerned Friends of the Winema v. U.S. Forest Serv.,* 2017 WL 5957811
    (D. Or. Jan 18, 2017) ......................................................... 8

*Concerned Friends of the Winema v. U.S Forest Serv.,* No. 1:14-Ccv-737-CL, ECF Nos. 135,
    136, 140 (D. Or. June 19, 2018) ....................................... 14

*Ctr. For Biological Diversity v. U.S. Dep't of Inter.,* 623 F.3d 633
    (9th Cir. 2006) .................................................................. 29

*Ctr. For Biological Diversity v. Wagner,* Civ. No. 08-302-CL, 2009 WL 2176049
    (D. Or. June 29, 2009) ........................................................ 7

*High Sierra Hikers Ass'n v. Weingardt,* 521 F. Supp. 2d 1065
  (N.D. Cal. 2007) ................................................................................................ 32

*Idaho Sporting Cong. Inc. v. Alexander,* 222 F.3d 562
  (9th Cir. 2000) ................................................................................................. 35

*Lands Council v. McNair,* 537 F.3d 981
  (9th Cir. 2008) ............................................................................................ 16, 27

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)......................................... 2

*League of Wilderness Defs./ Blue Mts. Biodiversity Project v. Connaughton,* 752 F. 3d 755
  (9th Circ. 2014) ................................................................................................. 16

*Marbled Murrelet v. Babbit,* 83 F.3d 1060
  (9th Circ. 1996) ................................................................................................ 33

*N. Alaska Envt. Ctr. V. Kempthorne,* 457 F.3d 969
  (9th Cir. 2006) .................................................................................................. 29

*Natl. Wildlife Fed'n v. Natl. Marine Fisheries Serv.,* 524 F.3d 917
  (9th Cir. 2008) ............................................................................................ 17, 18

*Natl. Wildlife Fed'n v. Natl. Marine Fisheries Serv.,* 184 F. Supp. 3d 861
  (D. Or. 2016) .................................................................................................... 18

*Natl. Wildlife Fed'n v. Natl. Marine Fisheries Serv.,* 886 F.3d 803
  (9th Cir. 2018) ............................................................................................ 33, 35

*Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372
  (9th Cir. 1998)* ................................................................................................. 30

*New Mexico ex rel. Richardson v. Bureau of Land Management,* 565 F.3d 683
  (10th Cir. 2009) ................................................................................................ 29

*N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067
  (9th Cir. 2011)* ............................................................................................ 29, 31

*Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889
  (D. Or. 2012) ..............................................................................................passim

*Or. Nat. Desert Ass'n v. Jewell,* 840 F.3d 562
  (9th Cir. 2016) .................................................................................................. 31

*Or. Natural Res. Council v. Allen,* 476 F.3d 1031

(9th Cir. 2007) ...................................................................................... 22

*Or. Wild v. Bureau of Land Mgt.,* 6:14-CV-0110-AA, 2015 WL 1190131
(D. Or. Mar. 14, 2015) ........................................................................ 33

*Sierra Club v. Bosworth,* 510 F.3d 1016
(9th Cir. 2007) ...................................................................................... 35

*Tenn. Valley Auth. V. Hill,* 437 U.S. 153
(1978) ................................................................................................... 35

*Thompson v. U.S. Dep't. of Labor,* 885 F.2d 551, 556 (9th Cir. 1989).................... 2

*Wild Fish Conservancy v. Irving,* 221 F. Supp. 2d 1224
(E.D. Wash. 2016) ................................................................................ 21

*Wild Fish Conservancy v. Salazar,* 628 F.3d 513
(9th Cir. 2010) .............................................................................. 16, 18

*W. Watershed Project v. Kraayenbrink,* 632 F.3d 472
(9th Cir. 2011) ..................................................................................... 31

*W. Watershed Project v. Rosenkrance,* No. 4:09-CV-298-ELJ, 2011 WL 39651
(D. Idaho Jan. 5, 2011) ........................................................................ 30

*W. Watersheds Project v. Salazar,* No. 4:08-CV-516-BLW, 2011 WL 4526746
(D. Idaho Sept. 28, 2011) ..................................................................... 30

*W. Watersheds Project v. U.S. Forest Serv.,* No 1:17-CV-434-CWD, 2017 WL 551574
(D. Idaho Nov. 20, 2017)...................................................................... 26

**Statutes**

16 U.S.C. § 1536 ..........................................................................16, 20

16 U.S.C. § 1604 ................................................................................ 22

42 U.S.C. § 4332 ................................................................................ 29

**Regulations**

36 C.F.R. § 219.15................................................................................22, 29

40 C.F.R. § 1500.1...............................................................................22

40 C.F.R. §§ 1500.16............................................................................29

40 C.F.R. § 1502.14 ........................................................................................... 31

40 CFR § 1502.14 ......................................................................................... 29, 31

40 C.F.R. § 1502.24 ........................................................................................... 31

50 C.F.R. § 402.02 ....................................................................................... 20, 22

50 C.F.R. § 402.14 ........................................................................................... 20

## GLOSSARY OF ACRONYMS

AMP        Allotment Management Plan

BA        Biological Assessment

BiOp        Biological Opinion

EIS        Environmental Impact Statement

ESA        Endangered Species Act

FWS        U.S. Fish and Wildlife Service

ITS        Incidental Take Statement

NEPA        National Environmental Policy Act

NMFS        National Marine Fisheries Service

NFMA        National Forest Management Act

ROD        Record of Decision

**INTRODUCTION**

Plaintiffs seek a preliminary injunction to prevent the Forest Service from re-opening two grazing pastures that provide habitat for numerous fragile and imperiled species, which has previously been damaged by cattle.  Much of the key habitat within these pastures has not been authorized for grazing for ten to fifteen years, and the rest of the area has been closed for the past two years due to this Court's 2016 injunction order.  The Forest Service plans to re-open both pastures to cattle use this summer despite the well-known and documented harms to these rare habitats and species from past cattle grazing.  Such use will quickly reverse the recovery that has occurred during these rested years and cause further harm to areas that remain degraded.

These pastures occur on a portion of the Fremont-Winema National Forest in south-central Oregon that contains extraordinary biodiversity, including a population of Oregon spotted frog, and the highest concentration of fens—a unique type of wetland that supports rare species —throughout Forest Service lands in the Pacific Northwest.  For more than a decade, the Forest Service knew about the presence of these species but continued to authorize cattle grazing, ignoring concerns of its own experts and other scientists, and other evidence that cattle significantly harm these resources.  The agency allowed virtually the same grazing to continue despite prolonged drought and management problems, which exacerbated degraded conditions.  As a result, this Court has twice ruled the agency's grazing decisions were unlawful, and in 2017, issued an injunction closing the Chemult Pasture that remained in place through 2018.

In 2018, the Forest Service completed a long-awaited analysis that considered whether grazing should continue on the allotment at all.  Instead of solving these ongoing resource conflicts, the agency chose a new management scheme that expands grazing in sensitive areas, which will increase threats to frogs and the fens on the pastures.  This decision ignores years of

the agency's own monitoring data and experts and perpetuates flaws this Court previously found. Because the decision is inconsistent with the Winema Forest Plan, and relied on a flawed Environmental Impact Statement ("EIS") and Biological Opinion ("BiOp"), it violates the National Forest Management Act ("NFMA"), National Environmental Policy Act ("NEPA") and Endangered Species Act ("ESA"). Thus, Plaintiffs seek a preliminary injunction to prevent cattle from grazing on the Chemult and North Sheep Pastures this summer from causing irreparable harm to the fragile resources that just started to recover from past grazing damage.

## STATEMENT OF FACTS

### I.     Threats to the Extraordinary Biodiversity of the Antelope Allotment.

The Fremont-Winema National Forest, located on the eastern slopes of the Cascade Mountains in south-central Oregon, contains a hydrogeologic system that is unprecedented in the Pacific Northwest. Ex. 1; Ex. 2 ¶¶ 38, 50, 67, 70.[1] The eruption of Mount Mazama 7,000 years ago facilitated hydrological, geological, and biological change that produced a shallow aquifer and an extensive groundwater-dependent ecosystem near the Walker Rim plateau. Ex. 2 ¶¶ 38–55. This area provides habitat for imperiled Oregon spotted frogs, sensitive plants, and a high concentration of fens—a groundwater-fed wetland. Declaration of Theresa Simpson, Ex. A ¶¶ 6, 11, 13, 23–32, 77-78; Declaration of Dr. Richard Dewey, ¶¶ 8, 12–42.[2] These fens and streams nearby provide an oasis for wildlife and plant species because this area experiences warm, dry summers with little precipitation, and is susceptible to drought. Ex. 2 ¶ 63, 69; Ex. 3 at 6; Ex. 4 at 3-89 to 3-90, 3-132 to 3-133. Federal biologists, other scientists, and the public have studied

---

[1] Exhibits 1—31 are part of the administrative record for this case because they were before the agency. *See Thompson v. U.S. Dep't. of Labor*, 885 F.2d 551, 556 (9th Cir. 1989).
[2] The Court may consider the declarations because they describe complex scientific matters, summarize or attach exhibits from the administrative record, and opine on irreparable harm. *See Lands Council v. Powell*, 395 F.3d 1019, 1029—30 (9th Cir. 2005).

and treasured this unique area for years. Ex. 2 ¶¶ 3–5, 12–15, 20; Simpson Decl., Ex. A ¶¶ 11–22; Dewey Decl. ¶ 4–11; Declarations of Jayne Goodwin, Paul Ruprecht, and Joanne Richter.[3]

In this area, the Forest Service has authorized one commercial operator to graze cattle for decades on the roughly 147,000-acre Antelope Allotment.[4] Ex. 4 at 1-3, 2-9 to 2-10. The area is dominated by dry lodgepole pine forests that provide little forage for cattle outside of sensitive meadows and riparian areas. *Id*. at 3-21. Frogs, fens, and sensitive plants depend on these riparian areas, which are concentrated on the west-side of the allotment within the 62,860-acre Chemult Pasture, and the adjacent 19,064-acre North Sheep Pasture that has been closed to grazing since 2003.[5] *Id*. 2-9, 3-8, 3-23; Ex. 1 at 4. Authorized and unauthorized grazing has degraded the riparian areas within these pastures and harmed these species for years. *See, e.g.,* Simpson Decl. Ex. A ¶¶ 33–53, 62–65, 91–141; Simpson Decl. Ex. B ¶¶ 11–15, 32–34.

