IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


| | |
|---|---|
| CONCERNED FRIENDS OF THE WINEMA; KLAMATH SISKIYOU WILDLANDS CENTER; WESTERN WATERSHEDS PROJECT; OREGON WILD; CENTRAL OREGON BITTERBRUSH BROADS OF THE GREAT OLD BROADS FOR WILDERNESS, | Civ. No. 1:19-cv-00516-MC |
| Plaintiffs, | **OPINION & ORDER** |
| v. | |
| DOUGLAS C. McKAY; BARRY L. IMLER; UNITED STATES FOREST SERVICE; LAURIE SADA UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

_____

McSHANE, District Judge.

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction. ECF No. 9. Oral argument was held on June 21, 2019. ECF No. 29. As Plaintiffs have failed to show a likelihood of irreparable harm in the absence of injunctive relief, the motion is DENIED.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary relief that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in

the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not, however, disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

Injunctive relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original, quotation marks and citation omitted). These standards are not relaxed for environmental plaintiffs, and no "thumb on the scale" works in an environmental plaintiff's favor. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

## BACKGROUND

### I.    The Antelope Allotment

The Antelope Allotment is a substantial parcel of land on the eastern slopes of the Cascade Mountains, within the Fremont-Winema National Forest in south-central Oregon. The local climate is characterized by warm, dry summers and wet, cool winters. The Antelope Allotment is home to a shallow aquifer created by pumice deposits left by an ancient volcanic eruption. Over

the millennia, the aquifer has created a complex of groundwater-dependent ecosystems, such as wet meadows and fens.

      The Antelope Allotment covers nearly 170,000 acres, but contains only one perennial stream, known as Jack Creek, which flows through two pastures on the western side of the Allotment: Chemult Pasture and North Sheep Pasture. As Jack Creek flows south through the Allotment it becomes intermittent during the dry summer and autumn months, disappearing underground and breaking up into pools in the downstream reaches.

## II.    The Oregon Spotted Frog

      Jack Creek is home to a population of Oregon spotted frogs ("OSF"). The OSF are the most aquatic of the native Pacific Northwest frog species and require a consistent supply of water, both to live and to reproduce. The water needs of the OSF are such that the frogs are unable to travel far overland if conditions deteriorate in their current habitat. The wider OSF population has declined in recent years, leading the U.S. Fish and Wildlife Service ("FWS") to list the species as "threatened" under the Endangered Species Act ("ESA") in 2014.

      Most of the ESA-designated critical OSF habitat in the Forest is found on the Antelope Allotment. Since the discovery of the Jack Creek OSF population in 1996, the population has declined precipitously, with frog egg masses reaching one percent of historical numbers in 2011. The decline of the Jack Creek OSF has coincided with years of drought conditions, exacerbated by algal blooms, poor water quality, loss of protective habitat, and alteration of bank conditions. Although the Jack Creek OSF population has recovered somewhat from its nadir in 2011, it remains critically small and isolated from other OSF populations in the Klamath Basin.

### III.    Fens

As noted above, the Antelope Allotment is home to a unique hydrogeological ecosystem, including a 500-acre wetland complex comprised largely of fens.  Fens are wetlands with groundwater tables near the surface, which slows the decomposition of plant materials and produces high peat levels.  The concentration of fens on the Antelope Allotment is found nowhere else on Forest Service lands in the Pacific Northwest.  Fens are susceptible to damage from drought and soil disturbance and can take a long time to recover from such damage, if they recover at all.  Some of the fens on the Antelope Allotment provide habitat for sensitive plant and mollusk species.

### IV.    Cattle Grazing

The Forest Service has historically issued permits authorizing the cattle grazing on the Antelope Allotment during the summer months, including grazing in the Chemult Pasture.  Grazing cattle have been observed to congregate in riparian areas as they search for water and forage.  Grazing cattle can remove vegetation, compact soil, trample streambanks, and consume or foul the limited supply of surface water on the Allotment.  This can result in the degradation or destruction of both fens and OSF habitat.  In addition, cattle trample OSF egg masses and adult frogs when they graze or drink from Jack Creek.

