Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **CONCERNED FRIENDS OF THE WINEMA, KLAMATH-SISKIYOU WILDLANDS CENTER, WESTERN WATERSHEDS PROJECT, OREGON WILD,** and **CENTRAL OREGON BITTERBRUSH BROADS of the GREAT OLD BROADS FOR WILDERNESS,**<br><br>Plaintiffs,<br><br>v.<br><br>**DOUGLAS C. McKAY,** District Ranger, Paisley & Silver Lake Ranger Districts, Fremont-Winema National Forests, **BARRY L. IMLER,** Forest Supervisor, Fremont-Winema National Forests, **U.S. FOREST SERVICE**, **LAURIE SADA**, Field Supervisor, Klamath Falls Fish and Wildlife Office, and **U.S. FISH AND WILDLIFE SERVICE,**<br><br>Defendants. | Case No. 1:19-cv-516-MC<br><br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED** |

## MOTION AND CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs Concerned

Friends of the Winema, Klamath-Siskiyou Wildlands Center, Western Watersheds Project,

Oregon Wild, and Central Oregon Bitterbrush Broads of the Great Old Broads for Wilderness

hereby move the Court to enter Summary Judgment in their favor on all of the Claims for Relief

in their Complaint and to issue relief before the 2020 grazing season.  Summary judgment is

appropriate as these claims involve no genuine dispute of material fact and Plaintiffs are entitled

to judgment as a matter of law.  This motion is supported by the accompanying memorandum;

Declarations of Theresa Simpson, Jayne Goodwin, Dr. Dewey, and Paul Ruprecht filed in this

matter[1]; the administrative record; and such other material that may be presented to the Court.

Plaintiffs request oral argument on this motion as soon as is convenient for the Court after

briefing is complete on March 20, 2020.   Pursuant to Local Rule 7-1, the undersigned certifies

that the parties have conferred regarding the subject matter of this motion.

WHEREFORE, Plaintiffs request that the Court grant their Motion for Summary

Judgment.

Dated: December 20, 2019                    Respectfully submitted,

                               s/Elizabeth H. Potter
                               Lauren M. Rule (OSB #015174)
                               Elizabeth H. Potter (OSB #105482)
                               ADVOCATES FOR THE WEST
                               3701 SE Milwaukie Ave. Suite B
                               Portland, OR 97202
                               (503) 914-6388
                               lrule@advocateswest.org
                               epotter@advocateswest.org
                               Attorneys for Plaintiffs

---

[1] The Goodwin, Ruprecht, and Richter Declarations demonstrate Plaintiffs' standing.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM IN SUPPORT OF MOTION

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

    I.    Longstanding Conflicts Between Livestock Grazing and the Extraordinary
        Biodiversity within the Antelope Allotment ...................................................... 2

    II.   The Forest Service's Decision to Expand Grazing on the Antelope Allotment ........ 6

    III.  FWS's Revised Biological Opinion .................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.    THE NEW GRAZING SCHEME IS ARBITRARY
        AND VIOLATES NFMA AND NEPA ............................................................... 9

    II.   THE NEW GRAZING MANAGEMENT SCHEME
        IS INCONSISTENT WITH THE WINEMA FOREST PLAN ................................ 14
        A.  The Forest Service Relies on a Flawed Interpretation of its Forest Plan ....... 14
        B.  Grazing is Inconsistent with Range and Resource Standards ....................... 16
           1.  Irreconcilable conflicts with suitability, riparian, and soil directives.... 17
           2.  Inconsistencies with management effectiveness directives.................. 20
        C.  The Forest Service Failed to Ensure the Viability of Sensitive Species ........ 21

    III.  THE EIS FAILED TO TAKE A HARD LOOK
        AT THE IMPACTS OF GRAZING ................................................................... 24
        A.  The Agency Improperly Dismissed Reduced Grazing Alternatives .............. 24
        B.  The EIS Fails to Take a Hard Look at Climate Change ................................ 25
        C.  The EIS Includes an Inadequate Analysis of Impacts to Frogs ..................... 26

    IV.  THE BIOP IS ARBITRARY AND CONTRARY TO THE ESA ........................... 27
        A.  The BiOp's Jeopardy Analysis Remains Flawed. ...................................... 27
        B.  The BiOp Relies on Ineffective and Uncertain Mitigation Measures ........... 29
        C.  The BiOp Fails to Consider Effects of the Action Adequately ..................... 31
        D.  The ITS Includes a Flawed Surrogate for Take of Frogs ............................. 33

    V.   VACATUR AND CLOSURE OF THE
        WESTERN PASTURES IS WARRANTED ....................................................... 34

CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018) ........................................................................ 10, 14, 21

*Aqualliance v. U.S. Bureau of Reclamation*,
    287 F. Supp. 3d 969 (E.D. Cal. 2018) .......................................................................... 25

*Buckingham v. Sec'y of the U.S. Dep't of Agric.*,
    603 F.3d 1073 (9th Cir. 2010) .......................................................................... 14, 15

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) .......................................................................... 24

*Concerned Friends of the Winema v. U.S. Forest Serv.*,
    2016 WL 1063701 (D. Or. Sept. 12, 2016),
    *report and recommendation adopted*,
    2017 WL 5957811 (D. Or. Jan. 18, 2017) .......................................................... *passim*

*Ctr. For Biological Diversity v. U.S. Dep't of Interior*,
    623 F.3d 633 (9th Cir. 2006) .......................................................................... 24

*Ctr. For Biological Diversity v. Wagner*,
    2009 WL 2176049 (D. Or. June 29, 2009),
    *report and recommendation adopted*,
    2009 WL 2208023 (D. Or. July 22, 2009) .......................................................... 4

*Fed. Election Comm'n v. Akins*
    524 U.S. 11 (1998) .......................................................................... 34

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
    844 F.3d 1095 (9th Cir. 2016) .......................................................................... 14

*Hells Canyon Preservation Council v. Connaughton*,
    2012 WL 13047991 (D. Or. Aug. 10, 2012),
    *adopted in relevant part*,
    2013 WL 665134 (D. Or. Feb. 22, 2013) .......................................................... 13

*High Sierra Hikers Ass'n v. Weingardt*,
    521 F. Supp. 2d 1065 (N.D. Cal. 2007) .......................................................... 14

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) .......................................................................... 10, 34

*Idaho Sporting Cong. Inc. v. Alexander*,
    222 F.3d 562 (9th Cir. 2000) ................................................................ 35

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) (en banc) ............................................... 23

*N. Alaska Envt. Ctr. V. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ................................................................ 24

*Native Ecosystems Council v. Tidwell*,
    599 F.3d 926 (9th Cir. 2010) ................................................................ 21

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) .......................................................... 10, 16

*Natl. Wildlife Fed'n v. Natl. Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ....................................................27, 28, 33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    184 F. Supp. 3d 861 (D. Or. 2016) ....................................................... 29

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) ................................................................ 35

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .............................................................. 24

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009) .............................................................. 15

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ......................................................... 10, 25

*Or. Nat. Desert Ass'n v. Sabo*,
    854 F. Supp. 2d 889 (D. Or. 2012) ................................................*passim*

*Or. Nat. Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) .......................................................... 13, 14

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006). .............................................................. 14

*Or. Nat. Res. Council v. Allen*,
    476 F.3d 1031 (9th Cir. 2007) .............................................................. 33

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
    806 F.3d 520 (9th Cir. 2015) ............................................................... 34

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................. 29

*Save the Yaak Comm. v. Block*,
    840 F.2d 714 (9th Cir. 1988) ................................................................. 26

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011) ............................................................... 35

*Sw. Ctr. for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) ................................................................. 13

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
    878 F.3d 725 (9th Cir. 2017) ................................................................. 28

*W. Watersheds Project v. Abbey*, 719 F.3d 1035
    (9th Cir. 2013) .............................................................................. 15, 16

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ................................................................. 10

*W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-ELJ, 2011 WL 39651
    (D. Idaho Jan. 5, 2011) ........................................................................ 24

*W. Watersheds Project v. Salazar*,
    2011 WL 4526746 (D. Idaho Sept. 28, 2011) ........................................ 24

*W. Watersheds Project v. U.S. Forest Serv.*,
    2017 WL 551574 (D. Idaho Nov. 20, 2017) ...................................... 15, 22

*Wilderness Soc'y v. Thomas*,
    188 F.3d 1130 (9th Cir. 1999) ............................................................... 15

*Wild Fish Conservancy v. Irving*,
    221 F. Supp. 2d 1224 (E.D. Wash. 2016) .............................................. 32

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ........................................................... 27, 28

**Statutes**

5 U.S.C. § 706 ............................................................................................................ 34

16 U.S.C. § 1536 ................................................................................................. 27, 31

16 U.S.C §§ 1538 ..................................................................................................... 13

16 U.S.C. § 1540 ...................................................................................................... 13

16 U.S.C. § 1604 ................................................................................................. 14, 21

42 U.S.C. § 4332 ...................................................................................................... 24

**Regulations**

40 C.F.R. § 1500.1 ................................................................................................... 10

40 CFR § 1502.14 .................................................................................................... 24

40 C.F.R. § 1500.16 ................................................................................................. 10

40 C.F.R. § 1502.24 ............................................................................................ 10, 25

50 C.F.R. § 402.02 ................................................................................................... 31

50 C.F.R. § 402.14 .............................................................................................. 31, 33

**GLOSSARY OF ACRONYMS**

| | |
|---|---|
| AMP | Allotment Management Plan |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NFMA | National Forest Management Act |
| ROD | Record of Decision |

# INTRODUCTION

For more than ten years, the Forest Service authorized livestock grazing on the Antelope Allotment despite mounting evidence that it harmed the extraordinary biodiversity of a riparian oasis within the Fremont-Winema National Forest.  A highly imperiled population of Oregon spotted frogs and rare plants inhabit this area, which includes the highest concentration of fen habitat throughout Forest Service lands in the Pacific Northwest.  Fens and these species are highly vulnerable to activities like grazing that dry up aquatic habitat, which is becoming a more severe threat as effects from drought and climate change increase in the Klamath Basin.

