Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **CONCERNED FRIENDS OF THE WINEMA, KLAMATH-SISKIYOU WILDLANDS CENTER, WESTERN WATERSHEDS PROJECT, OREGON WILD,** and **CENTRAL OREGON BITTERBRUSH BROADS of the GREAT OLD BROADS FOR WILDERNESS,**<br><br>                    Plaintiffs,<br><br>        v.<br><br>**DOUGLAS C. McKAY,** District Ranger, Paisley & Silver Lake Ranger Districts, Fremont-Winema National Forests, **BARRY L. IMLER,** Forest Supervisor, Fremont-Winema National Forests, **U.S. FOREST SERVICE, LAURIE SADA**, Field Supervisor, Klamath Falls Fish and Wildlife Office, and **U.S. FISH AND WILDLIFE SERVICE,**<br><br>                    Defendants. | Case No. 1:19-cv-516-MC<br><br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN SUPPORT OF MOTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    FEDERAL DEFENDANTS MISAPPREHEND BASIC APA PRINCIPLES ............... 2

II.   THE FOREST SERVICE FAILED TO CONNECT THE DOTS BETWEEN ITS
      CONCLUSIONS ABOUT IMPACTS OF THE NEW GRAZING SCHEME
      AND CONTRADICTORY EVIDENCE IN THE RECORD ........................................... 4

      A.  The Agency Ignored or Brushed Aside Relevant and Site-Specific Evidence
          Submitted by the Plaintiffs ........................................................................... 5

      B.  The Agency's Expanded Acreage and Rotation Justifications Ignore Evidence
          that Impacts on New Sensitive Acreage Will Persist or Worsen .............................. 7

      C.  The Record Does Not Show the Agency Evaluated and Demonstrated its
          Mitigation Measures Will Be Effective and Certain to Occur ................................... 10

      D.  The Agency Fails to Supports its Assumption that the Impacts on Private
          Lands will be Reduced. ................................................................................ 12

III.  THE RECORD DOES NOT SUPPORT THE FOREST SERVICE'S
      CONTENTION THAT THE NEW GRAZING SCHEME IS CONSISTENT
      WITH THE WINEMA FOREST PLAN AND NFMA .................................................. 13

      A.  The Agency Failed to Defend its Unlawful Interpretation ........................................ 13

      B.  The Record Does Not Support the Agency's Conclusion that Grazing is
          Consistent with Resource and Range Directives ...................................................... 14

      C.  The Agency Misapplies Applicable Precedent in its Viability Defense ................... 18

IV.   THE FOREST SERVICE OVERLOOKS KEY FLAWS IN THE EIS ......................... 22

      A.  The Agency Misled the Public About its Rejection of Alternatives ......................... 22

      B.  The Agency Continues to Discount Climate Change Impacts ................................... 23

      C.  The Agency Exaggerates the EIS's Analysis of the Impacts to Frogs ..................... 25

V.    FWS FAILS TO GRAPPLE WITH THE KEY FLAWS IN THE 2018 BIOP ............... 27

    A.  FWS's Circular Logic and Post-hoc Rationalizations Cannot Save the 2018
       BiOp's Flawed Jeopardy Analysis ................................................................. 27

    B.  FWS's Analysis of Climate Change and the Low Water Plan Was Flawed ............. 31

    C.  FWS Failed to Tie its Standards to the Frog and Evidence in the Record ............... 32

    D.  FWS Mounts No Real Defense of its Non-lethal Take Surrogate ........................... 33

VI.   FEDERAL DEFENDANTS FORFEITED THEIR OPPORTUNITY TO
     RESPOND TO PLAINTIFFS' REQUEST FOR RELIEF ............................................... 34

CONCLUSION ................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.,* 907 F.3d 1105
    (9th Cir. 2018) ............................................................................................ passim

*Cascadia Wildlands v. Bureau of Land Mgt.*, 410 F. Supp. 3d 1146
    (D. Or. 2019) ................................................................................................ 25, 26

*Cascadia Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979
    (D. Or. 2011) ................................................................................................ 22, 23

*Concerned Friends of the Winema v. U.S. Forest Serv.,* 2016 WL 10637010
    (D. Or. Sept. 12, 2016) ............................................................................... passim

*Ctr. for Biological Diversity v. U.S. Dept. of Int.,* 623 F.3d 633
    (9th Cir. 2006) ............................................................................................ 13

*Greater Yellowstone Coalition v. Timchak,* CV-06-04-E-BLW, 2006 WL 3386731
    (D. Idaho Nov. 21, 2006) ............................................................................ 22

*Inland Empire Public Lands Council v. U.S. Forest Serv.,* 88 F.3d 754
    (9th Cir. 1996) ............................................................................................ 18, 19

*In re Big Thorne Project*, 857 F.3d 968
    (9th Cir. 2017). ............................................................................................ 18, 19

*Lands Council v. McNair,* 537 F.3d 981
    (9th Cir. 2008) ........................................................................................passim

*Lands Council v. Powell,* 395 F.3d 1019
    (9th Cir. 2005*)* ................................................................................................ 6

*Lindberg v. U.S. Forest Serv.*, 132 F. Supp. 3d 1255
    (D. Or. 2015). ................................................................................................ 14

*Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29
    (1983) ..............................................................................................3, 10, 29

*N. Alaska Envt. Ctr. v. Kempthorne,* 457 F.3d 969
    (9th Cir. 2006) .............................................................................................. 22

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886
    (9th Cir. 2002) ................................................................................................ 7

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926
    (9th Cir. 2010) ....................................................................................3, 17, 19

*Nat. Resources Def. Council v. U.S. Forest Serv*., 421 F.3d 797
    (9th Cir. 2005) .............................................................................................. 22

*Nat'l Wildlife Fed'n v. NFMS,* 524 F.3d 917
    (9th Cir. 2008) .............................................................................................. 27

*Nat'l Wildlife Fed'n v. NMFS*, No. 3:01-CV-00640-SI, 2015 WL 423090
    (D. Or. Feb. 2, 2015) .................................................................................... 33

*Nat'l Wildlife Fed'n v. NMFS,* 184 F. Supp. 3d 861
    (D. Or. 2016) ..........................................................................................29, 32

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067
    (9th Cir. 2011) .............................................................................................. 24

*Okanogan Highlands All. v. Williams,* 236 F.3d 468
    (9th Cir. 2000) .............................................................................................. 11

*Organized Village of Kake v. U.S. Dept. of Agric*., 795 F.3d 956
    (9th Cir. 2015) ..........................................................................................10, 12

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092
    (9th Cir. 2010) ................................................................................................ 3

*Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889

(D. Or. 2012) ................................................................................................ 6, 11

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562
    (9th Cir. 2016) ........................................................................................ passim

*Or. Nat. Res. Council v. Allen,* 476 F.3d 1031
    (9th Cir. 2007) ................................................................................................ 34

*Oregon Wild v. BLM*, 2015 WL 1190131
    (D. Or. March 14, 2015) .................................................................................. 34

*Oregon Wild v. Cummins,* 239 F. Supp. 3d 1247
    (D. Or. 2017) .................................................................................................... 25

*Ramirez v. City of Buena Park*, 560 F.3d 1012
    (9th Cir. 2009) .......................................................................................... 13, 34

*Save the Yaak Comm. v. Block*, 840 F.2d 714
    (9th Cir. 1988) ................................................................................................ 26

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810
    (9th Cir. 2001) ................................................................................................ 12

*Woodford v. Ngo*, 548 U.S. 81
    (2006). .............................................................................................................. 14

*WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208
    (D. Or. 2019) .................................................................................................... 14

*W. Watersheds Project v. U.S. Forest Serv.,* No 1:17-CV-434-CWD, 2017 WL 551574
    (D. Idaho Nov. 20, 2017) ................................................................................ 21

*W. Watersheds Project v. U.S. Forest Service*, 780 F. Supp. 2d 1115
    (D. Idaho 2011) ........................................................................................ 10-11

**Statutes**

16 U.S.C. § 1539 ...................................................................................................... 12

**Regulations**

36 C.F.R. § 218.14 .................................................................................................... 14

50 C.F.R. § 17.22 ...................................................................................................... 12

50 C.F.R. § 402.02 .................................................................................................... 30

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| AMP | Allotment Management Plan |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NFMA | National Forest Management Act |
| ROD | Record of Decision |

## INTRODUCTION

After more than a decade of conflict, Federal Defendants have fallen short of their duty to bring federal management of cattle grazing on the Antelope Allotment into compliance with bedrock environmental laws.  The Forest Service argues that NFMA requires it to balance multiple uses on our public lands, but the agency actually rejected the alternative that proposed to balance the permittee's commercial needs with those of the public.  Rather than adopting an alternative that may remedy chronic grazing impacts, the agency chose an alternative that *expands* grazing in sensitive areas and will *exacerbate* past conflicts and management problems. The agency defends this decision by arguing that this Court must provide "strong deference" to the government's "predictive judgment" about grazing's impacts and its conclusions.  But the APA does not allow such rubber-stamping: deference is only warranted if the agency's justifications are supported by substantial evidence and rational explanations *in the record*.