*Oregon spotted frog*

Oregon spotted frogs—a species listed as threatened under the ESA—are the most aquatic of all native frog species in the Pacific Northwest, making them vulnerable to drought and declining water levels. Ex. 5 at 34; Ex. 6 at 51661, 51669-51672. These frogs have precise habitat needs. They rely on shallow pools near flowing water or wetlands to breed in spring and show high fidelity to breeding sites. Ex. 6 at 51660–61, 51687; Simpson Decl. Ex. A ¶¶ 84–85. Frogs need perennially deep, moderately vegetated pools to rear, metamorphose, forage, and bask during the dry season, and deep, well-oxygenated pools that do not freeze solid to overwinter. Ex. 6 at 51660-51661; Ex. 5 at 19–20; Simpson Decl. Ex. A ¶¶ 84, 86. Because

---

[3] These declarations also demonstrate that Plaintiffs have standing to pursue this action.
[4] Historically, the west side pastures comprised the Antelope Cattle and Horse Allotment and the east side pastures comprised the Antelope Allotment. The challenged decisions combined these allotments into one—the Antelope Allotment. This brief does not use old names for simplicity.
[5] Prior to the challenged decisions, the North Sheep Pasture was not part of Antelope Allotment, was historically grazed by sheep and has been closed to livestock grazing 2003. Ex. 4 at 3-8.

frogs require aquatic habitat year-round, they cannot survival long or migrate far if habitat dries up, which can increase mortality. Ex. 6 at 51660–51661, 51692; Simpson Ex. A ¶¶ 90, 123, 125.

The Chemult and North Sheep Pastures contain Jack Creek—the only perennial stream on the allotment—which supports a population of spotted frogs. Ex. 4 at 3-87, 3-132. Frogs inhabit parts of Jack Creek on private inholdings and the southern end of the Chemult Pasture, and on the northern half of the North Sheep Pasture. Ex. 5 at 29, 31. Females lay one egg mass per frog in shallow, flooded meadows along Jack Creek; tadpoles and frogs use Jack Creek, off channel pools, and wetlands to rear and forage in summer; and frogs use fens, flowing channels, undercut banks, and deep pools to overwinter. Ex. 5 at 24; Simpson Decl. Ex. A ¶¶ 85–86.

As Jack Creek flows into the North Sheep Pasture, it becomes intermittent and forms a series of pools in summer and fall. Ex. 4 at 3-132; Simpson Decl. Ex. A ¶¶ 87–89. As water levels drop, frogs concentrate in fewer and smaller pools that remain and may eventually dry up. Simpson Decl. ¶¶ 13–15. These low water conditions threaten frogs by increasing resource competition and predation risks, increasing the likelihood that frogs will be stranded and die as pools dry up, and reducing the availability of deep overwinter habitat. *Id.*

Cattle grazing exacerbates these risks—including within Jack Creek—and contributed to the Oregon spotted frog's listing under the ESA. Ex. 4 at 3-150 to 3-152; Ex. 6 at 51668, 51674–75; Simpson Decl. ¶¶ 16–19, Ex. A ¶¶ 107–111. Cattle use pools for watering and loafing, where they can trample, kill, and disturb frogs of all life stages, especially as pools dry up as summer and fall progress. Simpson Decl. ¶¶ 18–19, Ex. A ¶¶ 88, 111, 117–124. Cattle further lower water levels by drinking—15 to 20 gallons of water per day—and degrade streambanks, water quality, and other habitat conditions upon which frogs depend. Ex. 6 at 51674; Simpson Decl. ¶¶ 18–19, Ex. A ¶¶ 108–124. Cattle have caused long-term damage to

Jack Creek, which has not recovered even where grazing has not been authorized for more than a decade. Simpson Decl. ¶¶ 17, 23–28, Ex. A ¶¶ 114. Just a few cattle can harm frogs and their habitat, particularly during drought conditions in recent years, which likely reduced frog survival. Ex. 6 at 51674; Ex. 7 (drought, conflicts with cattle); Simpson Decl. ¶¶ 19, 24, 28, Ex. A ¶¶ 115, 118–125, 132. Conditions in 2018 were worse, with a few trespass cattle exacerbating the impacts of drought and threatening frog survival. Simpson Decl. ¶¶ 21, 24, 27–28.

The Jack Creek population has declined dramatically since its discovery in 1996, plummeting to just one percent of its historic numbers by 2011 and remaining at critically low numbers. Ex. 5 at 28, 30. This decline coincided with prolonged drought, poor water quality, habitat degradation, and loss of beavers. Ex. 6 at 51671; Simpson Decl. Ex. A ¶¶ 82–83. 522 of the 619 acres of the species' designated critical habitat on the Forest is within the allotment area. Ex. 4 at 3-92. As a small and isolated population, it is "acutely vulnerable to fluctuating water levels, disease, predation, poor water quality, and extirpation from stochastic events." Ex. 6 at 51688, 51693; Simpson Decl. Ex. A¶¶ 129, 138, Ex. B ¶ 28.

*Fens and sensitive plants*

Plaintiffs' expert—Dr. Dewey—a retired Forest Service botanist who studied fens throughout National Forests in Oregon and Washington, found the Chemult Pasture contains a "one-of-a-kind biophysical resource" with remarkably rich species diversity. Dewey Decl. ¶¶ 3–9, 24–30. Hundreds of acres of fen habitat contain many rare plant and mollusk species, including those the Forest Service designated as sensitive due to small or declining populations, or presence in unique habitats. Ex. 4 at 3-23, 3-30, 3-36, App. B at 5; *see also* Ex. 8 at 1–17. Due to its high concentration of fens, the Chemult Pasture contains a disproportionate number of these fen-loving species, including many vascular plants, bryophytes, and mollusks. Ex. 4 at 3-

23; Dewey Decl. ¶¶ 27–42.  This unique area is highly valued by scientists for research, but degraded conditions make it less valuable.  *E.g.*, Ex. 2 ¶¶ 33–37, 52–58, 70; Ex. 9.

Over the last several years, the agency's own monitoring and experts, along with other scientists, documented that grazing caused and contributed to degraded conditions in these fens. Ex. 3 at 41; Ex. 10; Ex. 11; Ex. 12 at 13-15; Simpson Decl. Ex. A ¶¶ 33–65, Ex. B ¶¶ 5–15; *see* Dewey Decl. ¶¶ 51–60.  Between 2010 and 2017, the agency found multiple fen sites exceeded the 10% soil disturbance standard, with problems attributed to cattle and continuing or worsening at some sites.  Ex. 10 at 6-11; Ex. 11 at 2-5, 11; Ex. 12 at 14–15, 99–102, 123–125.  Such degraded conditions occur because cattle are attracted to fens and other riparian areas to obtain water and forage during the dry summer months.  Ex. 11 at 11; Ex. 12 at 26.  Cattle punch through soils; trample and destroy vegetation; change water quality through excrement; remove biomass needed for peat buildup; accelerate erosion and peat oxidation; and drink water that sustains fens.  Ex. 12 at 13, 26–27; Simpson Decl. Ex. A ¶¶ 36-40; Dewey Decl. ¶¶ 52–59, 69. Impacts can occur quickly, with only light grazing, and cause chronic, long-term damage or destruction, with recovery taking decades, if it ever occurs.  Ex. 11 at 11; Ex. 12 at 27, 39; Dewey Decl. ¶¶ 54, 66.

Fens are particularly sensitive to impacts from cattle that lower water tables, especially when combined with drought.  Water levels that drop 20 cm below the surface threaten fens, which depend on high groundwater tables to develop and sustain their unique conditions and the peat layers and species diversity within.  Ex. 12 at 123; Dewey Decl. ¶¶ 13–15, 45.  Dr. Dewey began monitoring groundwater in fens on the Chemult Pasture in 2010, and found drought contributed to water tables dropping lower in summer.  Dewey Decl. ¶¶ 8, 43–50; Ex. 13; Simpson Decl. Ex. B ¶¶ 3–4.  In 2014, another researcher found groundwater that supplies fens

"at a precarious tipping point due to long-term drought."  Ex. 2 ¶ 69; *see also* Ex. 14.  Due to such impacts, in 2012, Dr. Dewey told the Forest Service "with the greatest sense of urgency" that cattle grazing in fens may be "an indefensible management activity" and recommended that the agency permanently remove cattle there.  Dewey Decl. ¶ 61; Ex. 15.