Beginning in 2008, the Forest Service undertook a series of measures to protect the OSF from the effects of livestock grazing, at least partially in response to litigation challenging the authorization of grazing on the Allotment.  One such measure was the construction of fences to exclude cattle from portions of Jack Creek, although the effectiveness of that fence proved to be limited and cattle trespass remained a significant problem.  The negative effects of grazing on fens and the Jack Creek OSF were compounded by several years of drought conditions, which drew cattle to the same pools the OSF relied on for survival.  When the OSF were listed as threatened

in 2014, the Forest Service ordered the permittee to remove his cattle from the pastures a month early, but the cattle were not removed and remained on the Allotment for more than month after the Forest Service issued its order.

During this period, the Forest Service promised to undertake a National Environmental Policy Act ("NEPA") analysis and to update its Allotment Management Plan ("AMP"). A final environmental assessment ("EA") was withdrawn in 2013 and the Forest Service announced in July 2014 that it would prepare a more comprehensive environmental impact statement ("EIS"). A draft EIS was issued in December 2014. Further litigation followed when the Forest Service had not completed its NEPA analysis or issued a new AMP by early 2014, but the case was stayed while the parties waited for FWS to issue a biological opinion ("BiOp") concerning the impacts of grazing on the OSF. The BiOp was issued in 2015 and it found that grazing would not jeopardize the continued existence of the OSF. During this period, the Forest Service continued to authorize grazing in the Chemult Pasture.

In early 2017, this Court held that the Forest Service had violated the National Forest Management Act ("NFMA") in 2012-2015 by authorizing grazing without accurately measuring the current levels of grazing. The Court also held that the 2015 BiOp violated the ESA and remanded the BiOp to FWS with orders for the agencies to reinitiate consultation under the ESA. The Forest Service was enjoined from authorizing grazing on Chemult Pasture until it complied with NFMA. *Concerned Friends of the Winema v. U.S. Forest Serv.*, Case No. 1:14-CV-737-CL, 2016 WL 10637010 (D. Or. Sept. 12, 2016), *report and recommendation adopted sub nom.,* 2017 WL 5957811 (D. Or. Jan 18, 2017).

Because of the injunction, no grazing was authorized during the 2017 season. The Forest Service issued a Final EIS and draft Record of Decision ("ROD") in November 2017. In May

2018, the Forest Service issued a final ROD and FWS issued a new BiOp. The Forest Service then issued the new AMP and term grazing permit. Shortly before the 2018 grazing season was set to begin, the Forest Service moved to dissolve the injunction. The motion was opposed and, given the limited timeframe, the motion could not be resolved before the close of the 2018 season and so no grazing was authorized in 2018. The motion was ultimately resolved in the Government's favor and the injunction was dissolved in early 2019.

**V.    The 2019 Grazing Season**

The new ROD and AMP authorize a substantially different system of livestock grazing on the Antelope Allotment, relative to what was previously permitted. The new plan involves opening new or previously closed areas to grazing, with adaptive management and expanded dispersal. The expectation is that the cattle will be dispersed over a wider area, using a deferred rotation system to alternate periods of use and rest for portions of the Chemult and North Sheep Pastures. The number of cattle authorized to graze and on which pastures, meadows, or units will vary each year based on the prevailing conditions on the Allotment. The plan also relies on monitoring and mitigation measures, including the construction or repair of miles of fencing to help control cattle and keep them out of riparian areas.

Plaintiffs have substantial objections to the new system and those challenges form the basis of this litigation. On April 12, 2019, Plaintiffs filed a Motion for Preliminary Injunction seeking to enjoin the Forest Service from authorizing grazing during the pendency of this action. The 2019 grazing season was scheduled to begin on July 1, 2019.

The precise scope and terms of the 2019 grazing season have been something of a moving target. The Forest Service, recognizing that this case was unlikely to be resolved on the merits before grazing could commence, entered into an agreement with the permittee to substantially

reduce the scope of grazing during the 2019 grazing season.  These agreements are memorialized in a series of letters between the permittee and the District Ranger, dated April 18, April 22, April 24, and May 17, 2019.  McKay Decl. Exs. A, B, C, D.  ECF No. 19.  The scope of grazing was further restricted by agreement between the Forest Service and the permittee on June 19, 2019, shortly before oral argument on Plaintiffs' motion.  Def. Notice of Admin. Dev.  ECF No. 28. During oral argument on June 21, 2019, the Government advised the Court and Plaintiffs that the Forest Service and the permittee had reached an agreement concerning additional modifications to the grazing agreement, which was memorialized in another letter dated June 25, 2019.  Def. Second Notice of Admin. Dev. ECF No. 30.  Based on the Government's representations at oral argument and the most recent exhibits, it appears that the Forest Service has authorized grazing as follows:

No grazing will occur on North Sheep Pasture during the 2019 season.  The earliest commencement of grazing (the "turn out" date) for Chemult Pasture has been pushed back from July 1 to July 15, 2019, and the number of authorized cattle has been reduced to 95 cow/calf pairs.[1] McKay Decl.  Grazing will only be permitted in a limited number of exclosures within Chemult Pasture.  The cattle will be delivered by truck to the Cannon Well exclosure, where they will graze for a portion of the season before being trailed by riders along Forest Service roads to the Rider's Camp exclosure.  The cattle will rest for up to two days at Rider's Camp before being trailed along Forest Service roads to the Round Meadow exclosure, where they will graze for the balance of the season.  The permittee is responsible for ensuring that the cattle do not stray from the road while traveling between the exclosures.

In its letters to the permittee, the Forest Service stresses that no turn out will be permitted until several conditions are met.  First, the fences surrounding all three exclosures are to be repaired

---

[1] The AMP permitted 275 cow/calf pairs on Chemult Pasture and 494 cow/calf pairs on North Sheep Pasture.  Pl. Mot. Ex. 22, at 3.  ECF No. 9-22.

and put into good order.  The Forest Service will inspect the fences and must affirmatively approve them before the permittee will be allowed to release cattle into the exclosure.  Additionally, the Forest Service must inspect conditions within the exclosures to ensure that they meet Range Readiness Standards before the cattle are released.  If, for instance, the meadows are too wet and muddy, the turn out date will be pushed back until conditions in the exclosure meet the applicable standards.

The permittee was reminded that he is responsible for monitoring the acceptable use levels in the exclosures.  Cattle are, for example, only allowed to remove a certain percentage of the vegetation or alter a certain percentage of soil during grazing.  Pl. Mot. Ex. 22, at 16-17.  ECF No. 9-22.  Once those acceptable use levels have been reached, the cattle must be removed from the exclosure.  In addition to the permittee's own monitoring, the Forest Service has represented, both to the permittee and to the Court, that it will be monitoring conditions within the exclosures to ensure that grazing does not exceed the acceptable use levels.  The permittee was warned that failure to comply with the conditions of grazing would result in non-compliance actions by the Forest Service.

## DISCUSSION

Plaintiffs seek a preliminary injunction preventing the Forest Service from authorizing grazing on Chemult Pasture and North Sheep Pasture during the pendency of this action.  In response, the Forest Service has substantially limited the scope of grazing in the 2019 season, as discussed above.  The Government argues that, in light of the limited grazing authorized for 2019 and the safeguards to be implemented for that grazing, Plaintiffs cannot make the necessary showing of irreparable harm.

Plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely, rather than merely possible, to result in the absence of the injunction. *Alliance for the Wild Rockies*, 632 F.3d at 1135. "[S]peculative injury does not constitute irreparable injury." *Col. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir. 1985). Similarly, a preliminary injunction may not be issued "simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22 (internal quotation marks and citation omitted).

In their motion, Plaintiffs allege two distinct forms of irreparable harm flowing from the proposed grazing: harm to the Jack Creek OSF population and harm to the fens on the Allotment.

## I.    Harm to OSF

The original grazing plan would have opened new or previously closed areas of Chemult and North Sheep Pastures to grazing, potentially including OSF habitat along Jack Creek. The new grazing plan for 2019 limits the cattle to three exclosures and the Forest Service roads running between them. None of the exclosures contain OSF habitat and all three are located miles from the known OSF habitat in Jack Creek. Nevertheless, Plaintiffs argue that the OSF face the threat of irreparable harm from cattle trespass and unauthorized grazing.

Plaintiffs' concerns are not unfounded. There is evidence in the record of cattle trespass on the Allotment, including during the 2017 and 2018 seasons when the Forest Service was enjoined from authorizing grazing on Chemult Pasture. Simpson Decl. ¶¶ 16, 20, 23-28. ECF No. 10. The permittee also submitted a comment to the Forest Service during the EIS process in 2015, in which he complained about the difficulty of managing cattle on the Allotment in a deferred rotation system:

> Cows are not "herdable," particularly the livestock that utilize the allotment. The type of cows that do well on this type of allotment are not mild, pasture cows that would be easily herded. For example, they are wily cows and able to hide in the lodge pole/timber stands on the allotment to avoid even the most knowledgeable

and experienced riders on the allotment.   Further, water on this allotment is spread out.  Livestock spread out to reach these various water sources.