This Court has repeatedly acknowledged such harm and the agency's struggle to manage grazing there, and twice ruled that the agency's decisions to authorize grazing were unlawful.  In response to those rulings, in 2018, the agency completed a long-awaited public planning process that was supposed to remedy these long-running conflicts and bring the agency into compliance with federal environmental laws.  Instead, the Forest Service's new management decisions double down on grazing, perpetuate past problems, and ignore scientific data and experts.

The agency's new Allotment Management Plan (AMP) opens thousands of acres of riparian areas that were long-protected from cattle grazing, and relies on ineffective and uncertain mitigation measures to manage cattle and protect natural resources.  This new grazing scheme is uneconomical and unmanageable, and it fails to protect riparian areas and sensitive species, making it inconsistent with the agency's National Forest Management Act (NFMA) duties.  It is also based on an Environmental Impact Statement (EIS) and Record of Decision (ROD) that are riddled with legal and scientific flaws.  Relatedly, the U.S. Fish and Wildlife Service's (FWS) new Biological Opinion (BiOp) suffers from serious shortcomings in its

analysis of grazing's effect on Oregon spotted frogs, and fails to correct the problems and concerns this Court previously found violated the Endangered Species Act (ESA).

Because the Forest Service's new grazing decisions and the FWS's new BiOp exacerbate scientific and legal problems, rather than fixing them, this Court should rule the new decisions are unlawful and vacate them before the next grazing season begins in summer 2020.

## STATEMENT OF FACTS

I.    **Longstanding Conflicts Between Livestock Grazing and the Extraordinary Biodiversity within the Antelope Allotment.**

For decades, the Forest Service authorized livestock grazing on the Chemult Pasture of the Antelope Allotment under a decades-old management strategy despite mounting resource conflicts.  AR 6595-96, 6740; AR 5928-29, 5934-35.  This allotment within the Fremont-Winema National Forest is dominated by dry pine forests and now encompasses more than 160,000 acres, but on its western pastures—Chemult and North Sheep—grazing occurs primarily on just a few thousand acres of riparian areas that contain a disproportionately high level of plant diversity.  AR 4999-5000, 5061; AR 5927, 5934-35.  Many species inhabit an "extensive and complex" network of springs and fens that took millennia to develop.  AR 4999-5000, 5934; AR 7213-39 (describing resources); AR 6025.  These unique wetland environments formed through "a unique confluence of hydrological, geological, and biological factors" that is "unprecedented in the Pacific Northwest" and supports "amazing biotic diversity."  AR 7238; AR 5934.

Cattle seek out these sensitive riparian areas and groundwater dependent ecosystems for water and forage during the dry summer and, once there, can quickly degrade resources by trampling vegetation, compacting soil, changing hydrologic or nutrient composition, and lowering groundwater levels that sustain fens.  AR 5028-29; AR 5100; AR 5947-5949; Pl. Ex. 11

at 11 (ECF No. 9-11).[2]  Even light grazing can cause degraded conditions to persist in fens,

which take decades to recover if they are ever able.  AR 5948-9; AR 6720; AR 7234, 7238.

Over the past several years, the agency and others have documented degraded conditions in fens,

other wetlands, and wet meadows that were subject to cattle grazing.  *See, e.g.*, AR 5001-02

(finding 7 of 8 fens in poor condition were open to grazing while 10 of the 11 fens in ungrazed

areas were in good condition), 5031-32; AR 5934-37; AR 4534-37; AR 7436-42, 7445-46; Pl.

Ex. 11 at 1-6; *see also* AR 6408-22, AR 7583-7584, AR 7586-7590 (illustrating damage).

These two pastures also support nearly all of the Forest's critical habitat for Oregon

spotted frogs—the most aquatic native frog species in the Pacific Northwest, which is listed as

threatened under the ESA.  AR 6745; FWS 5235, 5239.[3]  Frogs inhabit Jack Creek, which is

perennial in its upper reaches and then transitions to intermittent status as it flows seven miles

through the Chemult and the North Sheep pastures.  AR 5004; AR 6336; AR 6743-44.  Since the

discovery of this Jack Creek population in 1996, its size fell to just one percent of historic counts

in 2011 and remains at critically low numbers despite recently finding additional occupied

habitat in Jack Creek.  AR 8029, 8031; FWS 5240, 5249; AR 7613; AR 6740.  As a small and

isolated population, it is "acutely vulnerable" to stochastic events and fluctuating water levels

that affect specific habitat needs.  FWS 5239, 5271; AR 7879.

Dropping water levels—especially in intermittent or shallow habitat like that found in the

lower reaches of Jack Creek—concentrate frogs in fewer and smaller remnant pools, increasing

the likelihood of mortality from predation and stranding as pools dry up, and reducing the

---

[2] The administrative record excludes this report that was clearly before the agency at the time of decision.  For such documents, Plaintiffs cite to their own exhibits, most of which were submitted with their preliminary injunction motion. (Pl. Ex.).

[3] Both FWS and the Forest Service used "AR" as a prefix for their records, so Plaintiffs use the prefix "FWS" instead of "AR" for documents in the FWS record to prevent confusion.

availability of deep overwinter habitat.  FWS 5247, 5252; AR 7456-58, 7467-72.  Cattle grazing

in aquatic habitat further reduces water levels—as each cow can drink 15 to 20 gallons of water

per day—and degrades streambanks, water quality, and other habitat conditions upon which

frogs depend.  AR 5026-28; FWS 5246-53; AR 8037-38, 8042.  Cattle also trample, kill, and

disturb frogs of all life stages, especially as pools dry up during the grazing season.  AR 8045.

Cattle grazing has caused or contributed to such conditions and impacts within Jack Creek in

past years, causing or threatening harm to frogs.  *E.g.*, AR 7466-71; AR 7606-07.  These impacts

occurred even though cattle were not authorized to graze most of Jack Creek.  AR 4815-4817,

7203-04, 7205-06, 7208-7209, 7458-63 (examples of unauthorized use on Jack Creek).

Over the past decade, this Court has examined and discussed these unique resources and

grazing impacts in great detail through three previous lawsuits.  In response to the first lawsuit,

the Forest Service built a fence to exclude cattle from the middle portion of Jack Creek and

informed the court it was developing a new AMP to address grazing conflicts there.  *Ctr. For*

*Biological Diversity v. Wagner*, Civ. No. 08-302-CL, 2009 WL 2176049, at *4 (D. Or. June 29,

2009), *report and recommendation adopted*, 2009 WL 2208023 (D. Or. July 22, 2009).  The

Court found these promises mooted the plaintiffs' NFMA claims.  *Id*. at *14.

Discovery of many sensitive fen plants on the Chemult Pasture and continuing harm to

spotted frogs led to a second lawsuit in 2010.  *Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889

(D. Or. 2012).  In that case, the Court noted that cattle repeatedly breached the frog fence and

were found weekly "all along the excluded area" of Jack Creek, and also caused damage to fens

and sensitive fen plants.  *Id*. at 906.  Fences and orders failed to keep cattle out of Jack Creek,

and grazing each year caused "harm to sensitive plant and animal species and their habitat which

could be irreversible…."  *Id*. at 903–907, 923.  After ruling the agency violated NEPA and

NFMA by failing to analyze grazing's impacts on sensitive species, the Court expressed concerns about the "unique environmental resources" and expected the agency to complete its NEPA and AMP updates "in a timely manner" and seriously consider the public's concerns. *Id*. at 900, 920, 924-25. But despite this ruling and the Court's concerns, the Forest Service continued to authorize grazing on the Chemult Pasture under virtually the same conditions despite mounting resource conflicts and further trespass along Jack Creek in 2012 to 2015—all without completing a new AMP or NEPA analysis. *Concerned Friends of the Winema v. U.S. Forest Serv.*, Case No. 1:14-cv-737-CL, 2016 WL 10637010, at *2–4 (D. Or. Sept. 12, 2016), *report and recommendation adopted*, 2017 WL 5957811, at *2 (D. Or. Jan. 18, 2017).