Here, a careful review of the record reveals that the Federal Defendants fell short of this standard.  The government claims that the new grazing scheme will reduce impacts compared to the status quo, but fails to show where in the record it grappled with ample evidence and scientific opinions that cattle—even just a few—harm fens, wetlands, Jack Creek, and soils and thus will lead to greater impacts in newly-opened areas and continued harm on the Chemult Pasture.  The agencies also brush aside evidence that the new scheme is prohibitively expensive and unworkable; will take years to implement and does not ensure meaningful change during the permit's term; and that it relies on mitigation measures that are known to be ineffective on this rough and remote allotment.  Rather than connecting the dots between such evidence and their conclusions, the agencies inappropriately try to hide behind a curtain of deference.

Overall, the Federal Defendants' brief, like their administrative records, fall short of showing that the challenged decisions—the ROD, EIS, AMP, Term Permit, and 2018 BiOp—are rational and consistent with substantive standards. Thus, the Court should find unlawful and vacate the challenged decisions and restore the status quo of no grazing on the Chemult and North Sheep pastures to protect the resources and people who rely on those extraordinary areas.

## ARGUMENT

## I.    FEDERAL DEFENDANTS MISAPPREHEND BASIC APA PRINCIPLES.

Throughout the government's brief, it overstates the discretion it has to determine how to "balance" various uses of public lands and comply with bedrock environmental laws. Def. Br. at 15, 25, 30, 35, 47–48, 52, 59, 60. For example, the Forest Service claims it is due "strong deference because grazing management is within the [agency]'s field of discretion and expertise" based on a seminal Ninth Circuit decision. Def. Br. at 15 (citing *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)). But *Lands Council v. McNair* does not stand for the sweeping proposition that courts afford "strong deference" to the agency's "predictive judgments" under all circumstances. Instead, that decision undermines many of the agency's positions in its brief.

In *Lands Council*, the Ninth Circuit en banc overturned *Ecology Center v. Austin*, 430 F.3d 1057 (9th Cir. 2005), a decision that held the Forest Service must *always* verify its scientific methodology through on-the-ground analysis. 537 F.3d at 991. *Ecology Center*, the Ninth Circuit reasoned, had failed to "grant appropriate deference to an agency" by dictating how the agency must do its job. *Id.* at 992–93. But the court did not give unfettered deference to agency conclusions, instead reaffirming bedrock APA principles that require a court to:

> look to the evidence the Forest Service has provided to support its conclusions, along with other materials in the record, to ensure that the Service has not for instance, "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter

to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Id*. at 993 (alteration in original) (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).  The court then clarified that the agency "*must explain the conclusions* it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable."  *Id*. at 994 (emphasis added).  Those explanations must be in the record—not in a post-hoc explanation during litigation.  *State Farm*, 463 U.S. at 50.  Far from suggesting an expansive view of deference, *Lands Council* instructed courts to "determine whether deference is warranted" by looking "to the sufficiency of the evidence…."  *Id*. at 995.

Indeed, after *Lands Council*, the Ninth Circuit and this Court have overturned Forest Service decisions when administrative records did not support the agency's ultimate conclusions, failed to address contradictory evidence, and lacked explanations that the agency relied on in litigation.  *See, e.g., All. For the Wild Rockies v. U.S. Forest Serv*., 907 F.3d 1105, 1113, 1116–17 (9th Cir. 2018) (finding decision lacked a rational explanation for the agency's conclusions in the record); *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 935 (9th Cir. 2010) (finding the agency did not consider contradictory evidence); *Concerned Friends of the Winema v. U.S. Forest Serv*., No. 1:14-cv-737-CL, 2016 WL 10637010, at *9 (D. Or. Sept. 12, 2016) (finding agency failed to provide "rational support" for ignoring evidence); *see also Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (courts "cannot defer to a void").

*Oregon Natural Desert Association v. Jewell* is particularly relevant to the government's repeated attempts here to brush aside contradictory evidence by pointing to their ultimate, generalized conclusions.  Def. Br. at 17, 30–31, 38, 49.  In *Jewell*, the Ninth Circuit considered a challenge to an EIS for an industrial wind project on Steens Mountain where impacts to sage grouse were "by far the most significant concern" to the public.  *Or. Nat. Desert Ass'n v. Jewell*,

840 F.3d 562, 566–67, 569 (9th Cir. 2016).  The agency lacked data showing if sage grouse overwintered in a key location, so it relied on available data from a nearby area to conclude that grouse were absent during the winter.  *Id*.  Rather than deferring blindly to that conclusion, the Ninth Circuit found the record included contrary data that "greatly undermine[d] the validity" of the agency's assumption of the bird's absence, and that when taken as a whole, indicated the agency should have reached the "contrary assumption" *Id.* at 569–70.  In so doing, the court rejected the agency's call for "special deference" where its scientific analysis was based on "inaccurate information and [an] unsupported assumption." *Id*. at 570.

As in those cases, the Court should reject the Federal Defendants' call for heightened deference and instead determine whether the record includes rational explanations that support the agencies' conclusions and address contrary evidence.  A careful review of the record and other evidence before the agencies reveals those explanations are lacking, and the agencies thereby fell short of their duties under NFMA, NEPA, and the ESA.

## II.    THE FOREST SERVICE FAILED TO CONNECT THE DOTS BETWEEN ITS CONCLUSIONS ABOUT IMPACTS OF THE NEW GRAZING SCHEME AND CONTRADICTORY EVIDENCE IN THE RECORD.

To defend its four overarching justifications in the ROD, EIS, AMP, and Term Permit, the Forest Service rattles off a number of disjointed points and rehashes its general conclusions that the new grazing scheme will improve management and decrease impacts.  Def. Br. at 15–24.  But none of those points show that the agency explained, rationally and in the record, how contradictory evidence and scientific opinions did not undermine these justifications.  *See Lands Council*, 537 F.3d at 994 (requiring agency to "*explain the conclusions* it has drawn" and its "reasons" for relying on evidence).  Rather, the record shows that the agency should have reached the *opposite* conclusion when predicting its impacts: that expanding grazing into

sensitive areas would continue and increase—not lessen—problems and impacts across the

pastures compared to the status quo.  Plf. Br. at 1–6, 9–13, 17–19 (collecting evidence).  As in

*Jewell*, the Court should find this was a serious error and inconsistent with the agency's duties

under NEPA  840 F.3d at 570.  Similarly, these shortcomings undermine the agency's conclusion

that the new grazing scheme is consistent with the Winema Forest Plan.  Plf. Br. at 16-17

(identifying applicable direction); *see All. For the Wild Rockies*, 907 F.3d at 1113–16 (finding

lack of a rational explanation about NFMA consistency was arbitrary).  Accordingly, the Court

should find that the challenged decisions are arbitrary and violate NEPA and NFMA.

A.      **The Agency Ignored or Brushed Aside Relevant and Site-Specific Evidence Submitted by the Plaintiffs.**

For more than a decade, Plaintiffs and their members have spent incalculable time and

resources exhaustively raising their concerns and submitting evidence to the government about

the impacts that grazing has caused and will continue to cause on this cherished landscape.  Plf.

Br. at 2–8, 17–20; AR 7284–85 (listing comments over several years); *Concerned Friends of the

Winema v. U.S. Forest Service*., No. 14-737-CL, ECF No. 91 ¶ 1-22 (March 3, 2016) (detailing

fifteen times a group and its ninety-year old president with deep connections to the allotment

communicated with the agency between 2011 and 2014).  Through these and other submissions,

Plaintiffs shared the extensive knowledge about the ecological conditions that they and their

experts have amassed through decades of collective experience—which is particularly important

given the agency's significant turnover in personnel and expertise.  AR 7177; AR 4702.

For example, Jayne Goodwin has spent thirty-five years connected to this beautiful

ecosystem, including twenty as a Forest Service employee and countless time since engaging the

agency through field trips, comments, monitoring, and more.  ECF No. 12 at ¶ 3, 5, 7–14, 17–21,

25, Ex. A ¶¶ 8–26 (detailing her professional and personal experience and observations).

Similarly, Ms. Simpson—who spent twenty-one years as the Forest Service's wildlife biologist and worked extensively on the allotment—has provided countless reports, declarations, and other data to the agency that detail the harm and threats from cattle to frogs, fens, and aquatic resources. *E.g.*, AR 7424–7483, 7601–7614 (detailing her opinions and professional experience and referencing dozens of observations and scientific and agency reports in 2014 and 2016).[1]

Dr. Cummins—who has forty years of distinguished academic and professional experience as a geologist—has studied the area's groundwater-dependent ecosystems, presented his research to the agency, and explained he has "never before encountered such a unique and extensive" hydrogeologic system, which once disrupted is "very unlikely to return." AR 7213–7239, ¶¶ 3–16, 50, 67–70. Dr. Dewey—who spent more than twenty years as a botanist for the Forest Service—has led a long-term study of this unique fen system within the Chemult and North Sheep pastures, provided resulting reports to the agency, and recommended during the NEPA process "with the greatest sense of urgency" that the agency determine grazing in groundwater dependent ecosystems is an indefensible management strategy. ECF Nos. 11, 15.[2]

But instead of seriously considering the Plaintiffs' concerns, expertise, and evidence—as this Court has previously instructed the agency to do—it brushed them aside and ignored much of the evidence they submitted. *Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 900 (D. Or. 2012) (expecting "serious consideration of the views of plaintiffs and other concerned groups