## II.     Long-standing Problems with Livestock Grazing on the Allotment.

For more than a decade, livestock grazing has caused chronic conflicts with the unique ecological resources on the Antelope Allotment, which has led to several rounds of litigation before this Court.  During this time, the Forest Service continued to authorize grazing on the allotment with few changes to management, despite increasing evidence of harm to frogs, fens, and rare plants and orders from this Court that its authorizations were unlawful.

Shortly after the Jack Creek population of Oregon spotted frog was discovered in spring 1996, the Forest Service renewed the term permit that authorized grazing of 115 cow/calf pairs from July 1 to September 30 on the Chemult Pasture.  *Ctr. For Biological Diversity v. Wagner*, Civ. No. 08-302-CL, 2009 WL 2176049, at *2–3 (D. Or. June 29, 2009), *report and recommendation adopted,* 2009 WL 2208023 (D. Or. July 22, 2009).  After the precipitous decline of the Jack Creek frog population in the early 2000's, conservation groups challenged the agency's 2001-2007 annual authorizations, alleging that grazing contributed to the decline of the population.  *Id*. at *1, 4.  In response to the lawsuit, the agency built a fence to exclude cattle from the middle portion of Jack Creek within the Chemult Pasture, assigned maintenance of the fence to the permittee, and promised to update the Allotment Management Plan ("AMP") soon. *Id*. at *4–5.  As a result, the Court found the agency did not violate NFMA.  *Id*. at *11–14.

But problems and impacts continued.  In addition, the Forest Service discovered designated Sensitive plant and mollusk species within the fens on the Chemult Pasture, which

were also being harmed by cattle. These impacts led to a second lawsuit challenging the 2008-2010 grazing authorizations. *Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 901 (D. Or. 2012). There, this Court noted adverse effects to the newly discovered fens and Sensitive species, and harm due to cattle repeatedly breaching fences and entering frog habitat despite orders for the permittee to keep cattle out of Jack Creek. *Id*. at 903–907. Ultimately, this Court found that authorizing virtually the same grazing each year was "causing harm to sensitive plant and animal species and their habitat which could be irreversible…." *Id*. at 923. This Court also found that the agency failed to assess the impacts of grazing on sensitive species before authorizing grazing and failed to update its prior NEPA analysis and AMP from 1995, even though the agency promised that it would do so by early 2010. *Id*. at 915–919, 923–24. This Court expressed concerns about the "unique environmental resources" and expected that the agency would update its analyses quickly and seriously consider plaintiffs' concerns. *Id*. at 900.

Nevertheless, the Forest Service continued to authorize grazing on the Chemult Pasture under virtually the same conditions despite mounting resource conflicts and trespass problems between 2012 and 2015—without completing a new AMP or NEPA analysis. *See* Exs. 16, 17. Shortly after this Court's order in *Sabo* in 2012, the agency found evidence of "repeated trespass of cattle" behind the Jack Creek fence. *Concerned Friends of the Winema v. U.S. Forest Serv.*, Case No. 1:14-cv-737-CL, 2016 WL 10637010, at *2–3 (D. Or. Sept. 12, 2016), *adopting findings and recommendations*, 2017 WL 5957811, at *2 (D. Or. Jan. 18, 2017). In 2013—a drought year—trespass cattle were found using the same pools as frogs, drinking the limited water, degrading habitat, and creating a high likelihood of mortality. *Id*. at *3–4; Simpson Decl. Ex. A ¶¶ 103, 119–124; Ex. 7 at 1-6. Management in 2014 did not keep cattle out of Jack Creek, as significant trespass occurred again that year, along with drought. Ex. 7 at 7–21, 28–29; Ex.

17; Simpson Decl. Ex. B ¶ 14; *Concerned Friends of the Winema*, 2016 WL 10637010, at *3.

The agency finally ordered cattle off the Chemult Pasture a month early in 2014 due to the frog

ESA listing that summer—in response to concerns of the public—but this order was ineffective,

as cattle remained for another month. *Concerned Friends of the Winema*, 2016 WL 10637010, at

*3. Drought, cattle trespass, and resulting harm to Sensitive species and habitat persisted in

2015. Simpson Decl. Ex. B ¶¶ 4, 6–7, 13, 14, 32; Ex. 7 at 30–40; Ex. 11. Some trespass,

management problems, and impacts continued in 2016. Ex. 10 at 11; Ex. 18 at 1–3.

These problems led to another lawsuit. In *Concerned Friends of the Winema*, this Court

found that the Forest Service violated NFMA by authorizing grazing in 2012–2015 that failed to

ensure viable populations of frogs and sensitive plant species. 2016 WL 10637010, at *7–9. As

a result, this Court enjoined the agency from authorizing grazing on the Chemult Pasture unless

it showed grazing would not contribute to a negative trend in the species' viability. *Id*. at *9.

Plaintiffs also challenged a BiOp that FWS issued in 2015 to analyze the impacts of grazing on

spotted frogs. *Id*. This Court found the 2015 BiOp lacked support for its conclusion that grazing

is likely to kill only 3% of frogs each year by trampling, ignored non-lethal impacts when

estimating how many frogs would be harmed or harassed by cattle, and included insufficient

support for using a 35% forage utilization standard to protect frogs. *Id*. at *9–14. As a result,

this Court found the BiOp was arbitrary, remanded it, and ordered new ESA consultation. *Id*. at

*15–16. Despite the injunction, cattle trespass and resulting impacts to Jack Creek and sensitive

species continued, along with drought conditions in 2018. Simpson Decl. ¶¶ 21, 24, 26–28.

## III.    The Forest Service's NEPA Process.

In 2010, the Forest Service initiated a NEPA process to determine whether to authorize

grazing on the Antelope Allotment through a new ten-year term grazing permit. Ex. 4 at 1-5 to

1-6.  It issued an environmental assessment that it later withdrew and replaced with a draft EIS in December 2014, and a final EIS in November 2017.  *Id*. at i to ii, 1-1.  The EIS's purpose was "to determine whether the Forest Service should reauthorize livestock grazing" in the area, and "if so, what level of grazing should be reauthorized."  *Id*. at 1-3 to 1-5.  This analysis was "needed to determine if livestock management practices are sufficient for achieving and maintaining compliance with current Forest Plan direction, applicable laws, and regulations."  *Id*.

The EIS analyzed five alternatives: Alternative 1 proposed not to issue grazing permits; Alternative 2 proposed to authorize grazing under past management; Alternative 3 proposed to expand grazing into the North Sheep Pasture and several riparian areas that had been excluded from grazing for years; Alternative 4 proposed to close the Chemult Pasture but continue grazing on the east side pastures; and Alternative 5 proposed to expand grazing into the North Sheep Pasture and riparian exclosures as in Alternative 3, but also open up other riparian exclosures and lengthen the grazing season.  *Id*. at 2-4 to 2-28.  The EIS focused on the following key issues when assessing the environmental impacts of the five alternatives: grazing in meadows/riparian areas, grazing in Oregon spotted frog habitat, grazing strategies, utilization of available forage, fencing strategies, and expansion of allotment boundaries.  *Id*. at 1-6 to 1-10, Ch. 3.

The EIS admitted that past management did not ensure all Forest Plan standards were met, but rather caused and contributed to chronic impacts and degraded conditions of riparian areas and soils.  *Id.* at 3-60, 3-161 to 3-163, 3-169, 3-170; *see also* Ex. 19 at 17 (current management is "not adequately protecting resource values to maintain or improve range or other resource conditions in all key areas…").  The EIS found that the no and reduced grazing alternatives (Nos. 1 and 4) would likely improve and allow recovery of fen and riparian conditions much faster than the other alternatives.  Ex. 4 at 3-39, 3-55, 3-66, 3-68, 3-92, 3-136,

3-168 to 3-169, 3-195.  The EIS claimed that expanded grazing options (Nos. 3 and 5) would open more acreage to grazing and thereby dilute grazing's impacts over time, and would not cause fens to decline because cattle would generally avoid them or impacts would be mitigated. *Id*. at 3-15 to 3-17, 3-67.  Alternative 3 was the agency's preferred alternative.

The EIS largely ignored parts of the agency's specialist reports that undermined key conclusions about the new grazing scheme.  The Wildlife Report admitted: "every year livestock would continue to concentrate in riparian areas and could damage riparian vegetation, streambanks, and soils."  Ex. 20 at 53.  The Botany Report noted even light grazing can degrade fens and cause exceedences of Forest Plan standards.  Ex. 12 at 39, 47, 49.  The Range Report stated that cattle grazing in cow-calf pairs in summer resist herding, and that cattle are attracted to riparian zones, which can lead to poor distribution that degrades resources.  Ex. 21 at 52, 55.