Pl. Mot. Ex. 31, at 5.  ECF No. 9-31.

Plaintiffs presented evidence and testimony during the hearing demonstrating that the fences surrounding the Cannon Well, Round Meadow, and Rider's Camp exclosures are presently in a state of disrepair.  It is also concerning that the Forest Service has already issued a notice of non-compliance to the permittee for failing to maintain the fence separating Chemult Pasture from the neighboring Tobin Pasture, although the failure was rectified by June 15, 2019.  Gov. Notice of Admin Dev.

During the hearing, Plaintiffs' experts testified that the cattle who graze on the Allotment are accustomed to follow their own trails to reach the most desirable forage and water sources and will not willingly walk along the Forest Service roads.  Plaintiffs' experts believe that if the cattle are driven along the roads, they will disperse at the first opportunity and potentially make their way to Jack Creek and the OSF habitat in search of water and forage.

In response, the Government points to safeguards the Forest Service has put in place to alleviate the risk of cattle trespass.  The Government acknowledged that the exclosure fences are currently in a state of disrepair and that the permittee has already been cited for non-compliance in 2019 for failing to repair and maintain fences elsewhere on the Allotment.   The permittee has committed to repairing the exclosure fences by July 8, however, and the Forest Service will inspect the exclosure fences before the permittee can turn out the cattle.  The Government represents that the permittee will not be allowed to release the cattle unless and until he receives the affirmative permission of the Forest Service.  The Government offered to submit the results of the Forest Service's fence inspection to the Court, as soon after the July 8 inspection as possible.

With respect to dispersal, the Government points out that there are substantially fewer cattle authorized to graze in 2019 than in the years preceding the 2017-2018 injunction.  The most recent letter from the District Ranger to the permittee memorializes that the cattle will be driven from one exclosure to another using multiple riders to ensure that no cattle disperse during relocation.  Gov. Second Notice of Admin. Dev.  The letters from the District Ranger also repeatedly stress that the Forest Service will be closely monitoring the conditions in the exclosures to ensure compliance with the terms of the grazing permit.

The Court takes Plaintiffs' concerns about the history of cattle trespass on the Antelope Allotment and the threat to the Jack Creek OSF seriously.  Nevertheless, the Court concludes that the Forest Service has imposed sufficient limitations and safeguards to render the risk to the Jack Creek OSF population speculative, rather than imminent, for the 2019 grazing season.  Accordingly, the Court concludes that Plaintiffs have not made a sufficient showing of likely, imminent, and irreparable harm to the OSF from the proposed grazing.

## II.    Harm to Fens

Plaintiffs also contend that the proposed grazing is likely to cause irreparable harm to the fens on Chemult Pasture.  Cattle grazing can damage fens by compacting the soil, removing vegetation, and by "nutrient enrichment owing to direct deposit of bovine fecal waste and urine," which alters competitive balances among fen plant species.  Second Dewey Decl. ¶ 5.  ECF No. 25.  During the hearing, Plaintiffs' experts testified that there are several high value fens located just outside the exclosures and that those fens will be damaged by cattle being driven to and from the exclosures.

Government expert Joseph Washington has been the Botany Program Manager for the Fremont-Winema National Forest since July 2014.  Washington Decl. ¶ 1.  ECF No. 21.  In

addition to his Declaration, Washington testified at the hearing concerning the fens in the three exclosures at issue.