These escalating problems led to another lawsuit where this Court found that the Forest Service violated NFMA—again—by authorizing grazing year after year without ensuring viable populations of sensitive species. 2016 WL 10637010, at *7–9. As a result, this Court enjoined the agency from authorizing grazing on the Chemult Pasture unless and until it could show grazing would not contribute to a negative trend in the species' viability. *Id*. at *9. The plaintiffs in that case also challenged a BiOp that FWS issued in 2015 to analyze the impacts of grazing on spotted frogs, and this Court agreed it was unlawful and ordered a new consultation. *Id*. at *15-16. Despite the injunction in 2017 and 2018, cattle again trespassed onto the Chemult Pasture and caused adverse impacts to Jack Creek and sensitive species, which exacerbated effects from continuing drought. AR 7210; Simpson Decl. ¶¶ 21, 24–28 (ECF No. 10.)[4]

Last summer, this Court re-examined these conflicts, acknowledging many of the impacts that cattle have on the pastures' unique resources, and the significant problems that arose under

---

[4] The Declarations of Ms. Simpson and Dr. Dewey are appropriate to consider when resolving Plaintiffs' request for relief. *Concerned Friends*, 2016 WL 10637010, at *15

the prior management scheme.  ECF No. 31 at 2-5, 9-10 (July 9, 2019).  Despite the narrow

scope and duration of grazing the agency authorized in response to Plaintiffs' lawsuit and motion

for preliminary injunction, long-standing management problems and resource conflicts persisted

during the summer of 2019.  The Forest Service and permittee failed to fulfill their promises to

this Court regarding fence maintenance, and Plaintiffs' experts documented resource damage in

the few areas that grazing occurred.  *Compare* ECF No. 22 *with* ECF No. 28-2 (notice of non-

compliance with fencing provisions after Plaintiffs notified court about fencing problems); Third

Decl. Dr. Dewey ¶¶ 4-15 (filed herewith); Third Decl. Ms. Simpson, ¶¶ 12-18 (filed herewith).

**II.    The Forest Service's Decision to Expand Grazing on the Antelope Allotment.**

To address these long-standing conflicts, the Forest Service initiated a NEPA process in

2010 to determine *whether* to reauthorize livestock grazing on the Antelope Allotment, but did

not issue a final EIS until November 2017.  AR 6573, 6596–99.  The EIS analyzed the impacts

of five alternatives: Alternative 1 proposed not to allow grazing; Alternative 2 proposed to

authorize grazing under past management standards; Alternative 3 proposed to expand grazing

into several riparian areas while shortening the Chemult Pasture's grazing season; Alternative 4

proposed to close the Chemult Pasture but continue grazing on the east side pastures; and

Alternative 5 proposed to open more riparian areas than Alternative 3 and maintain season-long

grazing on the Chemult Pasture.  AR 6611–6635, AR 6654-6849.

The agency finalized this NEPA process in May 2018, when it issued a Record of

Decision (ROD) rejecting all alternatives as described in the EIS and approving a new

management scheme that combined parts of alternatives 3 and 5.  AR 8096-97 (ROD); AR 8138

(AMP).  The AMP sets forth the final management scheme, which adds about 21,400 acres to the

allotment, making it 168,565 acres total, by expanding grazing into the North Sheep Pasture,

several riparian exclosures, and Jack Creek—all of which were protected from grazing for more than a decade. AR 6661, 6674, 8098, 8102, 8104, 8141-42. Grazing along Jack Creek will increase from one to seven miles, a *nearly twentyfold* expansion within frog habitat, from 27 to 525 acres; and grazing in fen habitat will increase from 372 to 555 acres. AR 6646, 6648, 6651.

The AMP allows 275 cow/calf pairs to graze on the Chemult Pasture and 494 cow/calf pairs to graze on the North Sheep Pasture under a deferred rotation system from July 1 to September 30—the same season under the old system—although dates may vary up to two weeks each year. *Compare* AR 8140 *with* AR 6616. In the newly open riparian exclosures, a "variable" number of cow/calf pairs may graze. *Id*. Up to 75 cow/calf pairs may graze behind the existing fence in the new Jack Creek Pasture, which will be divided into four riparian pastures where grazing's "location and duration may vary over time …" but will "likely" be just one month. AR 8141. Jack Creek pastures two and three will not be grazed until undefined "resource objectives" are met after unidentified restoration is complete, but pastures one and four will open immediately. *Id*. Late season grazing in occupied frog habitat will somehow be discouraged, even though the AMP allows grazing there for the entire season. AR 8140, 8147.

The AMP largely omits further details about the new scheme, explaining that herd number, size, and permitted dates for each pasture, meadow, or unit will vary each year. AR 8139. Future details will also depend on: construction, maintenance, or removal of 42.3 miles of fencing; maintenance, development, or reconstruction of 23 water developments; undefined restoration work in Jack Creek pastures; and monitoring and adaptive management. AR 8098; AR 8141-8142, 8146-47, 8151-56. But such work will take up to 6 years—more than half the permit term—and grazing in some areas will not occur until certain measures are done. AR 6329; AR 8141-8142, 8158; AR 5086. Annual monitoring includes forage utilization (no more

than 35% of forage can be grazed on key portions of the pastures), bank or soil alteration (no more than 20% bank alteration on Jack Creek and no more than 20% soil alteration in high priority fens and fenced areas), and a vague requirement to maintain "effective water levels to support" frogs.  AR 8153.  Monitoring ecological trends in Jack Creek will occur every 5-10 years and within high priority fens every 1-5 years.  AR 8153-54.

### III.    FWS's Revised Biological Opinion.

In the previous case, this Court found the 2015 BiOp lacked support for its conclusion that grazing is likely to kill only 3% of Oregon spotted frogs each year by trampling, ignored non-lethal impacts when estimating how many frogs would be harmed or harassed by cattle, and included insufficient support for using a 35% forage utilization standard to protect frogs. *Concerned Friends,* 2016 WL 10637010, at *9–16.  This Court vacated and remanded the BiOp for reinitiation of consultation and ordered FWS to address the problems and concerns identified in its order.  *Id*. at *15–16, *report and recommendation adopted*, 2017 WL 5957811, at *2.

In response, Defendants reinitiated consultation over the impacts of the new grazing scheme.  AR 7087.  In May 2018, FWS issued a new BiOp.  AR 8000.  The BiOp focuses on three categories of effects: 1) physical alteration of riparian areas and vegetation; 2) degradation of water quality and quantity; and 3) disturbance to frogs.  AR 8034–46.  As to the first, it stated: "[d]amage can begin to occur almost immediately upon entry of the cattle onto the streambanks, and use of riparian zones may be highest immediately following entry of cattle into a pasture…." AR 8036.  But it concluded that grazing would "maintain or improve system function" because cattle will distribute across the allotment and not impair riparian habitat.  AR 8040.  The BiOp next recognizes the significant impacts of poor water quality and quantity on frogs, noting that

water quantity in the area may be inadequate to support the frog.  But it relies heavily on the

Forest Service's adaptive management plan to mitigate the effects of grazing.  FWS 8041–43.

Under the last category, the BiOp admits that when cattle and frogs use the same pools,

cattle can trample frogs or cause them to flee, estimating that up to 13.5% of frogs will be killed

and that 24% will be harmed annually.  FWS 8043–45.  These estimates form the basis of an

Incidental Take Statement (ITS) that found "in most years" up to 484 juveniles/metamorphs and

up to 169 adult/subadult frogs in Jack Creek are likely to be harmed when they are disturbed by

cattle, and up to 273 juvenile/metamorphs and up to 95 adult/subadult frogs are likely to die from

trampling.  FWS 8060.  The BiOp determines this level of take would still allow the species "to

persist" and that grazing is not likely to extirpate frogs in the area.  FWS 8043–48, 60.

## ARGUMENT

Plaintiffs challenge the new Antelope Allotment EIS, ROD, AMP, and the Term Permit

for violating NEPA and NFMA.  Plaintiffs also challenge FWS's 2018 BiOp for violating the

ESA.  The Court should vacate and remand these decisions, and prohibit grazing on the Chemult

and North Sheep pastures until the Defendants issue new decisions that comply with these laws.

### I.     The New Grazing Scheme is Arbitrary and Violates NFMA and NEPA.

The Forest Service's decision to expand grazing into sensitive riparian areas is based on

four overarching justifications that are irrational and unsupported by the record.  The ROD uses

these justifications to reject all alternatives analyzed in the EIS and to adopt the new

management scheme as described in the AMP and Term Permit instead.  These challenged

decisions, and the underlying reports, all rely on those justifications to minimize grazing's

impacts and to comply with NFMA and NEPA.  AR 4546-48; AR 5033-35; AR 5106; AR 5035;

AR 5999; AR 6747; AR 7769; AR 8099-8109; AR 8140-41.  But those statutes demand more.

NEPA requires an agency to ensure it has carefully considered and disclosed the environmental effects of its decisions to the public. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011); 40 C.F.R. §§ 1500.1, 1502.24. An EIS must rely on accurate data and effective mitigation measures, and discuss adverse impacts without "improperly minimiz[ing] negative side effects." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011); 40 C.F.R. §§ 1500.1(b), 1502.16(h). NFMA requires the agency to show that its decisions are consistent with the applicable Forest Plan. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1113–14 (9th Cir. 2018). To determine whether the challenged decisions comply with these standards, the APA demands "a thorough, probing, in-depth review" to see if the agency made a "rational connection between the facts found and the conclusions made." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010).

By relying on the following four justifications that are unsupported and irrational, the challenged decisions—the ROD, EIS, AMP, and Term Permit—violated NFMA and NEPA.