---

[1] AR 7339–7423, 7582–7584, 7585–7590, 7593–7600—exhibits to her declaration—show the incredible level of detail from on-the-ground monitoring with which she supports her opinions.
[2] Dr. Dewey's declaration summarizes his background and research, which the agency relied on in numerous parts of the record and posted to its sensitive species website. AR 6676, 6699; AR 6004–05; ; Interagency Special Status /Sensitive Species Program (ISSSSP), Inter-Agency Pacific Northwest (Oct. 6, 2014), https://www.fs.fed.us/r6/sfpnw/issssp/species-index/flora-vascular-plants.shtml. Thus, the Court should consider it. *See Lands Council v. Powell,* 395 F.3d 1019, 1029–30 (9th Cir. 2005) (allowing evidence to explain technical data).

and citizens"); AR Index (apparently excluding many of comments discussed above along with other information—*e.g.*, Plf. Ex. 7–11, 13, 15, 16–17, 29, which include monitoring, reports, and emails that were before the agency); *see Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002) (finding agency did not consider information was excluded from the record). Yet the government did not explain whether this evidence was wrong or irrelevant or why it refused to consider it when reaching its decisions.  The Forest Service also refused to provide Plaintiffs with an objection-resolution meeting—a "very valuable" tool for understanding and resolving the public's concerns—and instead mailed them curt three-page responses to their objections.  *See* AR 7811–19 (letters); AR 7820–23 (describing flaws in process); 78 Fed. Reg. 18481, 18488 (March 27, 2013) (importance of such meetings).  Rather than investing the time necessary to address such public concerns, the record indicates the Federal Defendants were focused on the permittee's needs.  *See* FWS 892 (FWS supervisor explaining "we want to do everything possible to make sure the permittee" can graze on time); AR 7085–86 (pressure to issue decision in time for grazing).  Thus, the agency is wrong that Plaintiffs' engagement fell short and that the record includes adequate information. Def. Br. at 15, 26–27, 42–43.

### B.    The Agency's Expanded Acreage and Rotation Justifications Ignore Evidence that Impacts on New Sensitive Acreage Will Persist or Worsen.

The Forest Service touts the benefits of its expansion into sensitive riparian areas, claiming it "would result in greater dispersal of cattle and lighter impacts than the status quo." Def. Br. at 15–16.  But this defense continues to ignore ample evidence showing the opposite: that impacts will largely worsen or continue, especially in the fens, wetlands, and riparian areas that will be open to grazing for the first time in more than a decade.  Plf. Br. at 10–12, 17–19.

Digging past the agency's general conclusions reveals its specialists predicted *increasing* impacts within the 20,000+ acres that will be newly open to grazing.  *See* AR 8140 (North

Sheep, Jack Creek, and riparian acres).  For example, the botany specialist found that "re-introducing trampling disturbances in six riparian exclosures and the North Sheep Pasture", as well as within the Jack Creek exclosure, will lead to "decreasing conditions" there, with a "particularly high potential of adverse effects" in Squirrel Camp, Dry Meadow, and Cannon Well exclosures.  AR 5971, 5999.[3]  Other specialists predicted that impacts in the newly-opened areas will increase.  *See*, *e.g.*, AR 5033–34 (anticipating negative impacts along Jack Creek); AR 4548 (expecting adverse effects in North Sheep).  Contrary to the agency's post-hoc assertions, Def. Br. at 17, a few general conclusions do not rationally address such contrary evidence.

Moreover, other evidence before the agency confirms impacts will likely increase in newly-opened areas.  In 2013, Ms. Simpson made at least sixteen trips to the allotment during the grazing season and observed cattle trespassing in fenced exclosures, on Jack Creek, and within the North Sheep pasture[4] and found cattle were, *inter alia*: concentrating in and drinking remaining pools in Jack Creek until they went dry, "tearing up stream banks",  "perpetuating soil damage" in a fen, and significantly harming frogs.  AR 7467–68.  During 2013, cattle were not authorized to be in those locations, so cattle numbers and use would have been significantly less than what is authorized under the new scheme.  *See* AR 7205–06 (confirming unauthorized use in 2013); AR 8140 (allowing up to 494 pairs in North Sheep and 75 pairs in Jack Creek during July–August); *see also* Plf. Ex. 7 at 5–6 (agency biologist finding unpermitted grazing was affecting Jack Creek frog habitat then).  This harm is consistent with science showing that even a few cattle can damage resources quickly and under light use.  *E.g.*, AR 6691 (explaining

---

[3] The Forest Service claims the impacts described under Alternative 3 are not accurate because the final selected alternative combined Alternatives 3 and 5.  Def. Br. at 24. If that is true, then the agency must complete new specialist reports and a supplemental EIS to accurately reflect and disclose the true impacts of the final selected alternative.
[4] It was called Jack Creek S&G at that time.

"continued grazing even at low levels in degraded fens resulted in the persistence of degraded conditions"); AR 8037 (stating damage and high use can occur "immediately" upon entry). Thus, the agency is wrong that AUMs, utilization caps, or other limits will lessen impacts or ensure good conditions in newly-opened areas compared to the status quo.[5]  Def. Br. at 15–16.

As for previously grazed areas on the Chemult Pasture, the agency overlooks evidence indicating that impacts will continue and not lessen.  *See* AR 5971 (conditions only have the "potential" to improve in fens on the Chemult Pasture); AR 5999 (anticipating "similar or somewhat less" levels of disturbance at "the large majority of fens" there).  Several areas that are below desired standards will still be open to cattle, which will allow impacts to persist or worsen. AR 4548 (explaining "[t]he seven riparian areas not meeting Forest standards would continue to be impacted by cattle grazing"); AR 6816 (stating detrimental conditions have occurred if fens unprotected); AR 7708 (admitting "riparian areas of concern would continue to be impacted"); Plf. Ex. 11 at 11 (ECF No. 9-11) (finding cattle contributed to poor conditions in fens).

Furthermore, the agency asserts that rotating cattle onto thousands of additional acres will reduce impacts on the Chemult Pasture without demonstrating when such rotations will actually begin or how often they will occur.  *See* Def. Br. at 8, 23 (admitting that cattle will graze only in the Chemult Pasture until restoration and fencing is complete at some unknown point in the future).  The agency also fails to dispute numerous conflicting statements about how deferred rotation will be implemented and when pastures will be rested, undercutting its reliance on such measures to assess impacts of the new scheme.  Def. Br. at 23 (arguing Plaintiffs merely "quibble" about such conflicting details); AR 6747, AR 8046 (both showing how the agencies

_____

[5] While the record did not show how long grazing will occur in each of these pastures, the AMP authorizes weeks of grazing in Jack Creek and riparian exclosures, and months in North Sheep.

relied on specific schedules to estimate impacts). Lastly, the agency's brief brushes off the permittee's critical comments about the effectiveness of deferred rotation on the Chemult Pasture, Def. Br. at 23–24, relying on improper post-hoc excuses. *State Farm*, 463 U.S. at 50.

Overall, the Forest Service failed to explain how evidence predicting greater impacts within the 20,000+ acres of newly-opened areas and continued degraded conditions on the Chemult Pasture did not undermine its conclusion that impacts will decrease from the status quo. The agency's failure to do so was a particularly egregious error because its decision represented a significant departure from its long-standing efforts to keep these areas closed and the resources protected there. *See Organized Village of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (holding that unexplained conflicting decisions violated the APA).

### C. The Record Does Not Show the Agency Evaluated and Demonstrated its Mitigation Measures Will Be Effective and Certain to Occur.

Continuing its reliance on general conclusions at the expense of contradictory evidence, the agency defends its monitoring and adaptive management plan by citing, *ad nauseam*, a sentence in its ROD: that the agency must strictly adhere to the plan. Def. Br. at 7, 18, 19, 20, 21, 34, 38 (citing AR 8106). But this does not respond to Plaintiffs' argument that the plan itself is riddled with uncertainty, as it requires the agency to inspect the pastures only "as the opportunity arises" or "as possible" and obligates the permittee—not the agency—to monitor "throughout the grazing season." AR 8151–52; Plf. Br. at 12. Moreover, the agency proves Plaintiffs' point that the plan may not force meaningful change during the permit term by claiming the agency may respond to problems during a *subsequent* permit term. Def. Br. at 21.

The agency also defends its mitigation plan with two cases that actually support Plaintiffs' argument. Def. Br. at 19. In the first case, the court deferred to the agency's supplemental NEPA analysis, but only after ruling that the *original* NEPA analysis included an

inadequate discussion of monitoring and adaptive management measures. *W. Watersheds Project v. U.S. Forest Serv.,* 780 F. Supp. 2d 1115, 1116, 1120–21 (D. Idaho 2011).  In upholding the supplemental analysis, that court noted the new adaptive management plan included major consequences: "modifications of seasons of use, reductions in the numbers of livestock allowed to graze, and closure of certain areas, among other options." *Id*. at 1121.