## IV.     The Forest Service's Decision to Expand Grazing on the Antelope Allotment.

The agency finalized its NEPA process in May 2018, when it issued a Record of Decision ("ROD") that authorized a new AMP and ten-year permit for the Antelope Allotment through a new grazing scheme.  Exs. 19, 21, 22.  The ROD rejected all five alternatives from the EIS and instead combined elements of the expanded grazing alternatives (Nos. 3 and 5).  Ex. 19 at 2.

The new management scheme expands grazing into fragile habitat for imperiled species by adding: (1) the North Sheep Pasture, which was closed to grazing for fifteen years and includes miles of Jack Creek as well as multiple fens, and (2) five riparian exclosures and the middle portion of Jack Creek on the Chemult Pasture that were closed to grazing for more than a decade.  Ex. 4 at 3-8, 3-21; Ex. 19 at 9; Ex. 22 at 3-4.  The Forest Service will assume management of about 3,000 acres of the permittee's private land inholdings on the Chemult Pasture.  Ex. 22 at 3.  Collectively, these additions add about 21,400 acres to the allotment, for a

total of 168,565 acres.  Ex. 19 at 3, 7.  Grazing on frog habitat will *increase nearly twentyfold*, from 27 to 525 acres, along seven miles of Jack Creek—compared to just one mile previously.  Ex. 4 at 3-92, 3-134.  Grazing of fens will increase from 372 to about 555 acres.  *Id*. at 2-41.

The new management scheme allows grazing of 275 cow/calf pairs on the Chemult Pasture and 494 cow/calf pairs on the North Sheep Pasture, relying on a deferred rotation system to alternate timing of pasture use.  Ex. 22 at 3.  In the newly open riparian exclosures, a "variable" number of cow/calf pairs may graze.  *Id*.  The new Jack Creek Unit may have 75 cow/calf pairs graze behind the existing fence and will be divided into four riparian pastures.  *Id*.

The AMP and the Permit authorize the permitted number of cattle to graze these two pastures from July 1 to September 30—the same season under the old system on the Chemult Pasture—and allow dates to vary up to two weeks each year.  *Compare id*. & Ex. 23 *with* Ex. 4 at 2-9.  The AMP and Permit omit further details about the new scheme, explaining that herd number, size, and permitted dates for each pasture, meadow, or unit will vary each year.  Ex. 22 at 2–3; Ex. 23.  On the four riparian pastures in the Jack Creek Unit, the "location and duration may vary over time …" but will "likely" be just one month.  Ex. 22 at 4–5.  Jack Creek pastures two and three will not be authorized until unspecified "resource objectives" are met but pastures one and four are open to immediate use.  *Id*.  The agency will somehow "discourage" late season grazing in occupied frog habitat even though the AMP allows grazing there for the entire season.  Ex. 22 at 3, 10.  Despite this lack of detail, the agency claimed that the new scheme would improve dispersal and management flexibility, and minimize impacts.  Ex. 22 at 4; Ex. 19 at 6–8.

The AMP states that future details will be set through annual authorizations and depend on implementation of fence construction and maintenance, water developments, restoration projects, monitoring, and adaptive management.  Ex. 22 at 4–5, 10, 15–19.  However, the ROD

abandoned the use of annual authorizations in favor of simple grazing bills that provide only the number and cost of cattle permitted for the entire allotment.  Ex. 19 at 20; Ex. 25.

To implement the new grazing scheme, 20 miles of fencing must be constructed, 20.7 miles reconstructed, and 1.4 miles removed, while 23 water developments must be maintained, developed, or reconstructed.  Ex. 19 at 3, 15.  The Forest Service relied heavily on these features to assert that cattle distribution will improve and impacts to fens, frogs, and other resources will decrease.  Ex. 4 at 3-53, 3-60, 3-94; Ex. 12 at 40; Ex. 19 at 9, 12, 14–16; Ex. 22 at 3–4, 19–21.  The agency estimates fence, restoration, and water development work will take up to 6 years—more than half the permit term—and grazing in some areas cannot happen until certain measures are complete.  Ex. 4, App. A (Map 11); Ex. 22 at 4–5, 9, 10, 20.

The AMP provides for annual monitoring of forage utilization (no more than 35% of forage can be grazed on key portions of the Chemult, North Sheep, and Jack Creek pastures), woody species use (no more than 40% use of woody shrubs along Jack Creek), stubble height (6" of forage must remain along Jack Creek and in fenced fens), and bank or soil alteration (cattle can cause no more than 20% bank alteration on Jack Creek and no more than 20% soil alteration in high priority fens and fenced areas).  Ex. 22 at 16.  The AMP makes the permittee ultimately responsible for monitoring and complying with standards, as the agency plans to make informal inspections "as the opportunity arises" and formal inspections only "as possible."  *Id*. at 14–15.  To track long-term ecological trends, Jack Creek will be monitored every 5-10 years and high priority fens will be monitored every 1-5 years.  *Id*. at 16–17.  With regard to water levels in Jack Creek, the standard is to maintain "effective water levels to support" frogs but the AMP fails to explain what that level is.  *Id*. at 16.

The annual monitoring will inform an adaptive management plan, which allows multiple years of violations before the Forest Service must exclude cattle from meadows, fens, or Jack Creek. *Id*. at 17–18. With regard to Jack Creek water levels, cattle must be fenced out if the perennial portion of Jack Creek becomes intermittent, if Pool D within the intermittent portion of Jack Creek drops below 1.5 feet in depth, or if grazing exceeds 35% utilization around the open water frog ponds on the Chemult Pasture. *Id*. at 18–19. The AMP does not specify who will do the monitoring of water levels or how often it must occur during the grazing season, noting only that action will be taken if field visits find low water conditions. *Id*.

On the eve of the grazing season in 2018, the Forest Service asserted its new decisions unilaterally dissolved the existing grazing injunction on the Chemult Pasture, a position this Court promptly rejected. *Concerned Friends of the Winema*, No. 1:14-cv-737-CL, ECF Nos. 135, 136, 140 (D. Or. June 19, 2018). The injunction remained in place through the 2018 grazing season before this Court lifted it early in 2019. *Id*. ECF No. 150 (D. Or. Feb. 28, 2019).

## V. FWS's Revised Biological Opinion.

After this Court remanded FWS's 2015 BiOp to correct several errors, FWS and the Forest Service reinitiated consultation over the impacts of the new grazing scheme on Oregon spotted frog, with the Forest Service submitting a new Biological Assessment ("BA") to FWS in December 2017. *Concerned Friends of the Winema v. U.S. Forest Serv.*, 2016 WL 10637010, at *16; Ex. 5 at 1. The BA described the new grazing scheme as the AMP and EIS did, lacking key details about when, where, and how grazing will occur on the Chemult and North Sheep pastures. Ex. 26 at 14–24. In addition to the 35% utilization standard that was carried over from the 2015 BiOp, the Forest Service added a 20% bank alteration standard and Jack Creek adaptive management plan. *Id*. at 16, 82–84.

FWS issued a new BiOp on May 21, 2018.  Ex. 5.  The 2018 BiOp noted the precipitous decline of the Jack Creek population since its discovery in 1996, but described the population as "relatively stable, with some potential for an upward population trend."  *Id*. at 28–31.  The BiOp described the litany of adverse effects that cattle can have on the frogs and their habitat across three categories: 1) physical alteration of streams and riparian vegetation; 2) effects on water quality and quantity; and 3) disturbance to individual frogs.  *Id*. at 34–46.  As to the first, the BiOp explained that "[d]amage can begin to occur almost immediately upon entry of the cattle onto the streambanks, and use of riparian zones may be highest immediately following entry of cattle into a pasture…."  *Id*. at 36.  But the BiOp concluded that the new grazing scheme would "maintain or improve system function" because cattle would be distributed across the allotment and would not impair riparian habitat.  *Id*. at 40.

For the second category, the BiOp recognized the significant impacts that poor water quality and quantity can have on frogs, and noted that water quantity in the action area may be inadequate to support the frog's life history needs.  It relied heavily on the Jack Creek adaptive management plan to mitigate these effects.  *Id*. at 41–43.

Under the last category, the BiOp admitted that when cattle and frogs use the same pools, cattle can trample frogs or cause them to flee, estimating that up to 13.5% of frogs will be killed, and that 24% will be harmed annually.  *Id*. at 43–45.  These estimates formed the basis of an Incidental Take Statement ("ITS") that found "in most years" up to 484 juveniles/metamorphs and up to 169 adult/subadult frogs are likely to be harmed when they are disturbed by cattle, and up to 273 juvenile/metamorphs and up to 95 adult/subadult frogs are likely to die from trampling. *Id*. at 60.  The BiOp determined this level of take would still allow the species "to persist" and that grazing is not likely to extirpate frogs in the area.  *Id*. at 43–48, 60.

<u>**ARGUMENT**</u>

## I.   PRELIMINARY INJUNCTION STANDARDS.

Plaintiffs seeking a preliminary injunction must show a likelihood of success on the merits, that they will suffer irreparable harm without relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014). Such relief is warranted if plaintiffs raise serious questions going to the merits and the balance of hardships tips sharply in their favor. *All. For the Wildlife Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citing *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir. 2008)).

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   THE BIOP IS ARBITRARY AND CONTRARY TO THE ESA.