The Round Meadow exclosure is approximately 400 acres and contains a single small fen of less than one acre. Washington Decl. ¶¶ 4, 6. The Round Meadow fen is in the far northwest end of the exclosure, 160 feet south of the north pasture fence. *Id.* at ¶ 6. Washington noted that the area would "likely receive minimal impact from livestock grazing due to its distant location, less desirable forage species, and main sources of water away from the fen." *Id.* There was some possibility that cattle would congregate near the fen, either following the greenline created by drainage from the fen to the central wetland area, or seeking relief from insects along the barren pumice at the nearby edge of the pasture. *Id.* Washington viewed the 2019 grazing season as an opportunity to evaluate the extent of livestock utilization of the Round Meadow fen, in order to determine if it is necessary to fence off the fen from the rest of the exclosure in future seasons. *Id.*

Cannon Well is a 44-acre exclosure. Second Goodwin Decl. ¶ 12. ECF No. 24. Washington reported that Cannon Wells contains a single "Low-Value" fen of "relatively low development that does not support any sensitive plant species." Washington Decl. ¶ 11. Washington did not recommend that the Cannon Wells fen be fenced off, "[u]nless further analysis indicates a higher value of the fen and trampling disturbance become[s] excessive[.]" *Id.* Plaintiff's expert, Dr. Richard Dewey, reported that Cannon Well contained three "small, inconspicuous fen communities," which are of particular interest because they "occupy the least wet portion of the fen wetness spectrum" on the Allotment. Second Dewey Decl. ¶ 11.

Rider's Camp, a 72-acre exclosure where the cattle will be rested during the trailing process, does not contain any fens. Washington Decl. ¶ 8; Second Goodwin Decl. ¶ 13.

Dr. Dewey reported that "[b]ased on my informal, but geographically extensive field observations, I believe that fen damage, especially soil damage, is additive over the years, and that such damage recovers in a timeframe of decades, if ever."   Dewey Decl. ¶ 66.  ECF No. 11.  Dr. Dewey opined that "[e]ven a single cow-calf pair in a single season will add incrementally to the enduring grazing-induced damage a given fen has already sustained."  *Id.*  However, Washington concluded that the effects of grazing are not "likely to be irreversible or significantly adverse to the fens at issue, principally because of the considerably small scale of authorized grazing in 2019, and protective measures in place to avoid such effects or correct them before the next grazing season through adaptive management."  Washington Decl. ¶ 12.

Although the Court acknowledges Plaintiffs' concerns about the potential for incremental harm to the Chemult Pasture fens from grazing, the Court concludes that the Forest Service has taken appropriate steps to mitigate that harm in the 2019 season.  With respect to the fens located outside of the exclosures, no cattle will be permitted on Chemult Pasture until the fences are repaired and inspected by Forest Service personnel.  The letters to the permittee memorialize that the cattle will be trailed using multiple riders while the cattle are moved from one exclosure to another, mitigating the risk of dispersal and harm to outside fens from trespassing cattle.

With respect to the fens located in Round Meadow and Cannon Well, the testimony at the hearing indicated that Forest Service personnel will be closely monitoring conditions in the exclosures, in addition to the monitoring done by the permittee.  While the cattle are not expected to be drawn to the fen areas inside the exclosures, Washington's Declaration affirmed that the Forest Service's monitoring is particularly interested in any use of the fen areas as part of the new adaptive management strategy.  The record indicates that the cattle will be removed once acceptable use levels are reached, including fen disturbance.  Under the circumstances, the Court

is satisfied that the Forest Service has taken appropriate steps to mitigate the risk of irreparable harm to the fens during the 2019 season.

As noted, the issuance of a preliminary injunction is an "extraordinary remedy," and is not to be undertaken lightly.  On this record, the Court cannot conclude that Plaintiff has made the necessary clear showing of irreparable harm in the absence of preliminary relief.  As such, the Court need not reach the other *Winter* factors.  *See Doe v. Reed*, 586 F.3d 671, 681 n.14 (9th Cir. 2009) (if a plaintiff cannot make a sufficient showing on one of the *Winter* factors, there is no need to address the remaining factors).  Plaintiffs' Motion for Preliminary Injunction is DENIED.

In making this ruling, the Court is cognizant of the long history of litigation concerning grazing on the Antelope Allotment and the significance of the Forest Service's new model for managing the Allotment's resources.  In response to Plaintiffs' motion, the Government and the permittee agreed to substantially reduce the grazing planned for the 2019 season, both in terms of the number of cattle and the areas to be grazed.  The full scope of the Forest Service's new adaptive management system is not, therefore, implicated by this motion.  Those issues will be resolved in the ordinary course of litigation, with the benefit of a full administrative record.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction, ECF No. 9, is DENIED.

It is so ORDERED and DATED this 9th day of July, 2019.

s/Michael J. McShane_____
MICHAEL McSHANE
United States District Judge