First, the Forest Service assumes that by expanding grazing onto more acres in the Chemult and North Sheep pastures, cattle would disperse across a larger land base and cause lighter impacts on the Chemult Pasture than historically occurred. *E.g.*, AR 6619, 6668, 6720; AR 8102; AR 8140-41. But the agency lacks scientific or practical support for that assertion, which was contradicted by its own specialists. For example, the botany specialist explains that any such benefits from the system would "largely depend on how well livestock are distributed" but that it "is uncertain whether high or even dispersal of livestock across any of the pastures can be achieved and maintained, and if so, whether this will provide acceptable levels of disturbance compared to current conditions." AR 5962, 5964. Further undercutting this assumption, the

range specialist admits that cattle dispersal is often poor when cow-calf pairs are grazing and water sources are poorly distributed, especially during summer months, and that cattle tend to spend a disproportionate time in riparian areas—not spread out evenly across available land.  AR 5097, 5100.  Yet these are the conditions under which grazing will occur.  AR 8139-40; Pl. Ex. 31 at 3 (ECF No. 9-31).  Other specialists further admit: "every year livestock would continue to concentrate in riparian areas …."  AR 4546; AR 7899.  Moreover, ample evidence from the prior grazing scheme confirms that cattle concentrate in riparian areas.  *E.g.*, *Sabo*, 854 F. Supp. 2d at 906; AR 7462-63, 7605-7607 (chronic trespass in Jack Creek despite fences and agency orders).

Second, the Forest Service claims that implementing deferred rotation between the Chemult and North Sheep pastures will better distribute cattle and allow for regular rest of those areas, thereby minimizing impacts to resources.  *E.g.*, AR 6619-20, 6747, 6824-25; AR 8102-05; AR 8141.  But the permittee aptly explains why this system is bound to fail:

> A deferred rotation system is unattainable on the Chemult pasture.  The pasture does not have the infrastructure to support it, nor would we be able to maintain the infrastructure if it did.  Cows are not "herdable," particularly the livestock that utilize the allotment.  The type of cows that do well on this type of allotment are not mild, pasture cows that would be easily herded.  For example, they are wily cows and are able to hide in the lodge pole/timber stands on the allotment to avoid even the most knowledgeable and experienced riders on the allotment.  Further, water on this allotment is spread out.  Livestock spread out to reach these various water sources.  From an ecological perspective, the idea of a herded deferred rotation would be harmful as well.  The constant herding will increase hoof impacts, soil disturbance, dust levels, more intense use of water resources.  The general premise that a deferred rotation will improve conditions as a result of the deferral is unlikely to work because of the degree of heightened impacts.

AR 6438.  Shockingly, the agency provided no response to this comment.  *Id.*

Further undercutting this justification, the record is littered with inconsistent statements about how deferred rotation will be implemented.  AR 6747 (assuming a rotation between the pastures on a two-year schedule); AR 8046 (assuming a rotation schedule that rests the North

Sheep pasture once every three years); AR 5096 (assuming rotations will defer entry on a pasture by 15 days every other year); AR 7720 (stating rest will occur during the bulk of the season). But the AMP—which is the governing document the permittee must follow—requires none of that, and instead authorizes season-long grazing in both pastures without any enforceable requirement or explanation of when rest or rotations might occur. AR 8140. Making the timing even more uncertain, season-long grazing on the Chemult Pasture may not happen until the permittee provides additional fencing for the North Sheep pasture. AR 5086; AR 6329, 6620.

Third, the Forest Service asserts that its monitoring and adaptive management plan will minimize impacts and problems, but largely assumed, without support, that these measures would be effective. *E.g.*, AR 5962; AR 6702, 6704, 6706, 6726, 6824-25; AR 7772-73; AR 8105. Casting uncertainty on their efficacy, however, the agency did not commit to monitoring or ensuring compliance with standards, instead making the permittee ultimately responsible for doing so. AR 8151-52 (committing only to do so "as the opportunity arises" or "as possible"). The adaptive management plan allows multiple years of violations before excluding cattle from meadows, fens, or Jack Creek. AR 8154-55. Similarly, monitoring of most ecological trends will not occur for 5 or 10 years, leaving little time to respond under the permit term. AR 8153-54. Particularly problematic are the Jack Creek provisions, which include a vague requirement to maintain "effective water levels to support [frogs]" and an adaptive management plan that fails to specify who will ensure action is taken when required. AR 8153, 8155-56. Such mitigation was insufficient in the past and is unprotective of the species. *See infra* at 29-31.

Finally, the Forest Service claims the new management scheme would benefit Jack Creek and Oregon spotted frogs because the agency will assume management of 3,000 acres of the permittee's private lands. AR 6749, 6792-93; AR 7906; AR 8105-06; AR 8140. The agency

claims that failing to do so would lead to "heavy-extreme" grazing within the private inholdings, and thereby be worse for frogs.  AR 6650, 6666; AR 8015.  But this assumption fails to account for the fact that the ESA would prohibit grazing within occupied habitat on private lands given the high levels of mortality and injury that would be likely to occur there.[5]  *See* AR 8061-62 (estimating take in frog habitat).  The agency undermines its assumption by admitting that the impacts of not managing private lands are actually unknown; that it lacks baseline information about private lands on which to base its analysis; and that grazing would actually increase on private lands under the new scheme.  AR 5104, 5107; AR 6702, 6749, 6826; AR 7793-94.

By relying on these four justifications that are unsupported and contradicted by the record, the agency overstates the benefits of these management and mitigation measures and improperly downplayed the impacts of grazing.  These problems permeate the documents that analyze and authorize the new management scheme.  Thus, the agency fell short of its duty to ensure that its decisions are consistent with the applicable Forest Plan under NFMA.  *Concerned Friends*, 2016 WL 10637010, at *7–9 (finding agency must accurately describe grazing to show consistency with Forest Plan standard); *Hells Canyon Preservation Council v. Connaughton*, No. 3:11-cv-00023-PK, 2012 WL 13047991, at *12 (D. Or. Aug. 10, 2012), *adopted in relevant part*, 2013 WL 665134 (D. Or. Feb. 22, 2013) (concluding that the Forest Service's finding of "compliance with or satisfactory progress towards Forest Plan objectives" was arbitrary because it relied on "vague future mitigation measures").  The agency also violated its duties to disclose accurately the impacts of its decisions under NEPA.  *See Or. Nat. Desert Ass'n v. Jewell*, 840

---

[5] Without incidental take coverage under the challenged BiOp, the permittee may face criminal and civil liability under Section 9 of the ESA for grazing in such frog habitat unless it prepared a Habitat Conservation Plan and obtained its own take permit from the FWS, which would also have to ensure grazing did not jeopardize the species.  16 U.S.C §§ 1538(a)(1), 1540(a), (b); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 814 (9th Cir. 2001).

F.3d 562, 570–71 (9th Cir. 2016) (stating that mitigation measures are "not a panacea" for inadequate analyses in an EIS); *High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1084–88 (N.D. Cal. 2007); *cf. Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1109–10 (9th Cir. 2016) (EIS held to be sufficient because it "contain[ed] an adequate evaluation of the effectiveness of possible . . . mitigation measures").

## II. THE NEW GRAZING MANAGEMENT SCHEME IS INCONSISTENT WITH THE WINEMA FOREST PLAN.

The Forest Service's grazing decisions must be consistent with the standards, guidelines, and desired conditions in the governing Forest Plan. 16 U.S.C. § 1604(i); *Buckingham v. Sec'y of the U.S. Dep't of Agric.*, 603 F.3d 1073, 1077 (9th Cir. 2010); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006); *All. for the Wild Rockies*, 907 F.3d at 1110. The Chemult and North Sheep pastures on the allotment are governed by the Winema Forest Plan and its goals, objectives, and standards for range management, riparian areas, and other resources. AR 3230-3629 (Forest Plan); *Sabo*, 854 F. Supp. 2d at 915–17. But the Forest Service brushed off many of these requirements, and failed to demonstrate that the new grazing scheme—as authorized by the ROD, AMP, and Term Permit—is consistent with the Forest Plan.

### A. The Forest Service Relies on a Flawed Interpretation of its Forest Plan.

Another overarching flaw of the challenged decisions is that the Forest Service reached them by relying on an erroneous interpretation of the Forest Plan and governing law. The ROD explicitly rejects the no or reduced grazing alternatives from the EIS (Nos. 1 and 4) "because to not graze at this point is not consistent with Forest Plan direction or Congressional direction to provide grazing allotments on suitable lands." AR 8111-12. This assertion is wrong and undercuts the agency's entire decision-making process. Neither Congress nor the Forest Plan

*direct* the agency to allow grazing on all lands it deems suitable for grazing.  Moreover, the 1990

Forest Plan did not determine that the allotment is still suitable for grazing thirty years later.

First, NFMA and the Federal Land Policy and Management Act govern livestock grazing

management on federal lands, and such multiple-use statutes do not require the Forest Service to

authorize *all* potential uses on all acres of its lands.  *See Buckingham,* 603 F.3d at 1077 (agency

has "broad authority" to prohibit grazing on its allotments); *see also New Mexico ex rel.*

*Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 710–11 (10th Cir. 2009) (multiple-use does

not mean all uses on all lands).  Although regulations at the time required the Winema Forest

Plan to identify lands capable of and suitable for grazing, federal law does not demand that the

agency subsequently authorize grazing on all lands deemed capable and suitable in a Forest Plan.

*Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1135 (9th Cir. 1999); *W. Watersheds Project v. U.S.*

*Forest Serv.*, 2006 WL 292010, No. CV 05 189 E BLW, at *7 (D. Idaho Feb. 7, 2006) (land

designated as capable in a Forest Plan may become off-limits to grazing).