    In contrast, here, the Forest Service's adaptive management plan includes many consequences that have long proved ineffective to protect Jack Creek, fens, and other resources on this allotment: temporary and permanent fencing, resting Jack Creek, water sources, and additional herding or riding.  *Compare* AR 8154–56 (detailing such consequences) *with* Plf. Br. at 2–3 (explaining problems with such measures); AR 4703, 4815–16 (finding non-compliance with orders to keep cattle out of areas); AR 4965 (excess use due to problems with water troughs); AR 7606–07 (observing water troughs were ineffective).  Indeed, this court has repeatedly noted such consequences proved inadequate. *See Sabo*, 854 F. Supp. 2d 889, 903–907, 923 (noting how cattle harmed sensitive species and habitat and breached the Jack Creek exclosure fence); *Concerned Friends*, 2016 WL 10637010, at *3.  Even a court injunction was insufficient to stop cattle from grazing in unauthorized areas.  AR 7210–12; Goodwin Decl. at 6–11, ¶¶ 12–14.  Thus, it is irrelevant if the triggers—like different use standards, low water levels, or other provisions—are slightly new or different when the evidence shows repeated noncompliance with whatever measures were used. *See* Def. Br. at 21 (touting new triggers).

    The Forest Service's reliance on *Okanogan Highlands Alliance v. Williams* is also misplaced.  Def. Br. at 19 (citing 236 F.3d 468, 473 (9th Cir. 2000)). There, the EIS included a standalone section on mitigation that included "a rating system" to determine the effectiveness of mitigation measures based on evidence. *Id*. at 474.  Here, in contrast, the EIS included a much

more perfunctory discussion of mitigation that assumed the measures would prevent impacts

from increasing under the new scheme without ever analyzing their potential effectiveness nor

disclosing that the available evidence shows such measures have been ineffective in the past.

*E.g.*, AR 6702, 6706, 6726 (all assuming measures would achieve or maintain good fen

condition). The agency's failure to evaluate and disclose the effectiveness of mitigation measures

here was particularly arbitrary given the ample evidence that fencing, herding, water

developments, monitoring, and other measures have not been reliable or effective in the past.

### D.    The Agency Fails to Support its Assumption That the Impacts on Private Lands Will Be Reduced.

With regard to the Forest Service's assumptions about the benefits of assuming

management of private lands, the agency misses the point.  Def. Br. at 22–23.  The agency

appears to concede that the permittee cannot "legally" graze Jack Creek habitat on its private

lands without obtaining an incidental take permit, Def. Br. at 22–23, but fails to recognize that

such a permit would require "ongoing mitigation efforts" to minimize impacts on frogs along

with a BiOp from FWS that ensures against jeopardy.  *Sw. Ctr. for Biological Diversity v. Berg*,

268 F.3d 810, 814 (9th Cir. 2001); 16 U.S.C. § 1539(a)(2); 50 C.F.R. § 17.22.  Those decisions

would require the permittee to graze at the same or lower levels to avoid conflicting findings

with the 2018 BiOp.  *Organized Village of Kake*, 795 F.3d at 969.  Thus, the agency's

assumptions about the benefits of the new grazing scheme were irrational.

To rebut Plaintiffs' other points, the agency cites evidence that is not in the record, Def.

Br. at 22 (citing ECF 9-31), and ignores numerous cites *in the record* that undermine the

agency's general conclusions. Pl. Br. at 13 (citing contradictory evidence). The lack of

explanation in the record connecting the dots between this evidence and the agency's conclusion

about the benefits of private land grazing management renders that conclusion arbitrary.

III.    **THE RECORD DOES NOT SUPPORT THE FOREST SERVICE'S
        CONTENTION THAT THE NEW GRAZING SCHEME IS CONSISTENT WITH
        THE WINEMA FOREST PLAN AND NFMA.**

A.    **The Agency Failed to Defend its Unlawful Interpretation.**

The Forest Service trots out various statements from the record to explain why the agency

chose the new grazing scheme from among the five alternatives.  Def. Br. at 25–28.  None,

however, actually respond to Plaintiffs' claim—that the ROD relied on an unlawful contention to

justify its selection of alternatives.  Plf. Br. at 14–16.  The agency thus waived its opportunity to

defend this justification.  *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir.

2009) (stating a "party abandons an issue when it has a full and fair opportunity to ventilate its

views with respect to an issue" but does not).  The agency may be correct that the record

includes other statements that contradict the ROD or may support its choice of alternatives.  *E.g.,*

Def. Br. at 25 (identifying contradictory statement in ROD that says "all action alternatives are

consistent with the Forest Plans").  But this misses the point—the ROD explained that it rejected

the no or reduced grazing alternatives because choosing them would be *inconsistent* with the

governing law and Forest Plan, thereby misleading the public about its ability to choose amongst

the alternatives.  AR 8111–12.  This was *the* key justification for rejecting alternatives that the

public supported—not an innocuous error that can be overlooked—rendering the ROD arbitrary.

*Ctr. for Biological Diversity v. U.S. Dept. of Int.*, 623 F.3d 633, 646–47, 650 (9th Cir. 2010)

(ROD based on a flawed assumption was arbitrary); *Jewell*, 840 F.3d at 570 (noting "inaccurate

information … materially impeded informed decisionmaking and public participation").

As for the waiver issue, Federal Defendants are wrong.  Def. Br. At 26; *see supra* 2–5

(detailing how Plaintiffs exhaustively put the agency on notice of their concerns).  In their

objections, Plaintiffs argued, *inter alia*, that the agency failed to consider that the area is no

longer suitable for or capable of grazing, and that the ROD failed "to consider" reducing grazing. AR 7176; AR 7290; AR 7306–07.  Through these and other comments, Plaintiffs alerted the agency to their concerns about the suitability of the pastures for grazing as required by 36 C.F.R. § 218.14.  *See* AR 7771, 7779 (both responding to objections about the unsuitability of area).

Plaintiffs did not need "to have specifically raised the precise legal argument" that they are forwarding in litigation.  *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1235 (D. Or. 2019) (citing *Nat'l Parks & Conservation Ass'n v. B.L.M.*, 606 F.3d 1058, 1065 (9th Cir. 2010) and summarizing relevant precedent).  Ignoring this well-established principle, Defendants cite two inapposite cases in support of their argument.  Def. Br. at 26–27.  But Plaintiffs' extensive participation efforts over a decade are incomparable to a plaintiff that failed to alert the agency it should even *consider* a specific issue in a NEPA process.  *Lindberg v. U.S. Forest Serv.*, 132 F. Supp. 3d 1255, 1268 (D. Or. 2015).  Defendants' reliance on another case that addressed whether administrative exhaustion is required under the Prison Litigation Reform Act, is even further off-base, because it did not address issue exhaustion under the APA nor the Forest Service's regulations.  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  The Court should thus reject the agency's position and refuse to erect hyper–technical barriers to justice.

**B.    The Record Does Not Support the Agency's Conclusion That Grazing is Consistent With Resource and Range Directives.**

To defend its decision that the new grazing scheme is consistent with the Forest Plan's suitability, riparian, and soil directives, the agency raises four main points.  Def. Br. at 28-36. But none of these defenses show that the agency provided a rational explanation, supported by evidence in the record, that the new grazing scheme is consistent with the Forest Plan.

First, the agency ignores or misconstrues the applicability of Forest Plan direction that requires the agency to maintain or improve conditions in moist and wet meadows, riparian areas,

and wetlands.  Def. Br. at 32; AR 3231–34, 3486, 3496, 3554, 3617; Plf. Br. at 16–19; *see also*

AR 5925–26 (confirming direction to "maintain or improve" habitat conditions in fens).  The

agency questions how past evidence of water table and soil disturbance problems is relevant,

ignoring that the agency uses these conditions to measure and address such direction for fens.

Def. Br. at 31–21; AR 6045 (establishing water table and <10% soil disturbance thresholds for

good condition).  Indeed, the agency has relied heavily on the 10% bare soil standard to track

whether grazing is maintaining or degrading good conditions at *individual* fen sites—not just

across a pasture.  *See* Plf. Ex. 11 at 2–6, 7, 9.   Thus, evidence that grazing causes or perpetuates

low water tables and greater than 10% soil disturbance in fens is relevant to show its

inconsistency with Forest Plan direction to maintain or improve conditions in such areas.

    The agency also claims it was rational to substitute the Plan's  <10% soil disturbance and

bank degradation standards with the new grazing scheme's <20% soil disturbance and 20% bank

alteration standards.  Def. Br. at 31–32 (citing AR 4548, 6677, 6691, 8037).  Even if the agency

is correct that science supports the new grazing scheme's standards and that bank alteration is

distinguishable from bank degradation, it does not cite record evidence that *explains how* the

<20% standards translate into a rational and adequate measurement to ensure compliance with

the <10% disturbance and degradation standards in the Forest Plan.  A post-hoc rationalization in

its brief will not suffice.  *See All. For the Wild Rockies*, 907 F.3d at 1113, 1116–17 (holding that

lack of a rational explanation in the record for a deviation from a Forest Plan standard rendered

agency decision arbitrary and inconsistent with NFMA).  The agency needed to connect the dots

*in the record* because it is not obvious that allowing up to 20% degradation at monitoring sites

will ensure that <10% degradation occurs "within an activity area."  Def. Br. at 32.