The ESA requires federal agencies to consult over the effects of their proposed actions on threatened species. 16 U.S.C. § 1536(a)(2). To conclude consultation, FWS must issue a BiOp that evaluates the status of the listed species and the effects of the proposed action, and determines whether the action is likely to jeopardize the continued existence of the species. *Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 518–519 (9th Cir. 2010). If the proposed action will incidentally "take" a listed species by, *inter alia*, harassing, harming, or killing any individuals, FWS must issue an ITS specifying the number of takings expected and exempted from the ESA's prohibition on take. *Id.* Courts review BiOps under the APA, and will set them aside if they are arbitrary, capricious, or otherwise not in accordance with law. *Id*. at 521.

#### 1.   The 2018 BiOp's Jeopardy Analysis Remains Flawed.

FWS must evaluate if a proposed action is likely to jeopardize the continued existence of a listed species by considering impacts on the survival and *recovery* of that species. *Natl.*

*Wildlife Fed'n. v. Natl. Marine Fisheries Serv.* ("NMFS"), 524 F.3d 917, 924, 933 (9th Cir. 2008). The 2018 BiOp's jeopardy analysis perpetuates flaws this Court found in the 2015 BiOp.

First, this Court determined that the 2015 BiOp did not adequately consider the full effects of the proposed grazing, including all of the non-lethal harm that would likely occur to frogs, when determining how the action would affect the survival and recovery of the species. *Concerned Friends of Winema*. 2016 WL 10637010, at *13, 15–16. On remand, the 2018 BiOp estimated hundreds more frogs will be injured, killed, or harmed *each year,* yet did not provide a rational explanation for how the Jack Creek population can survive or recover with such "significant" annual losses when it is already facing an "overall decline" and is at such critically low numbers. *Compare* Ex. 5 at 45–49, 58, 60–61, 79 *with* Ex. 27 at 49; *see also* Ex. 28 at 2, 5 ("every adult is crucial" and "[r]educing the population by just a few individuals could be significant"). Instead, the BiOp tries to dismiss these numbers by claiming they are overestimates, which merely undercuts the accuracy of the estimates without addressing their likely effects. Ex. 5 at 45–46, 58. FWS produced its best estimate of the annual frog mortality and injury caused by the proposed grazing, and needed to revised its jeopardy analysis—as this Court ordered it to do—and explain how those high numbers allow for the survival and recovery of this small population.

Second, the 2018 BiOp failed to consider the impact of the proposed action on the survival and recovery of the species as a whole, despite this Court's finding that the 2015 BiOp failed to do the same thing. *Concerned Friends of Winema*, 2016 WL 10637010, at *14. The 2018 BiOp concluded that grazing will not jeopardize the species because it will allow frogs to persist in Jack Creek. Ex. 5 at 45–46, 60. But FWS did not explain how such high levels of harm to frogs will allow for the population to persist, particularly because the longer a population

remains small, the lower its chances of recovery. This was arbitrary. *Wild Fish Conservancy*, 628 F.3d at 527 (the persistence of a local population ignores "how much longer it can hold on…" and that "a species can often cling to survival even when recovery is far out of reach").

Further, the BiOp did not discuss how the potential loss of the Jack Creek population would affect the survival and recovery of the species as whole. Loss of this unique and isolated population would further shrink the limited geographic range and genetic diversity of the species, which would impair recovery of the species. Simpson Decl. Ex. B ¶ 30; Ex. 6 at 51667, 51686–51687. FWS's failure to discuss potential impacts to recovery of the species renders the jeopardy analysis arbitrary and capricious. *See Natl. Wildlife Fed'n. v. NMFS*, 524 F.3d at 924, 933.

### 2. The BiOp Relied on Ineffective and Uncertain Mitigation Measures.

The ESA requires mitigation measures relied on in a BiOp to be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Natl. Wildlife Fed'n. v. NMFS*, 184 F. Supp. 3d 861, 901–02 (D. Or. 2016) (internal citations omitted); The 2018 BiOp improperly relies on mitigation measures that are uncertain to occur or will not address the threats to the species. Ex. 5 at 40, 42–43, 46–48.

First, the 2018 BiOp relies on 35% utilization and 20% bank alteration standards, Ex. 5 at 35–36, 58, which are not protective of the life history and habitat needs of Oregon spotted frog. Simpson Decl. ¶¶ 32–39, Ex. B ¶¶ 16–22. This Court found that FWS's scientific support for the 35% utilization standard in the 2015 BiOp was "weak" because it did not tie the standard to Oregon spotted frog needs. *Concerned Friends of Winema,* 2016 WL 10637010, at *14. The 2018 BiOp again fails to provide that information for the 35% utilization standard, but also lacks

similar support for the 20% bank alteration standard. *Compare* Ex. 5 at 35–36 *with* Ex. 27 at 35. Instead of explaining how those standards relate to the specific habitat needs of spotted frogs and threats to frogs presented by cattle, FWS simply cited studies that discuss the standards as useful for general riparian health. Therefore, FWS still failed to provide a rational explanation as to why the standards are protective of Oregon spotted frogs in particular.

Moreover, these standards assess riparian health across large areas, and will not prevent harm from cattle concentrating in specific areas that are important frog habitat. Simpson Decl. ¶¶ 35–39, Ex. B ¶¶ 18–22. Even when most of Jack Creek was not authorized for grazing and thus had even lighter use, the population continued to decline, demonstrating these standards are not tied to frog needs and do not ensure stable population levels. Ex. 5 at 30. Compliance with these standards is also uncertain to occur because the agency did not commit to monitor them, relying instead on a permittee that has failed to comply with requirements in the past. Ex. 22 at 14–15; Ex. 17; *Concerned Friends of the Winema*, 2016 WL 10637010, at *2-3.

Second, the BiOp's reliance on the water level monitoring and adaptive management plan to address the serious threat from cattle congregating at the same remnant pools as frogs during low water conditions is equally flawed. Ex. 5 at 30, 44–47, 58. The Plan calls for exclusion of cattle from Jack Creek "if field visits" determine that low water levels trigger such action, but does not state how often these visits must occur or even that the agency must conduct them at all. *Id*. at 14; Ex. 22 at 14–15, 18–19. This was a serious omission because frequent visits would be necessary to monitor water levels, which can drop to critical levels in just a few days. *See* Ex. 7 at 8-9 (recommending weekly monitoring); Ex. 29 at 1–2 (same); Simpson Decl. ¶¶ 41–42, 49.

Furthermore, the Plan's reliance on Pool D as a trigger to exclude cattle from the intermittent portion of the creek when it reaches 1.5 feet is flawed. Ex. 5 at 16. That pool is

spring-fed and thus has more stable water levels, making it unrepresentative of other pools that can reach depths inhospitable for frogs when Pool D is still relatively high. Ex. 29 at 1-2 (Pool D at 1.4 feet, Pool A at ~6 inches), 6; Simpson Decl. ¶¶ 43–48. And history shows the remedial actions—excluding cattle with gates or fencing—are ineffective. Ex. 5 at 16; Simpson Decl. ¶¶ 50–51; *Concerned Friends of the Winema,* 2016 WL 10637010 at *2–3; Ex. 17; Ex. 18 at 1-2.

Relatedly, the BiOp's reliance on fencing and water troughs to control cattle and mitigate other effects of grazing is similarly unreasonable. Ex. 5 at 40, 42–43, 47, 58. As explained throughout this brief, these measures have not prevented cattle from trespassing and causing harm to riparian areas, despite orders for the permittee to monitor and herd cattle, maintain fences, and prevent trespass. *See supra* at 3, 7-9; Ex. 7; Ex. 17; Simpson Decl. ¶¶ 23-28; Ex. A ¶¶ 91–105. The BiOp ignores this site-specific evidence about past failure of these measures to protect Jack Creek frogs, summarily relying on them to conclude that the impacts of the action will be minimal. Because it is uncertain that all of the mitigation measures will be implemented and effective, the BiOp's conclusions about the effects of the action are arbitrary.

### 3. The BiOp Failed to Adequately Consider Effects of the Action.

The BiOp also omits important information and explanation necessary to assess the direct and indirect effects of the action, and fails to use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02, 402.14(h)(3), (g), 402.14(g).

First, the BiOp virtually ignores climate change, despite the significant risk that warmer temperatures and increasing drought pose. It admits climate change is "potentially" exacerbating the effects of habitat loss at a range-wide level, Ex. 5 at 26, but never discusses what that means for this population when analyzing the effects of grazing. While admitting that drought has impacted frogs and is likely the most severe threat to the Jack Creek population, the BiOp does

not discuss whether or how climate change will exacerbate the impacts of grazing on low water levels in Jack Creek during summer. Ex. 5 at 28, 32, 40–42, 44, 47–48, 51, 58. This is a fatal flaw. *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233–34 (E.D. Wash. 2016).

Second, the BiOp relied on the BA for the description of the proposed action, which omitted key details—like when, where, and how many cattle will graze each pasture annually under the new system. Ex. 26 at 14–24; *see* Ex. 22 at 2 (herd number and size, dates, and locations of grazing "may vary each year" in pastures, meadows, and units), at 3–4 ("the location and duration" of grazing in the Jack Creek Unit "may vary over time"). It also ignored site-specific information about the history of grazing management problems on the Chemult Pasture and its effects on the Jack Creek population. Rather than considering actual impacts that have occurred and are likely to occur to Oregon spotted frogs and their habitat on the Chemult and North Sheep pastures, the BiOp relies on general studies that are less applicable. *Compare* Ex. 5 at 42 (general findings that cattle limit time in riparian areas), 43-45 *with* Ex. 20 at 53 (cattle will "continue to concentrate in riparian areas" under new scheme), Ex. 4 at 176, 253; Simpson Decl. Ex. A ¶¶ 120–122; Ex. 7 at 1-2, 5–6, 8. These omissions prevented the BiOp from accurately assessing the effects of the action and excluded the best available scientific information.