Second, the 1990 Forest Plan did not demand that grazing be authorized on the

allotments, instead stating only that they needed updated AMPs and lacked "reliable range

analysis data."  AR 3548; *see* AR 2306 (citing to 1982 analysis of Antelope Allotment and 1965

analysis of Jack Creek Allotment, which housed the North Sheep pasture).  Indeed, since those

prior analyses, conditions have changed significantly: boundaries are different; sensitive

resources were discovered; the Oregon spotted frog was listed as threatened under the ESA; and

drought, climate change, and management problems increased the severity of impacts to these

and other resources in past years.  AR 6596; *see supra* at 2-6 (history).  The agency cannot rely

on such outdated data to determine that the allotments are currently suitable for grazing.  *See W.*

*Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013) (finding that agency erred by

relying on old data without explaining how it was still accurate). Instead, the Forest Plan demanded that the agency consider the *suitability* of forage, among many other resource factors, before authorizing grazing. *E.g.*, AR 3492, 3547. Thus, rather than assuming that the entire Antelope Allotment is suitable for grazing as a precondition to its analysis, the Forest Service should have considered anew the suitability of the area for grazing based on current data and resource values. As explained below, these factors show that the Chemult and North Sheep pastures are unsuitable for grazing and inconsistent with numerous resource standards.

For these reasons, the Forest Service erred in determining that the Forest Plan and federal law mandated that the agency allow grazing on the Antelope Allotment, making the ROD and resulting decisions arbitrary. AR 8111-12; *see Native Ecosystems Council*, 418 F.3d at 964 (erroneous plan interpretation made decision unlawful).

**B.    Grazing is Inconsistent with Range and Resource Standards.**

Far from providing carte blanche to authorize livestock grazing on the Winema National Forest's allotments, the Forest Plan declares the following goal for future implementation of the range program: "[t]he demand for livestock grazing will be met *only* when it does not conflict with other uses." AR 3492 (emphasis added). Through AMPs that must be updated and implemented to meet such objectives, the agency "may" allocate forage to livestock that is in "excess" of vegetation and wildlife needs, but must set grazing levels and seasons based on factors such as: the "condition, suitability, and availability" of forage; "the permittee's ability to self-monitor management and maintenance"; soil stability; and wildlife needs. AR 3492, 3542, 3547. An AMP must also "provide for cost-effective management." AR 3547. AMPs must be consistent with a host of other Forest Plan directives such as: maintaining or improving soil productivity and stability, hydrologic conditions, and riparian habitat; maintaining or achieving

"good" forage condition; and controlling livestock to maintain or improve conditions in moist and wet meadows.  AR 3231-3235, 3486, 3496, 3553-55; *Sabo*, 854 F. Supp. 2d at 915–17.   The record does not show that the new grazing scheme is consistent with these standards.  Thus, the challenged decisions also violate NFMA for the following reasons.

   *1.  Irreconcilable conflicts with suitability, riparian, and soil directives*

  First, the record reveals that cattle grazing has degraded riparian areas on the Chemult Pasture—some of which already exceed Forest Plan standards—and that it is either likely or possible impacts and degradation will continue, especially within newly-opened riparian areas. Largely ignoring such evidence, the agency fails to articulate a rational explanation as to how the new grazing scheme is consistent with Forest Plan directives that demand the opposite.

  Under the new grazing scheme, cattle are likely to concentrate in riparian areas that comprise a fraction of the western pastures' 80,000 acres but contain *virtually all of the available forage*.  *E.g*., AR 5927, 5948; AR 4546; AR 6600 (90% of forage in riparian areas).  Once there, cattle can and will likely degrade riparian and soil conditions.  *E.g*., AR 5947-5949, 5999; AR 4546; Pl. Ex. 11 at 11.  This is particularly true for the 1,963 acres of fenced riparian areas, 498 acres of frog habitat, 183 acres of fen habitat, and 6 miles of Jack Creek that will be open to grazing for the first time in years.  AR 6646-51; *see*, *e.g*., AR 5033-34 (likely negative impacts to those parts of Jack Creek), AR 5971 (anticipating decreasing conditions in such fens); Pl. Ex. 11 at 11-12.  The agency even admits that "[e]xtreme levels of livestock trampling can easily occur in fens because they remain flooded or soil saturated during most or large portions of the grazing season…." and even light grazing can degrade fens and exceed standards.  AR 5949, 5999.

Such impacts have occurred when cattle have had access to fens and riparian areas, causing degraded conditions and exceedences of standards and desired conditions.[6] AR 5219 (soil standards exceedences in fens); AR 7602-05 (water table and soil standards exceedences in fens); AR 7436-7446; Pl. Ex. 11.  The agency admits the past grazing schedule was "not adequately protecting resource values to maintain and improve conditions."  AR 8112.  Further, "[t]he seven riparian areas not meeting Forest standards would continue to be impacted by cattle grazing."  AR 4548.  In addition to perpetuating such degradation, the new grazing scheme will "re-introduce[] trampling disturbances in six riparian exclosures and the North Sheep Pasture" along with Jack Creek, leading to "decreasing conditions" there.  AR 5964, 5971, 5999.

It is unclear how grazing in already-degraded areas is consistent with the Forest Plan standards to improve these areas, given that impacts there will continue.  AR 6816 (estimating hundreds of acres of detrimental soil conditions in riparian areas); AR 7708 (continuing impacts in riparian areas of concern); AR 5971 (5 of the 8 high-value fens accessible to cattle are not in good condition).  Further, most forage on the pastures is in fair or poor condition, raising questions about how continued or re-introduced grazing will not further degrade these conditions.  AR 5069-77 (poor conditions persisted in meadows with consistent cattle use).

Moreover, it is unclear how the new grazing scheme's allowance for up to 20 percent soil alteration within fens and fenced exclosures and 20 percent bank alternation will ensure compliance with the Forest Plan's requirement to maintain less than 10 percent disturbance for soils and streambanks in these areas.  *Compare* AR 8153 *with* AR 3617, 3233.  This is especially true as climate change and increasing drought are likely to exacerbate these impacts of grazing

---

[6] Desired conditions for fens include groundwater tables not below 20 cm for most of the year and less than 10% of the fen has bare peat, postholing, pedestalling, or areas of sediment deposition.  AR 6045.

within fens, springs, Jack Creek, and other riparian areas that are sensitive to dropping water levels.  Indeed, water tables have already dropped in fens as drought and cattle grazing impacts persisted.  AR 7235-7238; AR 7442-7446; AR 7602-7603.  But the agency largely ignored these issues.  AR 4992-5045 (failing to address climate change impacts in the hydrology report); AR 4517-4558 (same in soil report); AR 5924-6050 (same in botany report).

In light of this and other evidence, current and former agency experts and other scientists have opined that grazing poses unacceptable risks of harm to these areas and the species within. *E.g.,* AR 7451-52; AR 7613.  Remarkably, the agency's current botany expert concedes that grazing is not desired in wetland areas like fens, which the agency does not even consider "capable" of grazing.  AR 5948.  Additionally, the agency's longtime fen expert—Dr. Dewey— explained during his tenure "with the greatest sense of urgency" that grazing in fens may be "an indefensible management activity" and thus cattle should be permanently excluded there.  Pl. Ex. 15 (ECF No. 9-15).[7]  Jay Bowerman—a local scientist knowledgeable about Oregon spotted frog needs—criticized the agency's analysis of grazing's impact on frogs, and opined that the agency should not allow grazing in Jack Creek.  AR 6355-56; FWS 3632, 3747 (examples of credentials).  Other scientific opinions recommend that riparian areas not be grazed in summer or between mid-August and mid- September.  AR 5104; Pl. Ex. 28 at 2 (ECF No. 9-28).

The agency brushes aside this evidence that grazing is likely to degrade or perpetuate degraded conditions in riparian areas, relying on the four overarching justifications that are riddled with flaws.  *See supra* at 9-14*.*  In so doing, the agency fails to show that either pasture is suitable for grazing and that grazing there will maintain and improve riparian and soil values and not conflict with other uses, as required by the Forest Plan.  Thus, the agency violated NFMA.

---

[7] Notably, the agency must have ignored Dr. Dewey, as this document was not in the record.

### 2.   Inconsistencies with management effectiveness directives

Second, the Forest Service also failed to demonstrate that the new grazing scheme is "cost-effective" and reflects "the permittee's ability to self-monitor management and maintenance" for the allotment.  AR 3547.  The record, instead, reveals that the new grazing scheme is uneconomical and unmanageable, and therefore is inconsistent with the Forest Plan.

The new grazing scheme is not "cost-effective."  It relies heavily on fencing, deferred rotation, herding, and other measures that were the most expensive options considered.  *See, e.g.,* AR 8101-09; AR 8141-42, 8151-58; AR 6768.  The agency even admits it lacks the funding to implement the new AMP, and the permittee's share of costs appear uneconomical.  AR 6768, 6772-73; *see Sabo*, 854 F. Supp. 2d at 899 ("several miles" of new fencing makes grazing "unprofitable"); Pl. Ex. 31 ("adding more fences is time and cost prohibitive").  Further, the EIS reveals that the range management specialist has twenty-four other allotments to manage, raising serious questions about the agency's resources to oversee the pastures and this permittee.  AR 6772.  The agency stated that it need not "optimize cost effectiveness", but that statement does not explain how such an expensive management scheme is cost-effective.  AR 7801; AR 6527.