Second, the agency argues its hydrology, soil, and range reports concluded the new grazing scheme will be consistent with Forest Plan direction, Def. Br. at 29–31, ignoring the conflicting evidence that grazing will perpetuate degraded conditions on the Chemult Pasture and degrade resources in sensitive areas that will open to grazing for the first time in a decade or more.  Plf. Br. at 17–19; AR 7463–46, 7602–07, 7613 (describing harm to water tables and soil conditions where cattle had access to fens); AR 4966 (finding 40% bank alteration in part of Jack Creek during in 2017); *see supra* at 5–11 (discussing other evidence).  For example, the agency's botanist explained—in a report excluded from the record—that "saturated fen conditions assures that even low to moderate livestock use will result in moderate to high levels of bare ground that require extended periods of non-use to recover."  Plf. Ex. 11 at 11 (ECF No. 9-11).  Indeed, monitoring showed continued exceedences of 10% bare soil threshold in fens even after one year of relief from grazing in 2017.  AR 5219.  Further, the agency does not deny that its botany, soil, and hydrology reports overlooked a key issue—climate change, which threatens sensitive resources.  *Compare* Def. Br. at 29–31 *with* Plf. Br. at 18–19; *see* AR 7237 (Dr. Cummins opining that "fens may be in an extremely precarious water situation, putting them in greater danger of extirpation from other surface-level impacts").  By failing to identify a rational explanation that connects the dots between its conclusions and such contradictory evidence, the agency fell short of its legal duties.  *All. For the Wild Rockies*, 907 F.3d at 1113, 1116–17.

Third, the Forest Service is wrong that Plaintiffs relied on "extra-record and post-decisional evidence" from "their own preferred experts" that the agency can disregard under *Lands Council*.  Def. Br. at 31.  While Plaintiffs included three citations that were not in the record in support of their argument, all were before the agency when it issued the challenged decisions in 2018.  Plf. Br. at 11–19 (citing Plf. Exs. 11, 15, 28).  Exhibit 11 is a 2017 report

from the agency's botany program manager that detailed grazing's contribution to damage in

fens that were below desired conditions.  ECF No. 9-11 at 2–6.  Exhibit 15 is a letter that Dr.

Dewey submitted during the NEPA process for the allotment in 2012—when he worked for the

agency as a botanist—explaining "with the greatest sense of urgency" that grazing should be

permanently excluded in fens.  ECF No. 9-15.  Exhibit 28 includes notes from a 2010 meeting

with six Forest Service employees regarding grazing in Jack Creek that states "do not

recommend grazing from mid-August – mid September…."  ECF No. 9-28 at 2.  As for the other

critical opinions from *current* and former agency experts in the record, the agency is wrong that

it may disregard them.[6]  Def. Br. at 31; *see Tidwell*, 599 F.3d at 936 (finding analysis that

"conflicted with that of the scientific experts" arbitrary).  At a minimum, the agency must

explain in the record why those opinions are incorrect or irrelevant, which it failed to do.

Finally, the Forest Service provides a variety of record cites to rebut Plaintiffs' argument

about allotment management standards, but *none* include a rational explanation as to how the

new grazing scheme is consistent with those standards.  Def. Br. at 34–36.  The agency states it

merely had a procedural duty to "examine" and be "upfront" about economic issues in its EIS,

but the Forest Plan provision imposes a substantive duty—the agency "shall provide for cost-

effective management…."—rendering its contrary interpretation clearly erroneous.  AR 3547

(standard); Def. Br. at 35 (admitting inconsistent interpretation gets no deference).

As for management issues, the agency redirects from the permittee's atrocious

compliance history, claiming instead it "was not dependent on the permittee's ability to self-

monitor."  Def. Br. at 34; *see, e.g*., AR 7203–04, 7208–09 (examples of past non-compliance).

---

[6] As established through written and oral testimony last spring, Plaintiffs' experts have
substantially more experience than the government's specialists.  *E.g.,* ECF No. 22 at 22, 26.

But this ignores that the Forest Plan required the agency to *consider* these issues and that the AMP heavily relies on the permittee to monitor and ensure compliance with standards.  AR 8151–52.  Overall, it fails to refute evidence that the new scheme—which is more expensive and complex than before—is uneconomical and unworkable.  Plf. Br. at 20.

For these reasons, the Forest Service fell short of its obligation to provide a rational explanation in the record showing the new grazing scheme is consistent with the Forest Plan.

### C.    The Agency Misapplies Applicable Precedent in its Viability Defense.

The agency defends its conclusion that the new grazing scheme will maintain viable populations of sensitive plants and frogs by misapplying applicable precedent in three key ways.

First, the agency misrepresents this Court's finding in the prior litigation, claiming it "ruled that grazing was consistent with viability."  Def Br. at 37 (citing *Concerned Friends*, 2018 WL 7254704, at *3–4).  But this Court cabined its decision to lift the injunction to the "narrow issue" presented, stating "any substantive challenge to those agency actions is simply beyond the scope of the present motion and must await a new complaint and a full administrative record." *Concerned Friends,* 2018 WL 7254704, at *4.  Thus, the agency cannot shield the EIS's failure to disclose the full history of trespass grazing in Jack Creek, the North Sheep pasture, and other areas when evaluating what actual levels of grazing are likely to occur.  Plf. Br. at 21.

Second, the agency misapplies or misconstrues precedent about viability analyses.  The agency claims it need not consider "population viability in terms of actual population size" or "population trends" based on *In re Big Thorne Project,* 857 F.3d 968, 975 (9th Cir. 2017).  Def. Br. at 39.  But in that case, the Ninth Circuit made the unremarkable point that the agency is "not require[d] to identify a specific 'mechanism' for securing viability."  *In re Big Thorne Project*, 857 F.3d at 975.  In so doing, the court quoted a prior case, *Inland Empire Public Lands Council*

*v. U.S. Forest Service*, which rejected the idea that an agency *must always* use population data in its viability analysis, but upheld an analysis that identified how many acres "each species needed to survive" and how many acres of such habitat would remain after a project, among other details. *Inland Empire*, 88 F.3d 754, 759–763 (9th Cir. 1996). Since *Inland Empire*, the Ninth Circuit has approved other viability analyses that use habitat information in lieu of population data where the agency describes the "quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Lands Council*, 537 F.3d at 997–98; *Tidwell*, 599 F.3d at 932. *In re Big Thorne Project* did not overrule the Ninth Circuit's en banc decision in *Lands Council*, so the agency must follow that standard when conducting viability analyses with habitat info in lieu of population data.

The agency claims it need not follow the *Lands Council* standard because it did not use "habitat as proxy" for its viability analysis. Def. Br. at 40. The agency is wrong. Plf. Br. at 23.

For plants, the agency claims its "rational basis" for its viability findings are in the EIS at AR 6722–26, which addresses six plants that have been documented on the Chemult and North Sheep pastures: *Astragalus peckii* (Peck's milkvetch), *Botrychium crenulatum* (pumice grape-fern), *Carex capitate* (capitate sedge), *Carex lasiocarpa* (slender sedge), *Utricularia minor* (lesser bladderwort), and *Pseudocalliergon trifarium* (blunt water moss).[7] Def. Br. at 36; AR 6683 (common names). The viability finding for *U. minor*—a carnivorous, aquatic forb— illustrates the agency's reliance on habitat but failure to describe "the quantity and quality of habitat" necessary "to sustain the viability of the species." *Lands Council*, 537 F.3d at 997–98. For Alternatives 2, 3, and 5, the EIS states:

---

[7] The record does not appear to include photos that illustrate these remarkable plants, so the Court should review Dr. Dewey's photos that illustrate some. ECF No. 11 at ¶¶ 32–42.

> These alternatives may impact individuals or habitat of *U. minor*, but are not likely to cause a loss of viability of the populations or cause a trend toward federal listing. Grazing may cause trampling of plants and impacts to fen habitats, but local observations suggest *U. minor* has a degree of tolerance to these impacts. … Alternative 3 and 5 would respectively exclude three and two sites from grazing after construction of the proposed Little Parker fen exclosure.  Six of the twelve sites that would be grazed under Alternative 3 and 5 are High-Value fens where monitoring and adaptive management would ensure habitat is maintained or trends toward Good condition.  The remaining occupied sites, as well as suitable but unoccupied habitat, would be subject to grazing disturbances that may shift in spacial [sic] and temporal intensity over time.

AR 6725.  This conclusion focuses on the impacts to individual plants and habitat sites and

claims that mitigation, monitoring, and adaptive management would protect some sites in the

future.  *Id*.  The agency asserts this and other conclusions were "informed by its botany report",

which includes the following relevant details about *U. minor*: it has been found at 17 sites across

10.5 acres of fen habitat on the Forest, with 12 sites found on the Chemult Pasture, AR 5933, and

is potentially threatened by grazing because "field observations . . . show a decline or localized

elimination of populations with trampling by cattle, humans, or motorized vehicles."  AR 5953.

The botany report then includes about a page describing the impacts of Alternative 3,

which concedes the "effects of grazing… are not known" but expected to be negative, reveals

that the "amount of occupied and potential habitat for the species permitted for grazing would

increase from about 67% under current management, to 92% under Alternative 3", and examines

whether and how specific habitat sites would be grazed.  AR 5968–69.  Relying on that

information, the botany report concludes: "conditions of occupied and suitable habitat" that are

currently grazed should be maintained or improved but "habitat conditions in several sites where

grazing is proposed to be reintroduced has the potential to decrease."  AR 5969.  It also includes

the same paragraph from the EIS in its ultimate "effects determination."  AR 5997.