Additionally, the BiOp asserts that the area meets the species' survival and recovery needs, but fails to explain how this is so when the population is at a fraction of historical levels, and has remained at low numbers for more than a decade. Ex. 5 at 29, 30, 34. Biologists have expressed concerns about the ability of the population to hang on, and increasing frequency and severity of drought plus increased grazing impacts further calls into question the ability of the habitat to allow the population to increase. Ex. 28 at 1,4; Simpson Decl., ¶¶ 61-63, Ex. B ¶¶ 32–33. These key omissions show that FWS failed to consider all effects of the action.

### 4. The ITS Includes a Flawed Surrogate for Take of Frogs.

An ITS must include a trigger to identify when the level of authorized take is exceeded, thereby requiring reinitiation of consultation. 50 C.F.R. § 402.14(i)(4). FWS can use a surrogate instead of a numerical value to identify when take is exceeded, but must articulate a rational connection between the surrogate and the taking of the species. *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1037-38 (9th Cir. 2007). This Court found that the 2015 BiOp applied an improper surrogate to determine non-lethal take. *Concerned Friends of the Winema*, 2016 WL 10637010, at *14–15. The 2018 BiOp suffers from the same flaw despite using three surrogates: the 35% utilization standard, the 20% bank alteration standard, or if >13.5% of frogs that are present in a pasture are trampled. Ex. 5 at 61. None of these surrogates address a key threat and source of take—cattle causing disturbance and displacement of juvenile or adult frogs, which can occur quickly or by just a few cattle and before utilization and bank alteration standards are met or frogs are trampled. *See id*. at 36, 43–47; Simpson Decl. ¶¶ 51, 57, Ex. B ¶ 21. FWS estimated that up to 484 juveniles and 169 adults could be disturbed by cattle each year, but provided no trigger to assess when that level of take would be reached. Monitoring or other conditions in the ITS do not address adequately this threat, rendering the ITS unlawful.

For these reasons, Plaintiffs have raised serious questions going to the merits of their legal claim that the 2018 BiOp is arbitrary and capricious and inconsistent with the ESA.

### B. THE NEW GRAZING SCHEME VIOLATES NFMA.

The Forest Service's site-specific management decisions must be consistent with the Winema Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15; *Buckingham v. Sec'y of the U.S. Dep't of Agric.,* 603 F.3d 1073, 1077 (9th Cir. 2010). That Forest Plan established goals, objectives, and standards for management actions like grazing. Ex. 30; *Sabo*, 854 F. Supp. 2d at

915–17.  But the agency did not demonstrate that the new grazing scheme—as authorized by the

ROD, AMP, and term permit—complies with range and resource standards in the Forest Plan.

### 1. The Forest Service Ignored the Forest Plan's Range Standards.

The Forest Plan's goals and objectives for the range program include enhancing and

improving conditions in riparian areas, and meeting the demand for grazing "only when it does

not conflict with other uses."  Ex. 30 at 4-12.  It also requires that grazing plans be cost-effective,

and based on factors such as the suitability of forage, wildlife needs, and monitoring and

management issues.  *Id*. at 4-67.  The AMP fails to comply with these requirements.

First, the Forest Service arbitrarily determined that cattle grazing on the Chemult and

North Sheep pastures is appropriate.  The AMP must determine grazing levels based on issues

such as the "forage condition, suitability, and availability," economic factors, and other resource

needs.  *Id*. at 4-67.  It must determine an "appropriate season of grazing" based on wildlife

needs, livestock use, soil stability, and other factors.  *Id*.  The agency "may" allocate vegetation

for grazing *if* it is "in excess" of that needed to provide healthy vegetation and to meet wildlife

objectives.  *Id*. at 4-62.  The overarching goal of these and other range requirements is to "only"

meet grazing demand "when it does not conflict with other uses."  *Id*. at 4-67.

Overwhelming evidence before the agency demonstrates that grazing on the Chemult and

North Sheep pastures does not meet these standards and is inappropriate.  The agency admits that

the "large majority" of the Chemult Pasture is dominated by dry forests with "limited forage for

livestock."  Ex. 12 at 5.  Of the more than 60,000 acres on that pasture, the agency noted "much

greater forage" is concentrated in the 2,364 acres of riparian habitat within wet meadows, fens,

and along streams.  *Id*.  The North Sheep Pasture has similar vegetation composition but even

less riparian habitat with forage.  *Id*.  This lack of forage in uplands causes cattle to concentrate

in these limited riparian areas, where they have and will damage riparian vegetation and soil, resources, and cause conflicts with wildlife, habitat, soil, riparian, and recreational values.  Ex. 11; Ex. 21 at 55; Ex. 24 at 30, 32; Simpson Decl. ¶¶ 18, 59, 61; *see generally* Goodwin, Richter, and Ruprecht Decls.  The agency failed to explain rationally why forage that is concentrated in and around fens, Jack Creek, and wet meadows is suitable for livestock grazing when its own monitoring reveals that cattle use of those areas conflicts with wildlife, ecological, scientific, and recreational uses of these lands.  *See supra* at 3-9.  Overall, the agency failed to show that the grazing met the Forest Plan conditions for appropriate livestock use given longstanding conflicts with wildlife and riparian resources on the two pastures.

Second, the Forest Service failed to develop a grazing scheme that is "cost-effective" and reflects "the permittee's ability to self-monitor management and maintenance" for the allotment, as required by the Forest Plan.  Ex. 30 at 4-67.  The new grazing scheme relies heavily on fencing, deferred rotation, herding, and other measures that will not be cost-effective or manageable.  *See* Ex. 19 at 6–10, 12–13; Ex. 22 at 3–4, 17–21.  In fact, the EIS reveals that the new grazing scheme was the most expensive of those considered, the agency currently lacks the funding to implement the new AMP, and the permittee's share of costs appear uneconomical.  Ex. 4 at 3-115, 3-119, 3-120; *see also Sabo*, 854 F. Supp. 2d at 899 ("several miles" of new fencing would make grazing "unprofitable").  Indeed, the permittee told the agency that "adding more fences is time and cost prohibitive" and that a deferred rotation system is "unattainable on the Chemult pasture" in part because the permittee is *unable to maintain infrastructure.*  Ex. 31 at 3–4.  The permittee also explained that herding is unlikely to work, will actually *increase* impacts, as cows are easily lost in dense forest, resist herding, and spread out in search of water. *Id*.  Indeed, the history of trespass through fences and use of unauthorized areas shows the

inability of this permittee to "self-monitor management and maintenance." *Concerned Friends of the Winema*, 2016 WL 10637010, at *2-3; *see supra* at 3, 7–9. The agency ignored evidence that the permittee cannot manage cattle effectively and ensure they stay in authorized areas.

Finally, the Forest Plan requires annual operating plans to address management needs, Ex. 30 at 4-63, but the agency abandoned this practice despite relying on annual instructions to dictate when and how grazing will occur. Ex. 19 at 20; Ex. 22 at 4; Ex. 25; Ex. 26 at 20-21, 24.

### 2. The Forest Service Did Not Ensure the Viability of Sensitive Species.

The Winema Forest Plan requires the Forest Service to "maintain viable populations of all existing native …plant and animal species." Ex. 30 at 4-47. To do so, "[d]istribution of habitat shall provide for species viability and maintenance of populations *throughout their existing range on the Forest*." *Id*. (emphasis added). A viable population is one with "estimated numbers and distribution of reproductive individuals to ensure the continued existence of the species throughout its existing range within the planning area." Ex. 12 at 3. For threatened or sensitive species, the Plan set a goal of managing habitat to perpetuate and/or recover species. Ex. 30 at 4-6. The agency did not show the new grazing scheme ensures viable populations of Oregon spotted frogs and sensitive plants will be maintained throughout the Forest.

With regard to Oregon spotted frog, the Forest Service provided three reasons to conclude that grazing will not contribute to a negative trend in viability, but all three contradict evidence before the agency that grazing will threaten this highly imperiled species on the Forest. Ex. 19 at 4–5; Ex. 4 at 3-95. Further, the agency never identified what population level is needed for the Jack Creek population to reach a viable size, critical information for this assessment.

The agency first claims that the new AMP will not impair the viability of the species across the Forest because grazing will occur on only a portion of designated habitat on the

Forest. Ex. 19 at 4. This assertion is misleading because the Jack Creek population inhabits nearly *all* of the designated critical habitat for the species on the Forest—not just a small portion. *See* Ex. 4 at 3-92 (522 of 619 acres of critical habitat on the Forest is within the project area, with 404 of those acres permitted for grazing). Thus, the loss of this population would remove frogs from a significant part of its critical habitat on the Forest, which would not maintain the species "throughout" its existing range on the Forest as required. Ex. 30 at 4-47; *see also W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-CV-434-CWD, 2017 WL 5571574, at *12–13 (D. Idaho Nov. 20, 2017) (grazing that causes the loss of a single population is inconsistent with an agency's duty to maintain viable populations throughout the species' range on the Forest).