The new grazing scheme is also unmanageable.  As explained above, there are serious uncertainties about the efficacy and implementation of the management and mitigation measures.  *See supra* at 9-14.  Even the permittee admits the scheme is unworkable.  Pl. Ex. 31.  Given the permittee's extensive history of management problems and violations with a less-complicated scheme, the agency should have more thoroughly considered the permittee's ability to self-monitor and maintain such a complicated system.  *E.g.*, *Concerned Friends*, 2016 WL 10637010, at *2–3; AR 4703; AR 5054-58; AR 6440 (all examples of trespass and fencing problems).

Overall, the agency largely ignores this evidence and failed to explain rationally how the new grazing scheme is cost-effective and manageable, as required by the Forest Plan.  *All. For the Wild Rockies*, 907 F.3d at 1110, 1113 (rational explanation and support required).

### C.    The Forest Service Failed to Ensure the Viability of Sensitive Species.

Finally, the agency fell short of its duty under the Forest Plan to "maintain viable populations of all existing native …plant and animal species" by ensuring "the continued existence of the species throughout [their] existing range within the planning area."  AR 5925 AR 3527 (requiring habitat distribution to support viability "throughout their *existing range on the Forest*); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (NFMA "places a duty on the [agency] to 'provide for diversity of plant and animal communities based on the suitability and capability of the specific area….'" (quoting 16 U.S.C. § 1604(g)(3)(B))).

As an initial matter, the agency is wrong that it fulfilled this Court's order to correct NFMA violations by assessing the effects of *actual grazing levels* on the viability of sensitive species.  AR 8100; *Concerned Friends*, 2016 WL 10637010, at *9, 15.  The agency could not accurately describe and assess the effects of the *actual* levels of grazing that are likely to occur given the serious uncertainties about the scope and efficacy of management and mitigation measures.  The agency also relied on inaccurate and unsupported statements about what unauthorized grazing has occurred and is likely to occur.  *Compare* AR 6614 (only "7 occurrences" of past trespass) *with Sabo*, 854 F. Supp. 2d at 906 (noting trespass occurred weekly one season); *compare* AR 6620 (trespass would be "significantly" reduced under new scheme) *with see supra* at 9-14 (no support that measures to control cattle will be effective);

As for its viability analysis for frogs, the agency never explains how a "critically low" population that "is already below viability by any measure" can sustain the "significant" loss and

injury of hundreds of frogs each year and still increase to a viable size.  *Concerned Friends*, 2016 WL 10637010, at *8; *compare* AR 8046, 8061, 8077 (likely to kill or harm up to 264 of 853.5 adults/subadults and up to 757 of 2444 juveniles/metamorphs) *with* AR 8099-8100 (post-BiOp analysis fails to address such high losses).  This was a serious oversight given that the Jack Creek population is particularly vulnerable to drought and stochastic events, which could drive it to extinction.  FWS 5248-5250, 5264-66, 5271; AR 7470-71, 7474; AR 7891, 7879. Instead of addressing these critical issues, the ROD relies on arbitrary conclusions that are inconsistent with relevant data.  It first claims that grazing will occur on only a "distinct portion" of habitat across the Forest, even though the population inhabits nearly *all* critical habitat on the Forest, most of which will be grazed.  *See* AR 8099; AR 6745 (619 acres of critical habitat on the Forest, 522 in the project area, and 404 open to grazing).  Moreover, grazing that impacts the viability of a single population is inconsistent with maintaining viable populations *throughout* the species' range on the Forest.  AR 3527; *W. Watersheds Project v. U.S. Forest Serv*., No. 1:17-CV-434-CWD, 2017 WL 5571574, at *12–13 (D. Idaho Nov. 20, 2017).

The ROD next states that mitigation and management measures will minimize impacts to frogs, AR 8099-8100, but, as described herein, such measures are uncertain to occur or be effective.  *See supra* at 9-14; *see infra* at 29-31 (mitigation insufficient for frogs).  The ROD's final point—that grazing and restoration projects will benefit the species—is overstated.  AR 8099-8100.  Even if an "intermediate level of disturbance may be conducive to Oregon spotted frog habitat"—as the agency claims—such benefits may arise only "in some instances" where there is excess or invasive vegetation, which does not occur here.  *Id*.; FWS 5252-53; AR 8034 (limited invasive plants in Jack Creek); *see* AR 8040, FWS 5254 (studies showed cattle grazing

did not benefit frogs in other areas).  As for restoration, the ROD relies on undefined objectives and vague, future plans without identifying the resulting benefits for the species.  AR 8106.

As for other sensitive species that are likely to be impacted by grazing—including several sensitive plants and mollusks—the agency did not identify the size of the current populations, nor describe what population levels are needed to maintain their viability.  *See* AR 6679-86 (listing only the number of sites and acres where found); AR 5928-5933 (same).  Without such data, the agency could not rationally conclude that impacts to individuals will not impair the viability of rare plant and mollusk populations, whose viability is already a concern due to their listing as sensitive.  *See Concerned Friends*, 2016 WL 10637010, at *2.

Although the agency may use habitat as a proxy for a species' viability, here, the agency fails to identify "the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat."  *See Lands Council v. McNair*, 537 F.3d 981, 997–98 (9th Cir. 2008) (en banc), *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008).  Instead, the agency assumes that maintaining or improving habitat will suffice without describing the quantity or quality of habitat needed for viable populations.  AR 8100; AR 5993-98.  The agency never connects the dots between its admissions that grazing is likely to impact individual plants and its conclusion that such losses are not likely to impair viability.  *Id*.  It was unreasonable to conclude that grazing would ensure viable populations of fen-dependent species when even light levels can cause degraded conditions to persist or to arise in new areas.  Pl. Ex. 11 at 11; AR 5934-37, 5971.

For these reasons, the Forest Service's AMP, Term Permit, and ROD are arbitrary and inconsistent with viability standards in the Forest Plan and therefore violate NFMA.

## II.    THE EIS FAILED TO TAKE A HARD LOOK AT THE IMPACTS OF GRAZING.

To take a "hard look" an EIS must include a "reasonably thorough discussion" of significant effects. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) (citation omitted). In addition to the NEPA violations described above, the Forest Service also failed to take a hard look at the impacts of grazing by improperly dismissing alternatives and brushing aside effects of climate change and impacts to frogs.

### A.    The Agency Improperly Dismissed Reduced Grazing Alternatives.

An agency's consideration of alternatives is the "heart" of an EIS. *Ctr. for Biological Diversity v. U.S. Dep't. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010); 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14. An EIS must "*properly* reject proposed alternatives" by providing a rational explanation for their elimination. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978–79 (9th Cir. 2006) (emphasis added); 40 C.F.R. § 1502.14(a). As explained above, the Forest Service rejected the no and reduced grazing alternatives based on its erroneous interpretation of the law and the Forest Plan, incorrectly claiming it had to authorize grazing on all lands identified as suitable for such use. AR 8096, 8111, 8112. *See supra* at 14-16. Relying on such an invalid reason to reject an alternative action violates NEPA. *See W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 WL 39651, at *10 (D. Idaho Jan. 5, 2011) (dismissing alternatives based on a mistaken understanding of a land use plan was an error). *W. Watersheds Project v. Salazar*, No. 4:08-CV-516-BLW, 2011 WL 4526746, at *14 (D. Idaho Sept. 28, 2011) (law did not forbid no grazing).

**B.      The EIS Fails to Take a Hard Look at Climate Change.**

NEPA demands that an EIS disclose accurate and reliable data.  *N. Plains Res. Council*, 668 F.3d at 1086; 40 C.F.R. § 1502.24.  Here, the EIS violates NEPA by relying on old data and failing to take a "hard look" at how climate change will exacerbate grazing's effects.

First, in its meager three-page climate change analysis, the EIS cites increasing precipitation and decreasing temperature trends from 2000–2010, excluding seven subsequent years of data that do not support those weather trends.  *See* AR 6847-49.  Omitting that recent data obscured years of drought in the Klamath Basin that affected riparian areas and made impacts of grazing more harmful.  *E.g.*, *Concerned Friends*, 2016 WL 10637010, at *3 (increasing drought in 2014); AR 7469-72 (drought emergency and impacts to frogs).  The EIS's reliance on such stale data was arbitrary.  *N. Plains Res. Council*, 668 F.3d at 1086.

Second, the EIS arbitrarily dismisses public concern about climate change's impacts on water resources in the area, citing uncertainty and irrelevant claims that grazing decreases greenhouse gas emissions.  AR 6848-49.  The EIS admits snowpack will "very likely be reduced" due to climate change, but fails to connect the dots between reduced snowpack and habitat for frogs and fens.  *Id*.  Other than a few lines in another section, AR 6742, the EIS is devoid of information about the impacts of grazing when combined with climate change.  This was a serious error because climate change will likely increase drought conditions and temperature and decrease snowpack, which will exacerbate threats to frogs, fens, and other resources that depend on surface water and groundwater to survive arid summer conditions.  *See* AR 7236, 7238; AR 8033; FWS 5268-70; Pl. Ex. 11 at 11; AR 7880-81.  Such an inadequate analysis of grazing impacts added to climate change impacts renders the EIS arbitrary.  *Aqualliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1028–32 (E.D. Cal. 2018).