None of these findings about *U. minor* in the EIS or the botany report include any

information about the size of population or amount of habitat necessary to achieve and sustain

the viability of the species across the Forest.  Without such information, the agency could not

rationally conclude that grazing *nearly all* of the occupied and potential habitat for this sensitive

carnivorous forb would sustain this rare plant across the Forest.

As this example shows, the agency reported existing habitat conditions and the number of

sites and acres where plants were found, and then assumed that maintaining this habitat—largely

in fens—would maintain viable populations of those species.  AR 5930–33, 5952–53, 5965–71,

5993–6000.  As such, the agency clearly used the amount and condition of habitat as a proxy for

actual population data in its viability conclusions about sensitive plants.  Yet the agency failed to

fulfill *Lands Council*'s requirement to first describe the "quantity and quality" of habitat needed

to maintain viable populations of these sensitive species.  Thus, the agency could not rationally

conclude that effects to existing habitat would allow for viable populations of each species.

The same is true for the agency's analysis of frogs.  The agency points to no evidence in

the record showing it described what levels the Jack Creek population must reach to become

viable, nor the quantity and quality of habitat required for its viability.  Def. Br. at 35 (citing AR

8099–100 (findings in ROD missing such information)).  The agency cites to a paragraph in the

EIS about cumulative effects that mentions there are other frog populations and habitat on the

Forest, but that does not include any quantitative information about those other populations or

their habitat.  Def. Br. at 35, 38–39 (citing AR 6748).  Even if it had, the agency cannot discount

the Jack Creek population because it has a duty to maintain the viability of frog populations—

even small ones—throughout the Forest.  *See W. Watersheds Project v. U.S. Forest Serv.*, 1:17-

CV-434-CWD, 2017 WL 5571574, at *13 (D. Idaho Nov. 20, 2017) (rejecting argument that

agency could allow small bighorn sheep population to go extinct because there were other

populations across the Forest).  Further, the agency cannot save its analysis with the 2018 BiOp,

which addressed whether grazing is likely to jeopardize the species *across its entire range*—not ensure the viability of individual populations *across the forest*.  Def. Br. at 38.

In conclusion, the Forest Service misapplied the Ninth Circuit's "viability method" from *Lands Council* and did not identify where in the record the agency explained how its viability conclusions are consistent with that ruling.  Accordingly, it fell short of its duty under NFMA.

## IV. THE FOREST SERVICE OVERLOOKS KEY FLAWS IN THE EIS.

### A. The Agency Misled the Public About its Rejection of Alternatives.

In their opening brief, Plaintiffs cited *N. Alaska Envtl. Ctr. v. Kempthorne* to explain that NEPA requires an agency to "*properly* reject" alternatives by articulating a sufficient explanation for doing so.  Plf. Br. at 24; *Kempthorne*, 457 F.3d 969, 978–79 (9th Cir. 2006).  The Forest Service ignored this applicable Ninth Circuit decision, which is telling as the ROD relied on an irrational and inaccurate explanation of the governing law and Forest Plan as an excuse for rejecting the no-grazing or reduced-grazing alternatives.  Def. Br. at 41; Plf. Br. at 24.

The Forest Service points to a general clause buried in the ROD to support its selection, but does not defend the specific reason it *subsequently* provided for rejecting the no-grazing and reduced grazing alternatives.  *Compare* Def. Br. at 41 (citing AR 8102, which states all alternatives were consistent with the Forest Plan) *with* AR 8111–12 (rejecting alternatives 1 and 4 as inconsistent with Forest Plan and Congressional direction).  That specific reason left a misleading impression that the agency was not legally allowed to choose either alternative.  This was a serious error: the agency may not mislead the public about its reason for deciding between alternatives.  *See Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (violating duty "to present complete and accurate information" where EIS included misleading information); *Cascadia Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979, 991 (D. Or. 2011)

(finding a "misleading" determination violated NEPA); *Greater Yellowstone Coal. v. Timchak*, CV-06-04-E-BLW, 2006 WL 3386731, at *7 (D. Idaho Nov. 21, 2006) (finding "inaccurate representation" of an alternative was a "crucial inaccuracy" that misled the public).

Furthermore, in so doing, the Forest Service rejected Plaintiffs' support for a balanced management alternative that would have protected the exceptional resources on the Chemult and North Sheep pastures while allowing grazing to continue on the Tobin Cabin, Halfway, and other eastern pastures. *See* AR 7283 (supporting Alternative 4). Rather than defending this error, the Forest Service tries to distinguish the two cases that Plaintiffs cited, but misses their point. *See* Def. Br. at 41. While the agency is correct that those cases held that an agency improperly failed to *consider* no-grazing or reduced-grazing alternatives, it ignores that those cases hinged on the same basis for Plaintiffs' claim here: an agency's unlawful reliance on flawed interpretations of governing laws and land management plans as a basis for rejecting alternatives. The same unlawful reliance on flawed legal interpretations to reject reasonable alternatives violates NEPA.

## B.    The Agency Continues to Discount Climate Change Impacts.

As explained above, Plaintiffs exhaustively alerted the Forest Service to their concerns and thus did not waive this argument, as Defendants claim. *See supra* at 2–5. They made repeated comments about the impacts that increasing drought, combined with other aspects of climate change, will have on sensitive aquatic resources when combined with continued or increased grazing. *See, e.g.*, AR 7192, 7194–95, 7201, 7235–38, 7286–87, 7291, 7298, 7307, 7474 (objections and attachments discussing the mounting problems with drought-related issues like climate change and identifying data showing the agency's analysis was outdated).

Plaintiffs raised these concerns and this claim because climate change poses a significant threat to the Klamath Basin, Jack Creek, fens, and Oregon spotted frogs. As Dr. Cummins

informed the Forest Service in 2014, groundwater "is currently at a precarious tipping point due to a long-term drought" and the basin is already drought-prone.[8]  AR 7235–38.  Ms. Simpson further explained that climate change predictions suggest water tables will continue to decline and thereby also threaten Jack Creek and Oregon spotted frogs.  AR 7474.  Because cattle drink up to 20 gallons of water per day and impact fens and riparian areas in other ways that lower water levels, grazing will exacerbate these problems.  *See* Plf. Br. at 2–4 (explaining impacts).

Rather than demonstrating that the EIS took a "hard look" at climate change combined with grazing impacts, the agency argues that the EIS concluded grazing will not meaningfully *contribute* to climate change.  Def Br. at 42.  This has nothing to do with Plaintiffs' argument that the EIS inadequately analyzed *impacts* of climate change and grazing.  Plf. Br. at 25–26.

Next, the agency defends its failure to provide updated climatic data in the climate change section by arguing "the FEIS did not rest on that table", citing subsequent general statements about increased temperature and reduced snowpack, and likely impacts of climate change and grazing in light of drought.  Def. Br. at 43 (citing AR 6849, 6742–43).  But those statements in the EIS only prove Plaintiffs point: that in light of dire climate change predictions and the likely resulting harm to sensitive resources, the Forest Service needed to include more recent precipitation and temperature data from 2010–2017 in the Klamath Basin in the climate change section of the EIS.  Indeed, the agency had the duty to disclose to the public such accurate and current information along with an adequate analysis that took a harder look at the likely impacts of climate change when combined with increased grazing pressure in the EIS. *E.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075, 1085-86 (9th Cir. 2011) (reliance on 10-year old data was arbitrary).  Given the importance of climate change

---

[8] Plaintiffs attached the declarations of Dr. Cummins and Ms. Simpson to their objections.

during the coming decade, the agency should have provided more than outdated data, a three-page climate change analysis, and a few snippets sprinkled across the EIS.

The Forest Service's final point—that its adaptive management plan and mitigation measures can save the day—has been rejected by *Jewell*.  There, the Ninth Circuit explained that mitigation measures are "not a panacea for inadequate data collection and analysis" because such after-the-fact changes do not cure prejudice stemming from the "error's effect on informed decisionmaking and public participation, and on the outcome of the decision."  840 F.3d at 570–71.  The decision that the agency cites does not suggest otherwise.  *See* Def. Br. at 44 (citing *Oregon Wild v. Cummins*, 239 F. Supp. 3d 1247, 1276 (D. Or. 2017) (finding climate change was not significant new information warranting a supplemental NEPA analysis where the existing analysis already addressed the issue).  Here, the Court should reject the agency's attempt to defer a robust consideration of climate change until after grazing begins.

**C.    The Agency Exaggerates the EIS's Analysis of the Impacts to Frogs.**

The Forest Service defends its analysis of the likely impacts to frogs with three major points.  First, the agency provides a general citation to the frog section, but that does not rebut Plaintiffs point that the EIS just admitted the potential for, but did not examine and disclose, the scope of direct impacts to frogs in intermittent sections of Jack Creek.  Def. Br. at 44.

Second, the agency relies on the draft biological assessment and Jack Creek site management plan that it attempted to incorporate by reference, but those documents do not save the EIS's inadequate analysis.  Def. Br. at 44–46.  As this Court has explained, "NEPA allows incorporation by reference where the incorporated material is reasonably available for inspection and its content is briefly described."  *Cascadia Wildlands v. Bureau of Land Mgt.*, 410 F. Supp. 3d 1146, 1157–59 (D. Or. 2019) (quotations omitted)  The draft biological assessment does not

meet this standard: the agency did not, and cannot, show that the draft biological assessment was made "reasonably available for inspection" to the public during the 45-day objection period for the Final EIS—which fell over multiple fall and winter holidays.  *See* AR 6949–50.  Indeed, the legal notice for the objections process included a link to the agency's website that lists a ream of supporting documents, but excludes the biological assessment.[9]  Regardless, the EIS does not summarize that document's findings regarding the direct impacts to frogs as required.