The agency next claims that mitigation and management measures will minimize impacts to frogs, Ex. 19 at 4–5, but as described herein, such measures are ineffective and uncertain to occur. *See supra* at 18-20. The agency failed to explain how the continued impacts of grazing— including the loss of up to hundreds of individuals a year—will provide for a viable population in Jack Creek when the population is "already below viable by any measure." *Concerned Friends of the Winema*, 2016 WL 10637010, at *8; Ex. 5 at 45. Further, the agency ignored that the species is particularly susceptible to drought and stochastic events that could decimate the population. Ex. 6 at 51670–51672, 51686–51688, 51693; Simpson Decl. Ex. A. ¶¶ 129, 140.

The agency's final point—that grazing and restoration projects will benefit the species— is overstated. Ex. 19 at 4–5. It is unclear whether projects will enhance habitat, or when this will happen and if so, what restoration objectives or benefits may be achieved. *See id*. at 11 (relying on undefined objectives and referencing vague, future plans). The agency also claims an "intermediate level of disturbance may be conducive to Oregon spotted frog habitat." *Id*. at 4–5. But such benefits may arise only "in some instances" where there is excess or invasive

vegetation.  Ex. 6 at 51674–75; Ex. 5 at 39 (frogs did not increase after cattle introduced to control vegetation).  This is not the case here.  Ex. 5 at 33 (limited invasive plant sites).

The Forest Service similarly concluded in the ROD that the new grazing scheme would not impair the viability of sensitive plants and mollusks, citing solely to the monitoring and adaptive management scheme that is riddled with flaws as described herein.  Ex. 19 at 5; *see supra* 23-35; *compare* Ex. 12 at 40, 42 (noting protection for mollusk habitat permitted for grazing—which doubled to 94% of its total—depends on "high livestock distribution") *with* Ex. 21 at 52 (admitting distribution of cattle is often poor under cow/calf pair systems).  The agency included additional assertions for its viability findings in the EIS and Botany Report, but these analyses lack key information and are unsupported.  Ex. 4 at 3-38 to 3-75, 3-81 to 3-82; Ex. 12 at 6–11, 24–64, 69–78.  The agency claims that grazing may impact individuals or habitat for several plant and mollusk species, but asserts—with little to no explanation—that such impacts are not likely to cause a loss of viability for these species.  Ex. 12 at 70, 71–76.  The agency never identifies the size of the current populations on the allotment or the Forest, nor describe what population levels are needed to maintain their viability.  *See* Ex. 4 at 3-26 to 3-33 (listing only the number of sites and acres where found); Ex. 12 at 6-9 (same).  Without such baseline data, the agency could not rationally conclude that impacts to individuals will not impair the viability of rare plant and mollusk populations, whose viability is already a concern due to their listing as sensitive species.  *See Concerned Friends of the Winema*, 2016 WL 10637010, at *2.

Rather than relying on population data, the agency may use habitat as a proxy for a species' viability, but only if it identified "the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat."  *Lands Council*, 537 F.3d at 997–98.  Here, the agency never did that.  Instead, it

assumed that maintaining or improving habitat would suffice without identifying the quantity or quality of habitat needed for viable populations of each species. Given that sensitive plants are often found in fens—which grazing has degraded—it was unreasonable to conclude that the new grazing scheme would ensure viable populations of these fen-dependent species when even light levels of grazing cause degraded conditions to persist. Ex. 11 at 4-6, 11; Ex. 12 at 10-13, 47, 77 (admitting that even moderate or light grazing of fens led to exceedences of standards).

### 3. The Agency Did Not Ensure Consistency with Other Plan Standards.

The Forest Plan also included goals, objectives, and standards to maintain, enhance, and improve riparian areas, which include fens. Ex. 30 at 4-6 to 4-7, 4-16 to 4-17, 4-67, 4-73 to 4-77, 4-136 to 4-143; *Sabo*, 854 F. Supp. 2d 915–17; Ex 12 at 3–4. But significant evidence before the agency revealed grazing damages riparian areas and fens that are concentrated on the Chemult Pasture, with monitoring data and reports documenting significant soil disturbance at many high value fens grazed by cattle. *See supra* 5-9; Ex. 3 at 11; Ex. 10; Ex. 11. The agency's own experts undercut its assumption that the new grazing scheme will reduce these impacts, explaining that even light grazing in fens can cause degraded conditions to occur or persist, even after areas are rested. Ex. 11 at 11; Ex. 12 at 49, 77; *see also* Ex. 15. Moreover, the new grazing scheme opens six riparian areas to grazing for the first time in at least a decade, which is likely to degrade—not maintain or improve—conditions. Ex. 22 at 3-4; Ex. 3 at 43 Ex. 4 at 3-172; Ex. 11 at 11-12 (excessive disturbance in three exclosures "likely"); Ex. 12 at 49 (expecting "decreasing conditions" in riparian areas "where grazing would be reintroduced"); Simpson Decl. ¶ 52. By allowing grazing to degrade or maintain undesired conditions at fens and riparian areas, the challenged decisions are inconsistent with the Forest Plan's riparian directives.

For these reasons, Plaintiffs have raised serious questions that the Forest Service's AMP, Term Permit, and ROD were arbitrary and capricious and inconsistent with NFMA.

## C.     THE FOREST SERVICE'S EIS VIOLATES NEPA.

NEPA requires an agency to ensure it has carefully considered the environmental effects of its decisions, and the public has sufficient information to participate in the decision-making process.  40 C.F.R. § 1500.1.  To meet these goals, an EIS must take a "hard look" at the potential impacts of a proposed action.  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011).  Here, the Forest Service violated NEPA and failed to take a hard look at the impacts of grazing by improperly dismissing alternatives, brushing aside effects of climate change, and by ignoring relevant data and scientific information.

### 1.     The Agency Improperly Dismissed Reduced Grazing Alternatives.

An agency's consideration of alternatives is the "heart" of an EIS.  *Ctr. for Biological Diversity v. U.S. Dep't. of Inter.*, 623 F.3d 633, 642 (9th Cir. 2010); 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14.  An EIS must provide a rational explanation for eliminating an alternative and must "*properly* reject proposed alternatives."  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978–79 (9th Cir. 2006) (emphasis added); 40 C.F.R. § 1502.14(a).  Here, the Forest Service rejected the no and reduced grazing alternatives as inconsistent with the Forest Plan and federal laws like NFMA, claiming both direct the agency to allow grazing on suitable lands identified in Forest Plans.  Ex. 19 at 1, 16, 17.  This interpretation misconstrues the law and the Forest Plan.

NFMA is a multiple-use statute, but it does not require the Forest Service to authorize *all* potential uses on all acres of a National Forest.  *See New Mexico ex rel. Richardson v. Bureau of Land Management,* 565 F.3d 683, 710-11 (10th Cir. 2009)*.*  Thus, the Forest Service is wrong that NFMA or any other law *requires* the Forest Service to authorize grazing on the Chemult and

North Sheep pastures.  Similarly, the agency erred in claiming that the 1990 Winema Forest Plan determined the Antelope Allotment is "suitable for domestic livestock grazing …."  Ex. 4 at 1-4.  Rather, the Plan identified that allotment as needing an updated allotment plan and lacking "reliable range analysis data" and thus did not determine it was suitable for grazing nor assert that grazing *must* occur there.  Ex. 30 at 4-68.  Even if it had, a suitability analysis from decades ago would now be woefully outdated.  Conditions on the ground have changed, with the discovery of frogs, fens, and unique plants; the listing of Oregon spotted frog under the ESA; and the increasing impacts of drought and climate change.  *See supra* 7-9, 31; Ex. 2 ¶ 69.

Thus, it was arbitrary for the Forest Service to reject the no and reduced grazing alternatives based on misinterpretations of the governing authorities.  *See W. Watersheds Project v. Salazar*, No. 4:08-CV-516-BLW, 2011 WL 4526746, at *14 (D. Idaho Sept. 28, 2011) (law did not forbid no grazing alternative); *W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 WL 39651, at *10 (D. Idaho Jan. 5, 2011) (dismissing alternatives because land use plan mandated grazing in suitable areas was a "mistaken understanding" of agency's authority).

## 2.      The EIS Did Not Take a Hard Look at Climate Change.

To take a "hard look" at potential impacts of a proposed action, an EIS must include a "reasonably thorough discussion" of significant environmental effects.  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (citation omitted).  Here, the EIS relied on stale data and failed to take a hard look at how climate change will exacerbate grazing's effects.

In its three-page analysis of climate change, the EIS cites increasing precipitation and decreasing temperature trends from 2000–2010, but fails to included data from 2010–2017. Ex. 4 at 3-194 to 3-196.  This ignores recent data showing frequent and severe drought in the Klamath

basin over the last decade, which negatively affected riparian conditions and exacerbated impacts of grazing. *See supra* 7-9, 31; Ex. 2 ¶ 63. Reliance on such stale data was arbitrary. *N. Plains Res. Council*, 668 F.3d at 1086 (ten-year old data was stale); 40 C.F.R. § 1502.24.