## C.     The EIS Includes an Inadequate Analysis of Impacts to Frogs.

The EIS's disclosure of impacts to frogs falls grossly short of the agency's duty to take a "hard look" at potential impacts.  Most notably, the EIS has virtually no discussion about direct impacts to frogs from the expanded grazing scheme that opens up miles of Jack Creek to cattle use, even though it recognizes the potential for trampling.  AR 6746-6748.  The agency mentioned the BA it was preparing under the ESA, but that was not final until after the EIS was issued to the public and thus cannot fulfill the agency's NEPA duties.  AR 6748; AR 6573 (EIS done Nov. 2017); AR 7087 (BA done Dec. 2017); *see Save the Yaak Comm. v. Block*, 840 F.2d 714, 718–19 (9th Cir. 1988) (BA prepared after NEPA analysis did not fulfill NEPA duties).

Further, the EIS improperly downplays impacts to Jack Creek in the newly-opened North Sheep pasture by claiming grazing will not impact the perennial parts of Jack Creek.  AR 6747.  But frogs—including newly-discovered breeding females—are *more* vulnerable to impacts in such intermittent waters, especially as pools shrink during the dry summer and are subject to grazing.  *E.g.*, AR 7467-68 (observations of cattle in intermittent pools trampling frogs and drinking pools dry).  *See supra* at 3-4.  Reliance on the outdated and flawed Wildlife Report does not save the EIS, particularly when that report fails to explain how the large quantity of mortality and injury to frogs caused by cattle will allow the critically low population to achieve viability.  *See supra* at 21-23.  The EIS also wrongly assumes that grazing will impact a small portion of frog habitat across the Forest and thus be insignificant.  AR 6745, 6748 (grazing will impact "a very small portion of suitable habitat across the Forest" despite grazing in 404 of 619 acres of the Forest's frog habitat).  Thus, the EIS fails to take a "hard look" at the impacts of grazing on frogs.

III.    **THE BIOP IS ARBITRARY AND CONTRARY TO THE ESA.**

To conclude ESA consultation over the effects of proposed actions on a threatened

species, FWS must issue a BiOp that evaluates the status of the listed species and the effects of

the proposed action, and determines if the action is likely to jeopardize the continued existence

of the species.  16 U.S.C. § 1536(a)(2); *Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 518–

519 (9th Cir. 2010).  If the proposed action will incidentally "take" a listed species by, *inter alia*,

harassing, harming, or killing any individuals, FWS must issue an ITS specifying the number of

takings expected and exempted from the ESA's prohibition on take.  *Id.*  Courts review BiOps

under the APA, and will set them aside if they are arbitrary or unlawful.  *Id*. at 521.

A.    **The BiOp's Jeopardy Analysis Remains Flawed.**

FWS must evaluate if a proposed action is likely to jeopardize the continued existence of

a listed species by considering impacts on the survival and *recovery* of that species.  *Nat'l*

*Wildlife Fed'n. v. Nat'l Marine Fisheries Serv.* ("NMFS"), 524 F.3d 917, 924, 931–33 (9th Cir.

2008).   The 2018 BiOp's jeopardy analysis perpetuates flaws in the 2015 BiOp.  *See Concerned*

*Friends*, 2016 WL 10637010, at *13, 15–16 (detailing flaws).

The 2018 BiOp estimates hundreds more frogs will be injured, killed, or harmed *each*

*year* than the 2015 BiOp did*,* yet did not provide a rational explanation for how the Jack Creek

population can survive or recover with such "significant" annual losses when it is already facing

an "overall decline" and is at critically low numbers.  *Compare* AR 8046-50, 8059-61, 8079 *with*

Pl. Ex. 27 at 49 (ECF No. 9-27) (old numbers)[8]; Pl. Ex. 28 at 1-2, 5 ("every adult is crucial" and

"[r]educing the population by just a few individuals could be significant").  Trying to dismiss

these numbers, the BiOp claims they are overestimates, which merely undercuts the accuracy of

---

[8] For unknown reasons, FWS did not include the 2015 BiOp in the administrative record.

the agency's own conclusion, without addressing the likely effect of so much take occurring each year.  AR 8045–47, 8058.  FWS needed to revise its jeopardy analysis—as this Court ordered— and explain how those high numbers of take allow for the survival and recovery of this small population.  *Concerned Friends*, 2016 WL 10637010, at *14; *see Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 737–39 (9th Cir. 2017) (arbitrarily excluding a rational explanation about the best available science).  But it failed to do so.

Instead, the 2018 BiOp concludes that grazing will not jeopardize the species because it will allow frogs to persist in Jack Creek.  AR 8045–46, 60.  But FWS fails to explain how such high levels of harm to frogs will allow for the population to persist, let alone recover.  Indeed, the longer a population remains small, the lower its chances of recovery.  *Wild Fish Conservancy v, Salazar*, 628 F.3d at 527 (the persistence of a local population ignores "how much longer it can hold on…" because "a species can often cling to survival even when recovery is far out of reach").  Relatedly, the BiOp does not discuss how the potential loss of the Jack Creek population would affect the survival and recovery *of the species as a whole*.  Grazing will further stress and reduce the size of this population, which is already at risk of extirpation due to its small size, isolation, and lack of genetic diversity, and increasing drought.  FWS 5248, 5271, 5285; AR 7879; AR 8026.  Loss of this unique population would further shrink the species' limited geographic range and genetic diversity, impairing its recovery.  AR 7612-13; FWS 5245, 5264-65; AR 4482 (Jack Creek population is "particularly important for the conservation of the species").  FWS's failure to discuss potential impacts to the recovery of the species renders the jeopardy analysis arbitrary.  *Nat'l Wildlife Fed'n. v. NMFS*, 524 F.3d at 924, 931–33.

### B.    The BiOp Relies on Ineffective and Uncertain Mitigation Measures.

The ESA requires mitigation measures relied on in a BiOp to be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Nat'l Wildlife Fed'n. v. NMFS*, 184 F. Supp. 3d 861, 901–02 (D. Or. 2016) (internal citations omitted).  Ignoring this standard, the 2018 BiOp improperly relies on mitigation measures that are uncertain to occur or will not address the threats to the species.  AR 8040, 8042–43, 8046–48.

First, the 2018 BiOp relies on 35% utilization and 20% bank alteration standards, AR 8035–36, 8058, which are not protective of the life history and habitat needs of Oregon spotted frog.  Simpson Decl. ¶¶ 32–39,[9] AR 7607-09.  This Court found that FWS's scientific support for the 35% utilization standard in the 2015 BiOp was "weak" because it did not tie the standard to Oregon spotted frog needs.  *Concerned Friends*, 2016 WL 10637010, at *10, 12, 14.  The 2018 BiOp again fails to provide that information for the 35% utilization standard, and also lacks similar support for the newly-added 20% bank alteration standard.  *Compare* AR 8035–36 *with* Pl. Ex. 27 at 35.  Instead, FWS simply cites studies that discuss the standards as useful for general riparian health, despite acknowledging that their connection to frogs is unclear.  FWS 173-176; *compare* FWS 657, 681, 701 *with* FWS 1003, 1027, 701, 1047 (requesting more explanation from the Forest Service but receiving an inadequate response).  Further, these standards will not prevent cattle from concentrating in and quickly harming specific areas that

---

[9] The Court should consider this declaration, which identifies factors the agency should have considered, and explains complex scientific information.  *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992–93 (9th Cir. 2014) (explaining the circumstances under which a court may consider material outside the administrative record when reviewing agency action).

are important for frog survival and recovery, such as breeding areas and intermittent pools. Simpson Decl. ¶¶ 35–39, AR 7608-10; AR 8025, 8037.  Therefore, FWS still fails to provide a rational explanation as to why the standards are protective of the species.

In fact, when Jack Creek experienced even lighter grazing use due to the frog fence, the frog population did not increase, demonstrating the utilization standards are not tied to frog needs and do not ensure stable population levels.  *See* AR 8031-32 (population hovered at low levels since grazing was excluded from most of Jack Creek in 2008).  Compliance with these standards is also uncertain to occur because the agency did not commit to monitor them, relying instead on a permittee who has failed to comply with management requirements in the past and indicates that impacts will be worse under the new scheme, which he describes as unachievable. *Compare* AR 8152-53 *with Concerned Friends*, 2016 WL 10637010, at *2-3; Pl. Ex. 31; ECF No. 28-1 (permittee failed to comply with requirements despite pendency of motion).

Second, the BiOp's reliance on the water level monitoring and adaptive management plan to address the serious threat from cattle congregating at the same remnant pools as frogs during low water conditions is equally flawed.  AR 8015 (this "significantly reduced or eliminated the potential for negative effects"), 8030, 8044–47, 8058.  The Plan calls for exclusion of cattle from Jack Creek "if field visits" determine that low water levels trigger such action, but does not state how often these visits must occur or even that the agency must conduct them.  AR 8015; AR 8152-53, 8156-57.  This was a serious error; frequent visits are necessary to monitor water levels, which can drop to critical levels quickly.  *See* AR 5133-34 (monitoring of "the depth and breadth of the pools on a weekly basis" during drought); Simpson Decl. ¶¶ 41–42, 49; Pl. Ex. 7 (ECF No. 9-7) at 6 (weekly monitoring in 2013), at 8-16 (recommending weekly monitoring).

Furthermore, the Plan's reliance on Pool D as a trigger to exclude cattle from the intermittent portion of the creek when the pool reaches 1.5 feet is flawed.  FWS 8015.  That pool is spring-fed and thus has more stable water levels, making it unrepresentative of other pools that can reach depths inhospitable for frogs when Pool D is still relatively high.  Pl. Ex. 29 at 1-2 (ECF No. 9-29) (Pool D at 1.4 feet, Pool A at ~6 inches); Simpson Decl. ¶¶ 43–48.  FWS requested additional justification for the use of Pool D, but the Forest Service did not include it in the BA.  *Compare* FWS 166 *with* FWS 1063.  And history shows remedial actions—excluding cattle with gates or fencing—are ineffective.  Simpson Decl. ¶¶ 50–51; *Concerned Friends*, 2016 WL 10637010 at *2–3; AR 7458-7463; AR 4965 (excess and trespass use in Jack Creek).

Relatedly, the BiOp's reliance on fencing and water troughs to control cattle and mitigate other effects of grazing is similarly unreasonable.  AR 8040, 8042–43, 8047, 8058.  Such measures have not prevented cattle from trespassing and harming riparian areas, despite orders for the permittee to herd cattle, maintain fences, and prevent trespass.  *See supra* at 4-5; Pl. Ex. 7 at 1-3, 17.  In 2013, biologists reported: "[u]npermitted grazing is having an effect on the amount of water in the pools" and causing other problems in Jack Creek.  Pl. Ex. 7 at 5.  The BiOp ignores this important *site-specific* evidence about past failure of these measures to protect Jack Creek and frogs, instead relying on the measures' supposed effectiveness to conclude that the impacts of the action will be minimal.  Because it is uncertain that mitigation will be implemented and effective, the BiOp's conclusions about the action's effects are arbitrary.

### C.      The BiOp Fails to Consider Effects of the Action Adequately.

The BiOp also omits important information and explanation necessary to assess the direct and indirect effects of the action, and fails to use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02, 402.14(h)(3), (g), 402.14(g).

First, the BiOp virtually ignores climate change, despite the significant risks posed by warmer temperatures and increasing drought. It admits climate change is "potentially" exacerbating the effects of habitat loss at a range-wide level, AR 8027, but never discusses what that means for this frog population when analyzing the effects of grazing. Despite admitting that drought has impacted frogs and is likely the most severe threat to the Jack Creek population, the BiOp does not discuss whether or how climate change will exacerbate the impacts of grazing on low water levels in Jack Creek during summer. AR 8028, 8040–43, 8044, 8047–48, 8051, 8058. This is a fatal flaw. *See Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233–34 (E.D. Wash. 2016) (inadequate climate change analysis rendered BiOp unlawful).

Second, the BiOp relies on the BA for the description of the proposed action, which omits key details—like when, where, and how many cattle will graze each pasture annually under the new system. AR 7101-7111; *see* AR 8140 (grazing details "may vary each year" in pastures, meadows, and units), 8141-42 ("the location and duration" of grazing in the Jack Creek Unit "may vary over time"). In particular, the BiOp claims benefits from rest in North Sheep one out of every three years—including lower levels of take—even though that schedule is not required in the AMP and is contradicted by other evidence in the record. AR 8046; *see supra* at 11-12. FWS raised such concerns when commenting on the draft BA, but the Forest Service failed to adequately address them. *Compare* FWS 104, 106-08, 111-12 *with* FWS 996, 998, 1000-02, 1005-06 (comparing comments on draft BA to revised BA).

The BiOp also ignores site-specific information about the history of grazing management problems on the Chemult Pasture and its effects on the Jack Creek population. Rather than considering actual impacts that have occurred and are likely to occur to Oregon spotted frogs and their habitat on the Chemult and North Sheep pastures, the BiOp relies on general studies that are

less applicable.  *Compare* AR 8042 (general studies say cattle limit time in riparian areas), 43-45 *with* AR 6824 (cattle will "continue to concentrate in riparian areas"), AR 06377 (evidence of cattle damage to Jack Creek despite upland water sources in 2014), AR 7467-68 (cattle in intermittent pools trampling frogs and drinking pools dry); *see supra* at 17-19.  These omissions prevented the BiOp from accurately assessing grazing's effects and the best available science.

Additionally, the BiOp asserts that the area meets the species' survival and recovery needs, but fails to explain how this is so when the population is at a fraction of historical levels, and has remained at low numbers for more than a decade.  AR 8029, 8030, 8034.  FWS arbitrarily downplays the population's precipitous drop by painting historical data as unreliable and non-reflective of "the most current distribution of frogs in the action areas."  FWS 1349.  FWS has no support for this position, which contradicts the FWS listing rule, and impermissibly writes off FWS's obligation to consider the recovery of the species to reach levels above their current distribution.  FWS 5244.  *Nat'l Wildlife Fed'n. v. NMFS*, 524 F.3d at 924, 931-33.  Moreover, biologists have expressed concerns about the ability of the population to hang on, especially in light of increasing drought and grazing impacts, which further calls into question the ability of the habitat to allow the population to increase.  Pl. Ex. 28 at 1; Simpson Decl., ¶¶ 61-63; AR 7613.  These key omissions show that FWS failed to consider all effects of the action.

### D.    The ITS Includes a Flawed Surrogate for Take of Frogs.

An ITS must include a trigger to identify when the level of authorized take is exceeded, thereby requiring reinitiation of consultation.  50 C.F.R. § 402.14(i)(4).  FWS can use a surrogate instead of a numerical value to identify when take is exceeded, but must articulate a rational connection to the taking of the species.  *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1037–38 (9th Cir. 2007).  This Court found that the 2015 BiOp applied an improper surrogate to

determine non-lethal take. *Concerned Friends,* 2016 WL 10637010, at *14–15. The 2018 BiOp

suffers from the same flaw despite using three surrogates: the 35% utilization standard, the 20%

bank alteration standard, or if >13.5% of frogs that are present in a pasture are trampled. AR

8062. None of these surrogates address a key threat and source of take—cattle causing

disturbance and displacement of juvenile or adult frogs, which can occur quickly or by just a few

cattle and before standards are met or frogs are trampled. AR 8037, 44-48; Simpson Decl. ¶¶ 51,

57-59; AR 7609. FWS estimates that up to 484 juveniles and 169 adults could be disturbed by

cattle each year, but provided no trigger to assess when that level of take would be reached.

Monitoring and conditions do not address adequately this threat, rendering the ITS unlawful.

## IV.    VACATUR AND CLOSURE OF THE WESTERN PASTURES IS WARRANTED.

If the Court finds for Plaintiffs on any of their legal claims, the presumptive remedy

under the APA is vacatur of any unlawful agency decisions. *See* 5 U.S.C. § 706(2) (a reviewing

court "*shall*…hold unlawful and set aside agency action" that is unlawful) (emphasis added).

*Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). Defendants bear the burden to show

that an exception to vacatur is appropriate in "rare" situations. *Humane Soc'y of U.S. v. Locke*,

626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Pollinator Stewardship Council v. U.S. Envtl. Prot.*

*Agency*, 806 F.3d 520, 532 (9th Cir. 2015). Thus, Plaintiffs need not show that injunctive relief

is necessary to preclude grazing on the western pastures during any remand.[10]

Nevertheless, out of an abundance of caution, Plaintiffs herein demonstrate that an

injunction is warranted to ensure grazing does not occur on the Chemult and North Sheep

---

[10] If the Court vacates the ROD, EIS, AMP, or Term Permit, Plaintiffs' injury should be
sufficiently remedied because the agency cannot allow grazing under the prior grazing scheme,
which the court enjoined due to NFMA violations. Similarly, if the Court vacates the BiOp, the
agency cannot allow grazing due to the ESA violations that would occur without a valid BiOp.

pastures and cause irreparable harm, and the balance of hardships and public interest weigh in their favor. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011); *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018) (explaining standards).

Grazing on the Chemult and North Sheep pastures threatens serious and long-lasting or permanent damage to the fragile resources therein.[11]  ECF Nos. 9-14.  This will be the first time that miles of Jack Creek in the North Sheep Pasture will *ever* be open to cattle grazing, and the first time in ten years that much of the rest of Jack Creek will be open to grazing.  Simpson Decl. ¶ 52.  The Jack Creek population of Oregon spotted frog is hovering at dangerously low levels, presenting an unacceptable risk of extirpation.  Third Simpson Decl. ¶¶ 3-11.  As for fens, grazing even at low levels for just a few weeks damages fens and sensitive riparian areas, as seen this summer, and such damage is long-lasting.  *Id*. ¶¶ 4, 12-19; Third Dewey Decl. ¶¶ 2-16; AR 7802.  In contrast, there will be limited commercial harm to one company that does not outweigh the widespread public interest in the extraordinary biodiversity here.  *Idaho Sporting Cong. Inc. v. Alexander,* 222 F.3d 562, 569 (9th Cir. 2000); *Concerned Friends*, 2016 WL 10637010 at *15.

For these reasons, the Court should vacate the Forest Service's AMP, EIS, ROD, and Term Permit, and FWS's 2018 BiOp, and hold that grazing is prohibited on the Chemult and North Sheep pastures until the Defendants correct the legal flaws described here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for Summary Judgment and order their requested relief.

---

[11] Plaintiffs' Preliminary Injunction Motion and supporting declarations, along with the Third Dewey and Simpson declarations demonstrate irreparable harm from the new scheme is likely.

Dated: December 20, 2019                     Respectfully submitted,


  s/Elizabeth H. Potter
  Lauren M. Rule (OSB #015174)
  Elizabeth H. Potter (OSB #105482)
  ADVOCATES FOR THE WEST
  3701 SE Milwaukie Ave. Suite B
  Portland, OR 97202
  (503) 914-6388
  lrule@advocateswest.org
  epotter@advocateswest.org

  Attorneys for Plaintiffs