The agency's attempt to distinguish *Save the Yaak Committee v. Block*, 840 F.2d 714, 718 (9th Cir. 1988)—a case that Plaintiffs cite—is unavailing.  Def. Br. at 45.  The facts were different but the principle is the same: "[p]roper timing is one of NEPA's central themes" so the agency must evaluate and disclose the likely impacts of its proposed decisions at the appropriate time so an EIS "can serve practically as an important contribution to the decisionmaking process…."  *Save the Yaak Comm.*, 840 F.2d at 718.  Thus, the agency is also wrong that its response to comments on the draft EIS—which were issued with the final EIS and include little detail—remedy this problem.  AR 6469, 6480 (stating merely trampling "was analyzed").

As for the Jack Creek site management plan upon which the agency relies, it was issued in 2011—years before the frog was listed under the ESA and the agency crafted the new grazing scheme.  AR 6620.  Thus, the agency cannot credibly claim it can substitute for an accurate assessment of the likely impacts of the new grazing scheme on frogs in 2018 and beyond.

Third, the agency claims that it was justified in finding that grazing would impact "only a small portion of suitable frog habitat across the Forest."  Def. Br. at 46.  While the agency may be correct that there is other habitat outside of Jack Creek, it points to nothing in the record that

---

[9] The agency apparel did not post the document during the comment period despite a request, AR 7002.  https://data.ecosystem-management.org/nepaweb/nepa_project_exp.php?project=43246.

reveals how much habitat there is, where it is located, or how many frogs it supports. Without

that information, the agency has no basis for claiming the Jack Creek habitat is just a "small

portion" of available habitat across the Forest.  The agency cites to a federal notice designating

critical habitat for the frog, Def. Br. at 46, but that document is not in the record and does not

reveal how many acres of those units fall on the Forest.  81 Fed. Reg. 29336, 29360 (revealing

only aggregate acres on various lands in those units).  Thus, the agency lacked support for its

conclusion that Jack Creek provides just a "small portion" of habitat on the forest.

Given that the impact of grazing on frogs was one of the most controversial topics of

public concern during the NEPA process, the EIS should have done more to take a "hard look" at

this issue.  *See Jewell,* 840 F.3d at 568–71 (finding shortcoming in an analysis of "the most

significant concern during environmental review" was prejudicial and violated NEPA).

## V.    FWS FAILS TO GRAPPLE WITH THE KEY FLAWS IN THE 2018 BIOP.

### A.  FWS's Circular Logic and Post-hoc Rationalizations Cannot Save the 2018 BiOp's Flawed Jeopardy Analysis.

FWS relies on circular logic to defend its jeopardy analysis from Plaintiffs' claim that the

2018 BiOp failed to consider the impacts of grazing on the recovery of Oregon spotted frogs.

Def. Br. at 50; Plf. Br. at 28.  FWS claims the ESA defines jeopardy to include both "survival

and recovery" and the 2018 BiOp issued a jeopardy determination, so ergo it adequately

addressed recovery.  Def. Br. at 50.  The Court should reject this reasoning because the agency

must do more than pay lip service to the objective of recovery; it must show that it considered

what is necessary for recovery of the species and how the action will affect achievement of that

result.  *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 924, 931–33 (9th Cir. 2008).

While the 2018 BiOp mentions "recovery" in a few places, it fails to examine the

influence the new grazing scheme will have on recovery of Oregon spotted frog.  *See* FWS 1450

(definition of "jeopardy"); FWS 1459–60, 1466, 1472, 1490 (statements about the species' needs and action area); FWS 1486–89 (analyzing impacts to critical habitat); FWS 1490 (jeopardy conclusion).  By failing to consider the impact of grazing on the frog's recovery, FWS overlooked a key issue: the real risk that grazing will extirpate the Jack Creek population and the resulting implications for the species as a whole.  Contrary to FWS's argument, it needed to address this issue and grapple with evidence in the record that the small size of this population— combined with its isolation, reliance on intermittent waters, and location in a drought-prone area—make it particularly susceptible to extinction.  FWS 5271 (explaining small size and isolation of "the majority" of breeding locations make the species "acutely vulnerable" to several threats and extirpation), 5266 (Jack Creek population is isolated), 5248 (listing Klamath basin as one of two spotted frog sites "with the greatest risk from drought").  Indeed, the Jack Creek site management plan—on which FWS relies, Def. Br. at 51, explained "the risks of stochastic events causing extinction are significant particularly while the Jack Creek population is so small."  FWS 2359.  But rather than disclosing the population's significant risk of extinction due to conditions in Jack Creek, the 2018 BiOp remained silent and instead irrationally asserted this area already meets the frog's needs.  Def. Br. at 47; FWS 1460–65 (silence on such risk).

FWS also makes much of the 2018 BiOp's findings that the population has experienced a "significant" expansion in recent years and is "relatively stable, with some potential for an upward population trend."  Def. Br. at 47 (citing FWS 1461).  While Ms. Simpson did discover new occupied habitat sites in 2013, this has not meaningfully bolstered overall numbers, which have remained precariously low for years.  FWS 1462 (hovering between 3 and 10% of egg masses found before the population crash); *see* FWS 845, AR 7454 (Ms. Simpson's role).  Indeed, FWS points to no record support for its conclusion that a population is stable or healthy

when it fluctuates between 11 and 31 egg masses per year—which is indicative of one breeding female and one or two adult males per egg mass. FWS 1462; FWS 5241. This was a serious omission given that the listing rule suggests otherwise. *See* FWS 5264 (suggesting 50 adults is a small population), 5244 (noting populations with hundreds or thousands of adults).

Further, "the longer a species remains at low populations levels, the greater the probability of extinction….". *Nat'l Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861, 891 (D. Or. 2016); *see also Nat'l Wildlife Fed'n*, 524 F.3d at 931 (explaining "a species can often cling to survival even when recovery is far out of reach"). This is a particularly acute problem for the frog, which "can experience rapid population turnovers" and significant reductions in population due to stochastic events. FWS 5266, 5285. But the 2018 BiOp brushed aside this evidence, undermining its reliance on the "stability" of a small population for its jeopardy conclusion. Thus, without accurately considering the population's imperiled status, FWS is wrong that it is entitled to deference for its sunny findings about baseline conditions or its conclusion that the loss and injury of *hundreds* of frogs each year would allow the population to "persist." *Cf.*, Def. Br. at 48, 59; FWS 1466, 1477, 1490 (take estimates and conclusions).

Given the significant risk of the population's extinction, the 2018 BiOp needed to consider what its loss would mean for the species as a whole. *See Concerned Friends,* 2016 WL 10637010, at *13-16 (criticizing failure "to discuss the effects caused by the loss of the Jack Creek population on the survival and recovery of OSF as a whole"). FWS's brief includes an improper post-hoc attempt to write off the population as unimportant to the species, but the record undermines this position. Def. Br. at 49 (explaining what it *would have said*); *State Farm*, 463 U.S. at 50 (disallowing post-hoc points). Indeed, the Jack Creek management plan states:

> Jack Creek is one of the few sites with extant populations of *R. pretiosa* that lacks
> bullfrogs, non-native predatory fish, or is under immediate threats from invasive plants

such as reed canary grass.  These taxa are invasive species that are threatening the long-term persistence of *R. pretiosa* in other locations.  This makes the Jack Creek population of *R. pretiosa* particularly important for the conservation of the species.

FWS 2347.  It is also "the highest-elevation site known to support" the species.  FWS 2349.  As such, Ms. Simpson has explained the loss of this population would "further reduce resilience and the overall recovery potential of OSF across its range" and be a "significant loss for the genetic diversity of the species as a whole…."  AR 7474; AR 7612–13.  But FWS ignored her expert opinions—which are supported by her decades of professional experience, monitoring of conditions in Jack Creek, and substantial knowledge of the population and the species.[10]

FWS also irrationally downplays the importance of the Jack Creek population to the species by making much of the fact that frogs are distributed across 15 sub-basins.  Def. Br. at 49.  But this ignores that all sub-basins face a high "cumulative risk" from various threats and that "declining and/or small populations…constitute the majority the Oregon spotted frog's remaining distribution."  FWS 5285.  As such, FWS predicts that the species is "likely to become endangered throughout all or a significant portion of their range within the foreseeable future, based on the immediacy, severity, and scope of the threats" to it and that "best available data suggest that, under current conditions, Oregon spotted frogs will likely continue to decline toward extinction."  *Id*.  Furthermore, the ESA requires FWS to consider impacts to a species' distribution as part of a jeopardy analysis.  50 C.F.R. § 402.02.  Thus, FWS should have considered the serious threats facing the species across its range, and the importance of the Jack Creek population for the species' distribution and genetic diversity, before making its no-

---

[10] Ms. Simpson's prior declarations were submitted to FWS in the prior litigation and again to the Forest Service before it finalized the Biological Assessment, and thus were before the agencies during the consultation and should have been considered.

jeopardy conclusion.  Thus, FWS is not entitled to the "highest deference" for such conclusions.  *See Concerned Friends*, 2016 10637010, at *13 (rejecting deference to a "technical decision").

**B.  FWS's Analysis of Climate Change and the Low Water Plan Was Flawed.**

FWS is wrong that it actually addressed the threat that climate change poses to the frog.  Def. Br. at 57–58.  FWS touts its consideration of drought and the low water plan, but this was not enough.  While the 2018 BiOp acknowledged in a background section that climate change had the potential to exacerbate habitat problems (FWS 1458), it needed to analyze how the expected impacts to habitat from climate change would combine with impacts from grazing and the effect on the Jack Creek population in the coming years.  *E.g.*, FWS 5285 (finding climate change may exacerbate threats to species); FWS 2358 (identifying climate change as one of the greatest threats to Jack Creek, connecting it to past drought that coincided with the population crash, and explaining that grazing's impacts "may be proportionately greatest" during drought).  For example, the agency makes much of the fact that Pool A supported frogs during low water conditions in 2014 when it was only 6 inches deep, Def. Br. at 55, but fails to consider how climate change may exacerbate such conditions in the future and potentially dry up Pool A or intermittent waters in Jack Creek completely.  The agency cannot rely solely on past data about water conditions and how the agency's drought plan worked in 2014; it needed to consider how climate change will affect these conditions through the BiOp's expiration in 2027.  FWS 1446.

Furthermore, FWS misses Ms. Simpson's key critique of the low water plan's reliance on Pool D as the trigger: she explains that Pool D is unrepresentative because it is constantly fed by a separate spring, unlike the other pools that rely solely on Jack Creek water.  Simpson Decl. ¶¶ 41–51 (explaining she has "never seen Pool D dry up even when all other pools in the area go dry").  Throughout the record, FWS has relied on Ms. Simpson's expertise with the Jack Creek

population of Oregon spotted frog when it suits the agency, which undermines its attempt to waive away her opinions when they are inconvenient to the agency.  *Compare* Def. Br. at 55 (claiming Ms. Simpson's opinions should be given "no weight") *with* FWS 2132; FWS 2341; FWS 4911; FWS 5092; FWS 5253, 5255 (all crediting or citing to Ms. Simpson).

Apparently recognizing the low water plan's flaws, FWS incorrectly claims it "need not be certain that its mitigation measures will be effective."  Def. Br. at 53–54.  But as this Court has explained, mitigation measures "must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Nat'l Wildlife Fedn.*, 184 F. Supp. 3d at 901–02.  Here, more than a decade of data has shown that fences do not reliably keep cattle out of Jack Creek, so FWS erred by relying on a plan that employs fencing to do so when water levels are low.  *See supra* at 10–12; AR 7210–12 (trespass in 2017 during injunction).  Moreover, nothing in the low water plan commits the Forest Service to conduct the monitoring or specifies when and how often it will occur, further undercutting FWS's reliance on the plan.  AR 8155–56.  Even if FWS is correct that the measures will be effective, the agency admits it will take years to phase in "the full system" and for all pastures to be open, Def. Br. at 58, thereby delaying any resulting benefits and increasing the risk of trespass on Jack Creek in those areas in the meantime.

### C.  FWS Failed to Tie its Standards to the Frog and Evidence in the Record.

To defend its 35% utilization and 20% bank alteration standards, FWS re-states a number of reasons why those standards support general riparian health.  Def. Br. at 51–52.  But this does not address this Court's concerns.  *See Concerned Friends*, 2016 WL 10637010, at *15 (finding "insufficient and improper support for its use of the 35% utilization standard to determine the

effects on OSF from cattle trampling").  FWS then points to a few pages in the Jack Creek

management plan, the Biological Assessment, and the 2018 BiOp that re-state the standards,

their benefits for riparian health, or the agency's conclusions; but none rationally connect the

dots to the needs of the frog.  Def. Br. at 51 (citing FWS 2378, FWS 849–50, FWS 1467, 1472,

1484–89).  For example, FWS highlights its conclusion about the 20% bank standard's benefits

for critical habitat, which does not address direct effects like cattle trampling.  Def. Br. at 52; *see

also* FWS 173–176 (identifying no research tying alteration to frog needs when asked by FWS).

 FWS blames Plaintiffs for its failure to address best available science, Def. Br. at 52, but

ignores Ms. Simpson's declaration from the prior litigation that thoroughly explained the flaws

with using the 35% utilization standard to protect Jack Creek frogs.  AR 7607–7610.  As for her

current declaration that addresses the 2018 BiOp's insufficient support for the 20% and 35%

standards, the Court can and should consider it because she identifies important factors the

agency should have considered and explains complex information.  Simpson Dec. ¶¶ 32–40;

*Nat'l Wildlife Fed'n v. NMFS*, No. 3:01-CV-00640-SI, 2015 WL 423090, at *4 (D. Or. Feb. 2,

2015) (admitting expert declarations in a BiOp challenge for such purposes).  Further, her

declarations and evidence confirm cattle have concentrated in Jack Creek and damaged frog

habitat despite fences, agency orders, and an injunction, thereby undermining FWS's reliance on

general studies to conclude otherwise.  Def. Br. at 53.  The Court should not defer to these

standards when the 2018 BiOp did not rationally connect them to the frog's site-specific needs.

### D.  FWS Mounts No Real Defense of its Non-Lethal Take Surrogate.

FWS defends its non-lethal take surrogate in the ITS by explaining that the law allows it

to use one, pointing to the page in the BiOp where it did so, and then declaring it rational and

subject to the "highest" deference.  Def. Br. at 60 (citing FWS 1493).  Like its jeopardy defense,

the Court should reject the agency's attempt to declare its own decision lawful without any rational explanation for it.[11]  FWS does not demonstrate where in the BiOp or in the record the agency justified or explained how the ITS's utilization, bank alteration, and trampling standards are rationally connected to and accurately measure non-lethal take from disturbance and displacement of frogs.  Plf. Br. at 34 (explaining how standards do not do so).  FWS's silence in its brief and the record was a major omission given its need to demonstrate that the 2018 BiOp remedied the 2015 BiOp's failure to include a take surrogate that addressed non-lethal take. *Concerned Friends*, 2016 WL 10637010, at *14–15; *see also Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1037–38 (9th Cir. 2007) (requiring a rational connection to a surrogate).  Without an adequate surrogate to measure non-lethal direct take, the ITS is arbitrary and capricious.

## VI.    FEDERAL DEFENDANTS FORFEITED THEIR OPPORTUNITY TO RESPOND TO PLAINTIFFS' REQUEST FOR RELIEF.

In their opening brief, Plaintiffs explained that if the Court agrees with any of their claims, the presumptive remedy is to vacate and remand any unlawful decisions, and that the government has the burden to articulate why a "rare" exception to vacatur is warranted.  Plf. Br. at 34–45).  The government failed to articulate any exception in its responsive brief, and did not respond to Plaintiffs' alternative argument that an injunctive relief is warranted.  Accordingly, the Federal Defendants have waived their opportunity to respond.  *Ramirez*, 560 F.3d at 1026.

Plaintiffs' request for vacatur and injunctive relief in their motion for summary judgment was routine and appropriate.  This Court—including in the prior case—has issued such orders based on briefing in support of cross-motions for summary judgment.  *E.g.*, *Oregon Wild v. BLM*, 2015 WL 1190131, at *1, 13 (D. Or. March 14, 2015); *Concerned Friends of the Winema*,

---

[11] Should FWS mount a new defense on reply, Plaintiffs will seek leave to file a sur-reply.

2016 WL 1063701, at *15-16.  Thus, Defendants were plainly on notice of Plaintiffs' ability to do so, yet did not request bifurcated briefing or otherwise prevent them from doing so again.

Defendants should not be allowed to raise new arguments on reply or through separate briefing.  A prompt ruling on the appropriate relief is needed because the Federal Defendants' unlawful decisions are likely to cause irreparable harm to sensitive and threatened species if the new grazing scheme is allowed to begin next summer.  This is particularly important here because grazing has not occurred on the majority of the Chemult Pasture since 2016 nor on the North Sheep Pasture or within the various exclosures for more than a decade.  Further, this Court held the previous grazing decisions unlawful, so grazing under the old scheme cannot resume.

An order on relief that protects the western pastures while the agencies fix the numerous legal flaws in the challenged decisions serves the public interest.  The permittee remained able to graze the other pastures on the allotment while the past injunction was in place.  ECF No. 22 at 28–32.  Further, the government has not shown that grazing a smaller herd without the western pastures during 2019 caused serious or lasting harm to the agency, the public, or the permittee.  Thus, the Court should vacate the decisions and preserve the status quo of no-grazing on remand.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for Summary Judgment and order their requested relief.

Dated: February 25, 2020                    Respectfully submitted,

 s/Elizabeth H. Potter
 Elizabeth H. Potter (OSB #105482)
 Lauren M. Rule (OSB #015174)
 ADVOCATES FOR THE WEST
 3701 SE Milwaukie Ave. Suite B
 Portland, OR 97202
 (503) 914-6388
 epotter@advocateswest.org

PLAINTIFFS' SUMMARY JUDGMENT RESPONSE/REPLY MEMORANDUM          35