Further, the EIS arbitrarily dismissed public concern about climate change's impacts on water resources, citing uncertainty and specious claims that grazing decreases greenhouse gas emissions. Ex. 4 at 3-195 to 3-196. The EIS admits that snowpack will "very likely be reduced," but fails to connect the dots between reduced snowpack and water sources for frogs and fens. *Id.* at 3-196. Other than a few lines in a different section, Ex. 4 at 3-89, the EIS is devoid of information about the impacts of grazing when combined climate change. This was a serious error because climate change—by increasing drought conditions and temperature, and decreasing snowpack—is likely to exacerbate threats to frogs, fens, and other resources that depend on water to survive arid conditions in summer. *See* Ex. 2 at ¶¶ 63, 69; Ex. 5 at 32; Ex. 6 at 51690–51692; Ex. 11 at 11; Ex. 20 at 34, 45. Such an error renders the EIS arbitrary. *Aqualliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1028–32 (E.D. Cal. 2018).

### 3. The EIS Relied on Faulty Assumptions, Data, and Mitigation.

NEPA's "hard look" mandate requires an EIS to include "a discussion of adverse impacts that does not improperly minimize negative side effects." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011). It must also include accurate data about the environmental baseline, and ensure scientific integrity in its analysis, and discuss appropriate mitigation measures. *Or. Nat. Desert Assn. v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016); 40 C.F.R. §§ 1500.1(b), 1502.24. It must also include and discuss appropriate mitigation measures. 40 C.F.R. §§ 1500.16(h), 1502.14(f). Here, the EIS contains the flawed assumptions, stale data, and unreasonable mitigation measures, in violation of NEPA.

First, the EIS does not accurately describe the effects of the new grazing scheme because the ROD combined two of the EIS alternatives to form the new grazing scheme. Ex. 19 at 2, 6–8. While the new grazing scheme combined elements of alternatives 3 and 5, it is unclear which impacts of each alternative apply. This does not fulfill the Forest Service's duty to provide accurate information to the public about the impacts of its decisions.

Second, throughout the EIS, the agency assumed that by increasing the allotment size, using a deferred rotation system, constructing fences, and implementing monitoring and adaptive management, cattle would better distribute across a larger area and have lighter use on sensitive resources. *Eg.*, Ex. 4 at 2-12 to 2-13, 3-172. But the EIS ignored concerns and contradictory statements from its own specialists that undermined its conclusions. *See* Ex. 12 at 39, 49; Ex. 20 at 53; Ex. 23 at 52, 55. Further, the lack of detail about management and the uncertainty and ineffectiveness of mitigation measures prevented an accurate description of the impacts. *See supra* 12-14, 18-20 (problems with measures). Such an inadequate analysis violates NEPA. *High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1084–88 (N.D. Cal. 2007).

The EIS also failed to disclose the significant problems with trespass and resulting resource damage that have occurred over the past decade. The EIS misreported that only "7 occurrences of unauthorized use" occurred between 2005 and 2015. *Compare* Ex. 4 at 2-7 *with supra* at 7-9 (detailing history of trespass); Exs 7, 17. The agency is well aware this number is grossly low—even this Court has noted significantly more unauthorized use, with weekly observations of cattle breaching fences and grazing along an unauthorized area of Jack Creek one season. *Sabo*, 854 F. Supp. 2d at 906. Further, the EIS assumed trespass would be "significantly" reduced by opening up long-closed areas to grazing, Ex. 4 at 2-13, despite evidence the new scheme may not effectively control cattle. Ex. 12 at 58; Ex. 21 at 52, 55; Ex.

31 at 3-4.  The EIS's failure to disclose and discuss this data does not satisfy NEPA.  *Or. Wild v. Bureau of Land Mgt.*, 6:14-CV-0110-AA, 2015 WL 1190131, at *12 (D. Or. Mar. 14, 2015)

For these reasons, Plaintiffs have raised serious questions going to the merits of their legal claim that the EIS was arbitrary and capricious and inconsistent with NEPA.

## III.  IMMEDIATE RELIEF IS NEEDED TO AVOID IRREPARABLE HARM.

For Plaintiffs' ESA claims, an injunction is warranted if there is a reasonably certain threat of imminent harm to a protected species.  *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1064 (9th Cir. 1996), *as amended on denial of reh'g* (June 26, 1996).  The record and Plaintiffs' expert demonstrate that it is likely that cattle grazing will harm and kill numerous frogs each year that grazing occurs.  Ex. 5 at 60; Simpson Decl. ¶ 59.  The loss of individual frogs is imminent and irreparable.  Simpson Decl. ¶¶ 30–63; *see Natl. Wildlife Fed'n. v. NMFS*, 886 F.3d 803, 818 (9th Cir. 2018) (explaining harm to members of a listed species is irreparable).  Although extinction level harm is not required to support an injunction, *Natl. Wildlife Fed'n. v. NMFS*, 886 F.3d at 818, the Jack Creek population is already at critically low numbers, making it highly susceptible to extirpation if grazing resumes.  Simpson Decl. ¶¶ 61-63.  The loss of this population would be irreparable, due to its unique genetics and other factors that make it valuable to the species.  Simpson Decl. Ex. B ¶ 30.

Additionally, this will be the first time that miles of Jack Creek in the North Sheep Pasture will *ever* be open to cattle grazing, and the first time in ten years that much of the rest of Jack Creek will be open to grazing.  Simpson Decl. ¶ 52.  This is likely to cause long-lasting harm to frog habitat quickly after cattle enter.  *Id*. ¶ 60; Ex. 5 at 36 ("Vegetation and streambank recovery from long rest periods may be lost within a short period following grazing reentry.").  Grazing in the intermittent portion of Jack Creek would be particularly threatening to the

population due to the severe drought in 2018 that dried up most pools and likely decimated the frogs in that part of Jack Creek. Simpson Decl. ¶¶ 21, 61–62. Impacts from grazing in 2019 could eliminate frogs entirely from that portion of their habitat.

The Forest Service's new grazing scheme is also likely to irreparably harm fens and sensitive plants. Dewey Decl. ¶¶ 65–67, 71. Cattle can quickly damage the wet soils of fens and trample sensitive plants, which may never recover from this harm. Ex. 5 at 3; *see supra* at 3, 5-6, 11. The rare fens that house sensitive species took millennia to develop, and will take "decades, if ever" to recover once destroyed or seriously degraded. Dewey Decl. ¶ 66; Ex. 2 ¶ 55. "Once disrupted, the fen system is very unlikely to return due to the ongoing hydrogeologic evolution of the area and the time it takes to re-develop these complex wetland environments." Cummings Decl. ¶¶ 68, 70. Several high value fens are already in less than desired condition, and further grazing will perpetuate those poor conditions—even at light levels. Ex. 10 at 11; Ex. 11 at 4, 5, 11; Ex. 12 at 47, 77; Dewey Decl. ¶¶ 65–67, 71. Other fens have been closed to grazing for years, and thus will be quickly degraded by the new use. Ex. 11 at 12; Ex. 12 at 40, 49, 77; Ex. 22 at 3; Dewey Decl. ¶ 71. For fens that were rested during the past two years, any recovery of vegetation will be lost once cattle resume using them. These fens house unique sensitive plants that might "never come back" if lost. Simpson Decl. Ex. A. ¶ 76; *see* Dewey Decl. ¶ 66.

In turn, these harms to frogs, fens, and sensitive plants harm Plaintiffs and their members. *See* Goodwin, Ruprecht, Richter Decls; *see also Concerned Friends of the Winema,* 2016 WL 10637010, at 15. Thus, Plaintiffs have demonstrated the necessary irreparable harm if grazing occurs in 2019 on the Chemult and North Sheep Pastures.

# IV. THE EQUITITES TIP SHARPLY IN FAVOR OF AN INJUNCTION.

In ESA cases, the "plain intent of Congress in enacting the statute was to halt and reverse the trend toward species extinction, whatever the cost," and thus "the balance has been struck in favor of affording endangered species the highest of priorities . . . ." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184, 194 (1978). The Ninth Circuit recently reaffirmed that in ESA cases, the equities and public interest factors tip in favor of the protected species. *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d at 817. Thus, if this Court finds that Plaintiffs are likely to succeed on the merits of their ESA claims, an injunction closing the Chemult and North Sheep pastures to grazing until the case is resolved is warranted.

For the NFMA and NEPA violations, the balance of hardships and public interest weigh in Plaintiffs' favor. An injunction will further the public interest by protecting the environment and public lands from irreparable harm. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1033, (9th Cir. 2007); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138-39 (9th Cir. 2011). Frogs, fens, and sensitive plants on the allotment are unique and important to the public and scientists across the region. In contrast, the requested relief will affect only a single commercial entity, and he may still graze the east side pastures as he did under the prior injunction. *See Idaho Sporting Cong. Inc. v. Alexander,* 222 F.3d 562, 569 (9th Cir. 2000); *Concerned Friends of the Winema*, 2016 WL 10637010 at *15; Ex. 4 at 2-14. This limited commercial harm to one company does not outweigh the widespread public interest in the extraordinary biodiversity on these pastures.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for preliminary injunction and order their requested relief.

Dated: April 12, 2019                    Respectfully submitted,

  s/Elizabeth H. Potter
Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs