IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**CONCERNED FRIENDS OF THE
WINEMA**; **KLAMATH SISKIYOU
WILDLANDS CENTER**; **WESTERN
WATERSHEDS PROJECT**; **OREGON
WILD**; and **CENTRAL OREGON
BITTERBRUSH BROADS OF THE
GREAT OLD BROADS FOR
WILDERNESS**,

        Plaintiffs,

    v.

**DOUGLAS C. McKAY**, District Ranger,
Paisley & Silver Lake Ranger Districts,
Fremont-Winema National Forest; **BARRY
L. IMLER**, Forest Supervisor, Fremont-
Winema National Forest; **UNITED STATES
FOREST SERVICE**; **LAURIE SADA**,
Field Supervisor, Klamath Falls Fish and Wildlife
Office; and the **UNITED STATES FISH AND
WILDLIFE SERVICE**,

        Defendants.

_____

Civ. No. 1:19-cv-516-MC

OPINION AND ORDER

**MCSHANE, Judge**:

This case arises out of a decision by the United States Forest Service (Forest Service)

establishing a new framework for livestock grazing on the Antelope Allotment in the Fremont-

Winema National Forest. Plaintiffs, Concerned Friends of the Winema and other environmental advocacy groups, brought the instant action against Defendants, the Forest Service, United States Fish and Wildlife Service (FWS), and other named individuals working for these agencies, alleging violations of the National Environmental Policy Act (NEPA), National Forest Management Act (NFMA), and the Endangered Species Act (ESA).

Plaintiffs moved for summary judgment, seeking vacatur of the Defendants' final decisions that allow grazing. Defendants cross-moved for summary judgment. Following oral argument and supplemental briefings on Plaintiffs' climate change argument, the Court grants Defendants' Motion for Summary Judgment (ECF No. 51).

## BACKGROUND

The Antelope Allotment is a large rangeland in south-central Oregon covering 165,500 acres in Lake and Klamath Counties. The area has been grazed since the 1870s and the last NEPA review of grazing was completed in 1995, but the current system of grazing has been in place since at least 1975. One of the major features of the area is Jack Creek, a stream that becomes intermittent in its lower reaches.

The Oregon spotted frog was discovered in the Jack Creek area on both Forest Service land and private land in 1996. In August 2014, the Fish & Wildlife Service (FWS) listed the spotted frog as threatened under the ESA. The Jack Creek spotted frog population suffered a catastrophic collapse, but recent data indicates a modest recovery. The effect of grazing on the spotted frog is one of the key issues in this case and in most prior litigation concerning the Antelope Allotment. Part of the Antelope Allotment is also made up of groundwater-fed ecosystems called fens, which contain sensitive plant species. The Antelope Allotment has the largest concentration of fens in this Forest Service region.

The Final Environmental Impact Statement (FEIS) for the proposed grazing plan was released in November 2017. The FEIS considered five alternatives: no grazing (Alternative 1); current grazing (Alternative 2); modified grazing under a Monitoring and Adaptive Management Plan (Alternative 3); modified grazing with portions of the pasture closed (Alternative 4); and modified grazing with private inholdings brought under Forest Service management (Alternative 5). A draft Record of Decision (ROD) was released in December 2017 and Plaintiffs objected in January 2018.

The FWS released a Biological Opinion (BiOP) on May 21, 2018. The FWS concluded that the proposed project would affect the Oregon spotted frog's habitat but was not likely to adversely affect the frog's critical habitat. The agency also concluded that the proposed action was not likely to jeopardize the continued existence of the frog or cause the extinction of the Jack Creek frog population.

The final ROD was released on May 21, 2018, along with an Allotment Management Plan (AMP) that implements the ROD. The ROD opted for a combination of Alternatives 3 and 5. The plan authorizes 275 cow/calf pairs (550 total animals) from May 1 to October 15 and 219 cow/calf pairs under a Term Private Land Permit. The plan opens up an additional 21,433 acres to grazing (from Alternative 5) with a Monitoring and Adaptive Management Plan that monitors usage and closes areas to cattle as they reach their usage maximum (from Alternative 3). The Forest Service's expectation is that by opening up more land, the cattle will disperse to graze, there will be more uniform usage, and it will allow for portions of the rangeland to be closed for rest periods to allow recovery. Ideally, this will reduce the concentration of cattle in riparian areas that are important spotted frog habitat. The ROD also places private land under cooperative management with Forest Service land to limit over-grazing on privately held spotted frog habitat

and create a uniform system for managing the frog populations. The Forest Service committed to monitoring usage and removing cattle once the utilization thresholds are reached, even if it means removing them before the grazing term has run, in order to prevent excess grazing. The new system contemplates the construction of additional fencing and water sources, as well as restoration measures.

Plaintiffs filed this action in April 2019 seeking a preliminary injunction to prevent grazing. In July 2019, this Court denied Plaintiffs' motion for preliminary injunction on the grounds that the Government was voluntarily reducing the scope of planned grazing, which deferred any consideration of the new system until now. Plaintiffs filed their Motion for Summary Judgment in December 2019, raising four overarching claims for vacatur of the Defendants' actions: (1) claiming the Forest Service's final decision was arbitrary and violated NEPA, (2) claiming the grazing management plan is inconsistent with the Winema Forest Plan, (3) claiming the FEIS failed to take the requisite "hard look," and (4) claiming the FWS's 2018 Biological Opinion is arbitrary and violated the ESA. Pls.' Mot. Summ. J., ECF No. 45. Defendants filed a Response and Cross-Motion for Summary Judgment in January of 2020. Defs.' Resp., ECF No. 51. These cross-motions for summary judgment are now before the court.

## STANDARD OF REVIEW

The Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v.*

*Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

The Administrative Procedure Act (APA) provides the standard for judicial review of final agency actions involving NEPA, the ESA, and the NFMA. 5 U.S.C. § 704; *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017). The Court may set aside an agency action under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (citing *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

Courts are cautioned not to "substitute [their] own judgment for that of the agency or merely determine that it would have decided the issue differently." *Or. Natural Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989)). Moreover, courts should be "'most deferential' when the agency is 'making predictions, within its area of special expertise.'" *Lands Council*, 537 F.3d at 993 (citing *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)) (cleaned up).

**DISCUSSION**

I.    <u>Challenges to the Antelope Allotment Grazing Decision Under NEPA</u>

Plaintiffs challenge the Forest Service's Antelope Allotment grazing decision—ROD, FEIS, AMP, and Term Permit—as arbitrary and in violation of NEPA. Pls.' Mot. Summ. J. 9. Plaintiffs allege that the Forest service has not "carefully considered and disclosed the environmental effects of its decisions," as required by NEPA. *Id.* at 10 (citing *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011); 40 C.F.R. §§ 1500.1, 1502.24 (2020)). These final agency actions are subject to judicial review under the APA.

Plaintiffs argue that the Forest Service relies on four "unsupported and irrational" justifications for the agency's grazing decision. Pls.' Mot. Summ. J. 10. These justifications are: (1) expanding the acreage of grazing will result in greater dispersment of cattle and, therefore, lighter impacts; (2) implementing deferred rotation between the Chemult and North Sheep pastures will better distribute cattle and allow for regular rest of those areas; (3) the Monitoring and Adaptive Management Plan will effectively minimize impacts; and (4) assuming management of private lands will benefit Jack Creek and the spotted frog. *Id.* 10–12.

First, Plaintiffs allege that the Forest Service lacks "scientific or practical support" for the assumption that "by expanding grazing onto more acres in the Chemult and North Sheep pastures, cattle would disperse across a larger land base and cause lighter impacts on the Chemult Pasture than historically occurred." Pls.' Mot. Summ. J. 10.

The administrative record contains sufficient support for the Forest Service to rationally predict that better dispersal, and therefore decreased impacts, will occur under the new grazing management plan as compared to status quo grazing. Under the new grazing management plan,

an additional 21,433 acres have been made available for grazing. AR 8101.[1] The area of riparian grazing acreage has increased by approximately forty percent as compared to the prior management strategy and, at the same time, the overall quantity of authorized forage has remained nearly consistent with the status quo. AR 8121, 6645, 6651, 6654.

Although the agency's experts found that cattle tend to concentrate in riparian areas rather than spread out across available land, the agency has included measures to address this concern. AR 4546, 5097, 5100, 7899. The agency has employed forage utilization caps that will require the removal of cattle if reached, the addition of new artificial water developments, decreased grazing time in pastures, and adaptive management controls to better disperse cattle and reduce their impacts. *See, e.g.*, AR 8107, 8109. The agency's determination also finds support in the opinions of its experts. For example, the agency's botany expert found that the addition of riparian acreage "would contribute to a reduced level of grazing within currently grazed areas." AR 5962. Relatedly, the agency's soils expert reported that "[t]he advantage of dividing the herd and converting to a deferred rotation grazing strategy is better control of animal distribution and dispersal of impacts across a larger land mass." AR 4551.

Second, Plaintiffs allege that "the record is littered with inconsistent statements about how deferred rotation will be implemented" and challenge the viability of the deferred rotation system. Pls.' Mot. Summ. J. 11 (citing AR 6747, 8046, 5096, 7720, 8140).

The Forest Service's new grazing scheme is not inconsistent regarding deferred rotation and Plaintiffs have failed to raise sufficient challenges to the viability of the deferred rotation system. Under the new grazing management plan, the Chemult and North Sheep pastures will

---

[1] This opinion includes references to both the Forest Service and Fish and Wildlife Service's administrative records. For the sake of clarity, this opinion will refer to the Forest Service's administrative record as "AR" and the Fish and Wildlife Service's administrative record as "FWSR."

"periodically incorporate a year of rest between pastures or portions of a pasture in the allotment." AR 8119. The Forest Service has designed a scheme that allows for adaptation to changing conditions and needs in the management area. The AMP includes a schedule outlining the rotation of cattle between the pastures, noting that "[a]ctual on/off dates . . . would vary within plus or minus two weeks annually based on forage conditions, weather variations, or resource conditions." AR 8140. The agency also states that "livestock will be removed from the pasture or allotment as [utilization and bank alteration] standards are approached" and "adjustments to the timing, season of use, or allowable use will occur as part of adaptive management." AR 8107. "[A]daptive management could include seasons of rest if resources indicate a need for such action." *Id.* Although concerns about the viability of cattle rotation were raised by the permittee through comments to the Draft EIS in 2015, the permittee did not raise any objections to the FEIS or draft ROD.

Third, Plaintiffs challenge the agency's Monitoring and Adaptive Management Plan, stating that the plan lacks adequate support regarding its effectiveness, contains vague standards, does not commit the agency to monitoring, and leaves "little time to respond" once ecological trends are observed. Pls.' Mot. Summ. J. 12.

The Forest Service's determinations surrounding the Monitoring and Adaptive Management Plan were not arbitrary or capricious.[2] Moreover, the agency has gone beyond what is required by NEPA by making its Monitoring and Adaptive Management Plan a mandatory part of the grazing framework. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352–53 (1989) ("[I]t would be inconsistent with NEPA's reliance on procedural mechanisms—as

---

[2] "The selection of criteria for monitoring is a matter within the expertise of the Forest Service," and thus, the Court should be at its most deferential while still "mak[ing] a thorough review of the record." *W. Watersheds Project v. U.S. Forest Serv.*, 780 F. Supp. 2d 1115, 1121 (D. Idaho 2011) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377–78 (1989)).

opposed to substantive, result-based standards—to demand the presence of a fully developed

plan that will mitigate environmental harm before an agency can act."); *see also Okanogan*

*Highlands All. v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000).

The ROD requires the Forest Service to "strictly adhere to the Monitoring and Adaptive

Management Plan." AR 8106. The ROD also requires Forest Service to report "[t]he results of

all monitoring" to the FWS "on a routine basis during the grazing season, and an annual report

shall be completed and submitted . . . by March 31 of each calendar year." AR 8107. The Forest

Service is required to complete "routine site visits . . . to ensure implementation standards (e.g.,

35% utilization, 20% bank alteration) are compliant" and must carry out "pre- and post-season

checks of each allotment." AR 8106–07.

The Monitoring and Adaptive Management Plan includes strategies meant to "ensure . . .

[s]ites at desired condition remain in desired condition; [s]ites not in desired condition have an

upward trend or an acceptable static trend; and [u]se standards are being met." AR 6350. The

adaptive management strategies are triggered if "monitoring indicates that current management

actions are not reaching defined objectives or desired conditions." *Id.* The management plan

provides the specific standards and conditions and their corresponding adaptive management

strategies for each pasture. AR 6348–49. The Forest Service also explained why the specific

measures outlined in the management plan were chosen. AR 6348–52, 8106–07.

The ROD, AMP, and Monitoring and Adaptive Management Plan provide for a timely

response to violations of use standards once they are observed. "Any instance of excess use will

result in a timely permit action . . . and be reported to [the FWS]." AR 8106; *see also* AR 8151.

Adaptive management measures are designed to take incremental steps toward addressing excess

use. For example, if use standards along Jack Creek are "exceeded for two consecutive years . . .

then the pasture it occurred in will be rested the next grazing season." AR 6350. But, if after resting for two years, monitoring continues to indicate that use standards are being exceeded, the pasture will continue to be "excluded from grazing until desired conditions are met." *Id.*

Fourth, Plaintiffs argue that the agency did not sufficiently support their determination that the new grazing scheme would reduce the impact of grazing in private holdings, which in turn would reduce impacts on the spotted frog. Pls.' Mot. Summ J. 13.

The Forest Service sufficiently supported their determination regarding the benefits to spotted frog habitat within private holdings. The ROD found that cooperative management of public and private spotted frog habitat under a single management system would "allow for more efficient use of resources and a greater likelihood of population recovery." AR 8105; *see also* 4512–16. The agency found that the private landowner "grazes to a 55-65% utilization level" on the Jack Creek private lands, which contain "primary" frog breeding sites. Pls.' Mot. Prelim. Inj. Ex. 31, ECF No. 9-31; *see also* AR 4512, 7781. The agency concluded that managing the private spotted frog habitat to a 35% utilization standard in conjunction with public lands would "provide better protection[,] . . . thus increasing habitat suitability." AR 8100.

The Court finds that the Forest Service was not arbitrary and capricious with respect to its final decision on the Antelope Allotment grazing plan and is in compliance with NEPA. Accordingly, Plaintiffs' Motion for Summary Judgment is denied for this claim and Defendants' Cross-Motion for Summary Judgment is granted.

## II.    Challenges to the Grazing Decision Under the Winema Forest Plan

Plaintiffs challenge the Forest Service's ROD, AMP, and Term Permit as inconsistent with the Winema Forest Plan (Forest Plan), and therefore in violation of the NFMA. Pls.' Mot. Summ. J. 14–23. The NFMA requires that the Forest Service develop a forest plan consisting of

broad goals and objectives for the entire forest then show that its subsequent decisions are consistent with the applicable forest plan. 16 U.S.C. §§ 1604(a), (i); *In re Big Thorne Project v. U.S. Forest Serv.*, 857 F.3d 968, 973 (9th Cir. 2017). "The Forest Service must strictly comply with a forest plan's 'standards,' which are considered binding limitations, but it may deviate from the forest plan's 'guidelines,' so long as the rationale for deviation is documented." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).

First, Plaintiffs allege that the Forest Service's rationale for dismissing the no and reduced grazing alternatives—Alternatives 1 and 4—relies on an erroneous interpretation of the Forest Plan and governing federal law. Pls.' Mot. Summ. J. 14. Plaintiffs argue that the Forest Service was incorrect to determine that "to not graze at this point is not consistent with the Forest Plan direction or Congressional direction to provide grazing allotments on suitable land." *Id.* (citing AR 8111–12). Rather, Plaintiffs argue that the NFMA and the Federal Land Policy and Management Act, which govern livestock grazing management on federal lands, "do not require the Forest Service to authorize *all* potential uses on all acres of its lands." *Id.* at 15. Plaintiffs also point to the Forest Plan and argue that it does not "demand that grazing be authorized on the allotments." *Id.*

The Forest Service made a rational decision when it decided on a course of action that included continued grazing in the Antelope Allotment. "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service did not conclude that Alternatives 1 and 4 were inconsistent with the Forest Plan but instead explained that "all action alternatives are consistent with the Forest Plan[]." AR 8102. The agency determined that the continued grazing alternatives were most consistent with the agency's multiple-use goals and

objectives based on input from the agency's resource experts. *See, e.g.*, AR 8102–03, 8111–12. Further, the record demonstrates that the Forest Service did not assume the area would be suitable for grazing but evaluated whether continued grazing in this area remained appropriate in light of key resource issues. AR 6600–01.

Second, Plaintiffs claim that the Forest Service's grazing scheme is inconsistent with the Forest Plan's requirements because there are "irreconcilable conflicts with suitability, riparian, and soil directives" and "inconsistencies with management effectiveness directives." Pls.' Mot. Summ. J. 17, 20.

The Forest Service "must support its conclusions that a project meets the requirement of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable." *Lands Council*, 537 F.3d at 994. Courts must allow an agency the discretion "to rely on the reasonable opinions of its own qualified experts" when faced with "specialists express[ing] conflicting views." *Id.* at 1000. The Forest Service has provided sufficient support, in the form of expert opinions and studies, demonstrating that the Antelope Allotment grazing plan meets the NFMA and Forest Plan's requirements.

The Forest Plan requires that livestock stocking levels be determined by several criteria, including "forage condition, suitability, and availability." AR 3547. Grazing seasons must be determined by "soil stability factors, phenological development of plants, wildlife needs . . . , and livestock use factors." *Id.* Plaintiffs argue that "the agency fails to articulate a rational explanation as to how the new grazing scheme is consistent with these Forest Plan directives." Pls.' Mot. Summ. J. 16.

In advancing their argument, Plaintiffs pull excerpts from the Forest Service's expert reports, which, taken in isolation, appear to lend credibility to Plaintiffs' argument. Pls.' Mot.

Summ. J. 19. However, the agency's expert reports, on the whole, support the Forest Service's final decision. For instance, the agency's soils expert concluded "effectively implemented mitigations would limit impacts on the soil resource to acceptable thresholds of the Forest Plan," and "[a]ll proposed alternatives would continue to manage the forage vegetation and soil resource for long-term sustained productivity through attainment of upward or stable vegetation trends." AR 4547, 4555. The agency's hydrology expert also found the chosen alternatives would maintain or improve hydrologic resources. AR 5035, 5037. To the extent Plaintiffs rely on their own experts to support their arguments to the contrary, these opinions are not binding on the agency. *Lands Council*, 537 F.3d at 1000; *see* Pls.' Mot. Summ J. 19.

Plaintiffs also question how the AMP's "allowance for up to 20 percent soil alteration within fens and fenced enclosures and 20 percent bank alteration" are consistent with the Forest Plan's requirement to "maintain less than 10 percent disturbance for soil and streambanks." Pls.' Mot. Summ. J. 18 (citing AR 8153, 3617, 3233). As the Forest Service explained, there is no conflict between these standards because the Forest Plan's standards pertain to the "total riparian acreage within an activity area" whereas the AMP's standards "address[] the percentage of bare soil in fens and the degree of streambank alteration, not total riparian acreage." Defs.' Resp. 32. The Forest Service also pointed out that the Forest Plan's limit on "degradation" of certain streambanks is different from the AMP's "alteration" limit. *Id.*

Plaintiffs argue that the agency's action violates the Forest Plan's goals to "maintain or improve riparian areas" and other goal statements relating to the maintenance or improvement of conditions in moist meadows, riparian areas, and wetlands. Pls.' Mot. Summ. J. 15 (citing AR 3231–34, 3486, 3496, 3554, 3617). Plaintiffs' argument plainly ignores the agency's findings that the grazing plan will result in "greater periods of forage recovery as well as reduced impacts

to soils associated with trampling," and "more efficient use of resources and a greater likelihood of population recovery" as compared to the status quo. AR 8105.

The Forest Plan also requires that an allotment management plan "provide for cost-effective management" and consider a "permittee's ability to self-monitor management and maintenance projects." AR 3547. Plaintiffs argue that the Forest Service failed to demonstrate the AMP's compliance with these standards. Pls.' Mot. Summ. J. 20.

As discussed above, the AMP requires active monitoring and oversight by the Forest Service and the FWS. AR 8106–07, 8062, 8063–64. Moreover, the Forest Service is required to ensure "strict[] adhere[nce]" to the grazing management framework and to complete "routine site visits" and carry out "pre- and post-season checks of each allotment." AR 8106–07. Thus, the framework's success does not depend solely on the permittee's ability to self-monitor.

The FEIS documented the agency's cost-benefit analysis, which included costs and benefits to the Forest Service and the permittee. AR 6768–78. This analysis found that the "associated costs of implementing Alternatives 3 and 5" include fence reconstruction, construction, and removal "totaling $32,448 for the Forest [Service] and $399,501 for the permittee under Alternative 3, and $24,121 for the Forest [Service] and $405,360 for the permittee under Alternative 5." AR 6772; *see also* AR 6768. Both alternatives also include additional costs of $36,150 for reconstruction, construction, cleaning, and sealing of springs and ponds. AR 6772. Under either alternative, "[c]ontinued management of the permit and allotment would not change the workload or number of Forest [Service] range management personnel." *Id.*

The FEIS acknowledges that "these costs are higher than what is generally available within the Forest's rangeland management budget for allotment infrastructure" and the agency would require "partnerships or . . . additional resources." AR 6772–73. Costs to the permittee

under these alternatives would "likely increase, because more riding and on-the-ground management would be required with the proposed deferred-rotation grazing strategy." AR 6773. However, the analysis concludes that "[s]preading the costs over 6 years would reduce any adverse direct or indirect impacts to continued rangeland management on the Forest." Additionally, the increased workload for the permittee is "within reasonable amounts assigned to a ranching operation" and although "[i]ncreased operational costs could cause adverse direct and indirect impacts . . . these alternatives also present the greatest potential for financial return." AR 6774.

In response to concerns about the costs of fencing and undue hardship on the permittee, the agency selected elements from Alternatives 3 and 5. AR 8107–08. Accordingly, "the selected action will allow for the use of natural control features, drift fences, and native material barriers" and phases in fence construction "over a period of years." AR 8108.

Finally, Plaintiffs argue the Forest Service "fell short of its duty under the Forest Plan to 'maintain viable populations of all existing native . . . plant and animal species.'" Pls.' Mot. Summ J. (citing AR 3527).

The Forest Service is "not required to identify a specific 'mechanism' for securing viability . . . [the] agency need only supply 'a rational connection between the facts found and the conclusions made.'" *In re Big Thorne Project v. U.S. Forest Serv.*, 857 F.3d 968, 975 (9th Cir. 2017) (citations omitted). "This rational connection can be supplied with studies or models or experts—or really any legitimate evidence, so long as the agency describes a reasonable fit between its means and ends." *Id.* Courts should be "'especially' deferential 'when questions of scientific methodology are involved,' like how to protect viability." *Id.* (citation omitted).

The Forests Service's viability determination for the sensitive species in the Antelope Allotment is rational and consistent with the Winema Forest Plan. The Forest Service adequately assessed the viability of Oregon spotted frog, sensitive plants, mollusks, and other sensitive species in the FEIS and expert botany report, ultimately finding that the new grazing framework would not impair these species' viability. AR 8099-100, 6745–48 (frogs), 6722–26 (sensitive plants), 6734–35 (mollusks); *see also* AR 6010–24 (addressing the effects of grazing on various sensitive species). The agency's analysis centered on species occurrences both inside and outside the project area and how the species would react to grazing under particular utilization standards. AR 6010–24, 6745–48, 6722–26, 6734–35. FWS's 2018 Biological Opinion also addressed the effects of the grazing scheme on the spotted frog, concluding that the effects of grazing "are not expected to occur to an extent that is likely to cause the extirpation of the Oregon spotted frogs in the Jack Creek area." AR 8048.

The Court finds that the Forest Service's grazing decision is in alignment with the Winema Forest Plan's provisions and the NFMA. Accordingly, Plaintiffs' Motion for Summary Judgment is denied on this claim and Defendants' Motion for Summary Judgment is granted.

## III.  <u>"Hard Look" Challenges to the FEIS</u>

Plaintiffs challenge the sufficiency of the Forest Service's FEIS, arguing that the agency "failed to take a hard look at the impacts of grazing by improperly dismissing alternatives and brushing aside effects of climate change and impacts to frogs." Pls.' Mot. Summ. J. 24. NEPA requires that an agency considering "major Federal actions significantly affecting the quality of the human environment" prepare and publish an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(C). Through these requirements "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the

die otherwise cast." *Robertson*, 490 U.S. at 349 (citation omitted). However, "NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1150 (9th Cir. 2010).

The EIS must take a "hard look" at, and provide a "reasonably thorough discussion" of, the "probable environmental consequences" of the proposed action. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Furthermore, an EIS must rely on accurate data and may not "improperly minimize negative side effects." 40 C.F.R. §§ 1500.1(b), 1502.16(h) (2020); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (citation omitted).

First, Plaintiffs argue that the Forest Service improperly dismissed the "no and reduced grazing alternatives"—Alternatives 1 and 4—based on an "invalid reason," bypassing the requisite "hard look" analysis *Id.* Plaintiffs allege that the Forest Service's rational for dismissing these alternatives was rooted in the claim that "it had to authorize grazing on all lands identified as suitable for such use" and that this rationale was an "erroneous interpretation of the law and the Forest Plan." *Id.* (citing *W. Watersheds Project v. Rosenkrance*, No. 4:09-cv-298, 2011 WL 39651, at *10 (D. Idaho Jan. 5, 2011); *W. Watersheds Project v. Salazar*, No. 4:08-cv-516, 2011 WL 4526746, at *14 (D. Idaho Sept. 28, 2011)).

As discussed above, "the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference" and the Court is satisfied that the Forest Service rationally decided on a course of action that included continued grazing in the Antelope Allotment. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

Second, Plaintiffs argue that the Forest Service failed to take the requisite "'hard look' at how climate change will exacerbate grazing's effects" and relied on "old data" in violation of

NEPA. Pls.' Mot. Summ. J. 25. "Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." *N. Plains Res. Council*, 668 F.3d 1067, 1086 (9th Cir. 2011) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (finding six-year-old fish count surveys, without updated habitat studies, too stale to support the EIS's cumulative effects analysis)).

The Forest Service took the requisite "hard look" at how climate change will interact with grazing in the FEIS. AR 6847–49. The agency analyzed precipitation and temperature trends from 2000–2010 that demonstrate increasing precipitation and decreasing temperature for that time period. AR 6847. However, the agency did not solely rely on the trends demonstrated in that data, but also considered future expected trends of increased average temperatures, reduced snowpack, and other effects of climate change. AR 6849. The agency acknowledged that "[c]hanges in water levels or localized drought from climate change can cause seasonal loss of habitat and degradation of essential shoreline vegetation" and that "water supply in the Klamath Basin is expected to become more variable." AR 6742; *see also* AR 6743 ("[C]attle–frog conflicts may increase under limited stream flow, especially if cattle are using the same few pools as frogs; direct risks, such as trampling, and indirect risks, such as reduced water quality, increase."). The agency concluded that, in light of these changes, "the magnitude of stressors to [the spotted frog] are expected to increase as they interact with water supply," but, ultimately, the project would not undermine the Jack Creek frog population's viability. *Id.*; AR 8099.

Finally, Plaintiffs argue that "[t]he [FEIS's] disclosure of impacts to frogs falls grossly short of the agency's duty to take a 'hard look' at potential impacts." Pls.' Mot. Summ. J. 26. Plaintiffs allege that the agency did not adequately discuss direct impacts to frogs, relied on a

Biological Assessment that was incomplete at the time the FEIS was issued, downplayed impacts to Jack Creek, and relied on an "outdated and flawed Wildlife Report." *Id.*

The Forest Service took the requisite "hard look" at the potential impacts to the Oregon spotted frog and its habitat in the FEIS and documents incorporated into the FEIS and came to a rational determination regarding the impacts of grazing on the species. AR 6740–50. The FEIS concluded that the "project impacts a very small portion of suitable habitat across the Forest . . . and overall direct, indirect[,] and cumulative effects will result in small-scale negative impacts to habitat as well as some positive impacts to habitat." AR 6748.

The FEIS identified the occupied frog habitat in the project area and elsewhere on the Fremont-Winema National Forest. AR 6744, 6745. The FEIS discussed spotted frog vulnerabilities and threats to the species, including habitat overlap with fish, "potential loss or alteration of springs used for overwintering, . . . [c]hanges that increase deep, permanent water components[,] . . . loss and alteration of wetland habitat[,] . . . livestock grazing[,] . . . [and] water quality degradation." AR 6742. The FEIS also addressed both direct and indirect impacts of grazing on the spotted frog:

> Direct and indirect effects to the species and its habitat from the management of the allotment include: the potential destruction of riparian habitat, the potential alteration of the hydrology within the Jack Creek system, the potential to trample individuals, and the potential to introduce non-natives, parasites, or pathogens.

AR 6746.

The Forest Service reasonably relied on both independent and agency conducted studies when assessing the effects of the grazing plan on the spotted frog and its habitat. For example, the agency relied on *A Conservation Assessment for the Oregon Spotted Frog (Rana Pretiosa)* to better understand "the life history, threats, and management considerations for this species." AR 6740. The FEIS also incorporated the *Jack Creek OSF Site Management Plan*, which addresses

the "conservation challenges and opportunities for Jack Creek" and identifies "[s]everal management actions" toward conservation of the spotted frog and its habitat. AR 6743. That plan includes cattle grazing as a potential management action and states:

> Grazing may be a helpful tool in achieving habitat goals provided the cattle are properly handled. Grazing rotations that put cattle on meadows for a short period of time with more intensive grazing, utilize rest years, and vary when each meadow is grazed among years have the potential to minimize damage to key riparian habitat characteristics while still allowing resource utilization once restoration goals have been achieved.

AR 4501. The agency also responded to concerns about the impacts to the spotted frog by developing the Monitoring and Adaptive Management Plan discussed above. *See* AR 5347–6352.

The Forest Service took the requisite "hard look" at, and provided a "reasonably thorough discussion" of, the "probable environmental consequences" of the proposed action. *Block*, 690 F.2d at 761. Plaintiffs Motion for Summary Judgment on this claim is, therefore, denied and Defendants Motion for Summary Judgment granted.

## IV. Challenges to the 2018 BiOp under the ESA

Plaintiffs challenge the FWS's 2018 BiOp as "arbitrary and contrary to the ESA." Pls.' Mot. Summ. J. 27. Under the ESA, a federal agency must ensure its proposed action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). In fulfilling this requirement, "each agency shall use the best scientific and commercial data available." *Id.*

If the acting agency determines that "its proposed action *may* affect a listed species or critical habitat, it must . . . consult with the Secretary of the Interior, or his or her delegee," here the FWS. *San Luis & Delta-Mendoza Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014)

(citing 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.14(a) (2020); *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1122 (9th Cir. 1997)). First, the consulting agency will issue a Biological Assessment (BA) to determine if "the proposed action is *likely* to adversely affect a listed species or critical habitat;" if so, the acting agency must engage in formal consultation with the FWS. *Id.* (citing 50 C.F.R. §§ 401.13, 402.14).

Formal consultation results in a Biological Opinion (BiOp) issued by the FWS stating whether the proposed agency action is likely to jeopardize the listed species or critical habitat. 16 U.S.C § 1536(b)(3)(A); 50 C.F.R. § 402.14. If the BiOp concludes that the action will incidentally take, but not jeopardize, a listed species, the FWS must issues an Incidental Take Statement (ITS). 16 U.S.C § 1536(b)(4); 50 C.F.R. § 402.14(i). The ITS specifies the number of takings expected and exempted from the ESA's prohibition on takes.[3] *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518–19 (9th Cir. 2010).

The FWS's 2018 BiOp and the accompanying ITS are final agency actions subject to judicial review under the APA. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1035–36 (9th Cir. 2007) (citing *Bennet v. Spear*, 520 U.S. 154 (1997)). Thus, the Court must review these actions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

First, Plaintiffs argue that the BiOp's jeopardy analysis is flawed because it does not consider the impacts of the proposed action on the "*recovery* of the [spotted frog]" and "perpetuates flaws in the 2015 BiOp." Pls.' Mot. Summ. J. 27 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924, 931–33 (9th Cir. 2008); *Concerned Friends of*

---

[3] To "take" is defined by ESA Section 3 as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." The taking of listed species is proscribed by Section 9 of the ESA.

*the Winema v. U.S. Forest Serv.*, No. 14-cv-00737, 2016 WL 10637010, at *13, *15–16 (D. Or. Sept. 12, 2016)).

The FWS's 2018 BiOp adequately addressed both survival and recovery of the spotted frog in the project area and was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The BiOp concluded that "implementation of the [Forest Service's] proposed action is not likely to jeopardize the continued existence of the Oregon spotted frog" and will not likely adversely affect critical spotted frog habitat.[4] FWSR 1489–90. In reaching this conclusion, the BiOp assessed the extent of the Jack Creek spotted frog population, the status of the frog's habitat in the project and surrounding area, and the effects of the proposed grazing scheme. *See, e.g.*, FWSR 1463–80.

The BiOp explained that the Jack Creek frog population is "relatively stable with some potential for an upward population trend" and that there has been an "increase in the amount of known occupied habitat in Jack Creek." FWSR 1461. The BiOp also found that "riparian system function will be maintained or improved, . . . and given Oregon spotted frogs are dependent upon riparian and aquatic systems, [the FWS] expect[s] that habitat function for Oregon spotted frogs would not change." FWSR 1479. The FWS acknowledged that grazing "is likely to cause disturbance to individual spotted frogs beyond what would occur without grazing" but also concluded that "previous and ongoing habitat restoration efforts, project design features, and application of grazing implementation standards" would ensure the Jack Creek frog population is not extirpated. *Id.*; *see also* FWSR 1477–78. Moreover, the BiOp found that there was scientific

---

[4] The BiOp's "no jeopardy" finding, by definition, encompasses both "survival and recovery." 50 C.F.R. § 402.02 ("Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of *both the survival and recovery* of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.").

evidence "that an intermediate level of cattle grazing-related disturbance may be conducive to Oregon spotted frog habitat use." FWSR 1471.

Second, Plaintiffs argue that the "BiOp improperly relies on mitigation measures that are uncertain to occur or will not address the threats to the species." Pls.' Mot. Summ. J. 29. Plaintiffs challenge the 35% utilization and 20% bank alteration standards as insufficient to protect the spotted frog. *Id.* Plaintiffs also challenge the "BiOp's reliance on water level monitoring and [the] adaptive management plan" as "flawed." *Id.* at 30.

The mitigation measures relied upon in the 2018 BiOp are premised on a "reasonable evaluation of relevant data, not on pure speculation," and are sufficiently tied to the spotted frog's needs. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336–37 (9th Cir. 1992). The 35% and 20% standards referenced in the BiOp are supported by scientific literature regarding the protection of riparian wildlife habitat and the Forest Service's *Jack Creek OSF Site Management Plan*. *See* FWSR 849, 1467, 2378. The BiOp specifically discusses the relationship between these standards and the specific needs of the Oregon spotted frog and its habitat. For instance, the BiOp states:

> Adherence to the proposed 35% utilization standard is expected to maintain or improve riparian system function by: (1) preventing livestock grazing above a utilization level that may reduce bank stabilizing vegetation (Hall and Bryant 1995); (2) allowing sufficient streamside vegetation to encourage trapping and deposition of fine sediments to maintain and rebuild streambanks (Clary and Webster 1989; Clary et al. 1996); (3) preventing unwanted browsing of woody vegetation to minimize channel modification (Hall and Bryant 1995; Clary and Leininger 2000); and (4) preventing streambank damage (Hall and Bryant 1995; Platts and Nelson 1989; Clary 1999). For these reasons, we expect that use of the proposed 35% utilization standard will minimize the effects of vegetation removal on the Oregon spotted frog and its habitat such that the effects would be insignificant.

FWSR 1467.

In the Biological Assessment, the FWS explained that a "35% utilization standard was selected in order to provide better protection for willow and other sensitive vegetation along the creek while removing biomass from areas used by ovipositing frogs and tadpoles, thus increasing accessible breeding habitat (Gervais 2011, p. 35)." FWSR 849. Regarding the 20% bank alteration standard, the agency found that "[t]he Forest's proposed 20% bank alteration standard is consistent with recommendations made by Cowley (2002 and references therein) to maintain adequate streambank conditions." FWSR 1467. Finally, as has been discussed elsewhere in this opinion, the Court is not convinced by Plaintiffs' argument that the monitoring will be left to chance or otherwise abdicated to the permittee with no oversight from the responsible agencies.

Similarly, the 2018 BiOp's water level monitoring and adaptive management plan is sufficient under the ESA. The water level monitoring plan discussed in the BiOp leaves timing for field visits by the Forest Service to the Forest Service's determination. The Forest Service's drought plan and adaptive management plan require field visits to monitor water levels and include responses in the case that water levels fall below "[e]ffective water levels to support [spotted frogs]." AR 6348, 6352; *see also* FWSR 832. The Forest Service relies on monitoring of a specific pool of water, Pool D, located along Jack Creek, as a proxy for monitoring intermittent low water levels in the entirety of the Chemult and North Sheep pastures and Jack Creek. Plaintiffs take issue with the use of Pool D as a proxy for water levels in "other pools that can reach depths inhospitable for frogs when Pool D is still relatively high." Pls.' Mot. Summ. J. 31. However, the agency has demonstrated that, based on past monitoring, the use of Pool D would serve as an adequate proxy. *See* AR 5133–34.

The BiOp's reliance on fencing and water troughs as a means to help control cattle and mitigate the effects of grazing is also sufficient under the ESA. The District of Oregon has

already ruled that FWS's reliance on such measures was not arbitrary or capricious. *Concerned Friends*, 2016 WL 10637010, at *11. In that decision, the court noted that "[f]ences have improved [spotted frog] habitat conditions . . . [and] [t]he BiOp emphasized that the existing fence, which Plaintiffs had previously advocated for so zealously, needed improvements and repairs." *Id.*

Third, Plaintiffs argue that the "BiOp omits important information and explanation necessary to assess the direct and indirect effects of the action[] and fails to use 'the best available scientific and commercial data available.'" Pls.' Mot. Summ. J. 31 (citing 16 U.S.C § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(h)(3), (g), 402.14(g)). Specifically, Plaintiffs allege that the 2018 BiOp "virtually ignores climate change, despite the significant risk posed by warmer temperatures and increasing drought." *Id.* at 32 (citing *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233–34 (E.D. Wash. 2016) (inadequate climate change analysis rendered BiOp unlawful)).

The Court is not persuaded by Plaintiffs' argument that the FWS's 2018 BIOP failed to consider climate change. Here, the FWS's 2018 BiOp acknowledged that "historical loss of Oregon spotted frog habitats and lasting anthropogenic changes in natural disturbance processes are exacerbated by the introduction of reed canary grass, non-native predators, *and potentially climate change*." FWSR 1458 (emphasis added). The BiOp went on to identify drought as "probably the most severe threat to the Jack Creek spotted frog population, particularly in intermittent reaches." FWSR 1464. The BiOp relied on recent water temperature data from 2014-2017 that indicated water temperatures were "suitable for the different life stages of [the spotted frog]." [5] *Id.* The BiOp then concludes that the proposed action, with its mandatory enforcement

---

[5] The 2018 BiOp is only valid through 2027.

and mitigation mechanisms, "is expected to be compatible with an Oregon spotted frog population persisting in Jack Creek." FWSR 1490.

The Court is equally unpersuaded by Plaintiffs' argument that the FWS's 2018 BiOp was not in accordance with the ESA because the agency failed demonstrate that it used the "best scientific and commercial data available." *Lands Council*, 537 F.3d at 987 (citation omitted); 16 U.S.C. § 1536(a)(2); *see also Turtle Island Restoration Network v. United States DOC*, 878 F.3d 725 (9th Cir. 2017) (upholding a BiOp where "[o]n the whole, the BiOp demonstrated that the [agency] considered a variety of ways in which climate change may affect the [species], but simply concluded that the data available was too indeterminate for the agency to evaluate the potential [species] impacts with any certainty."). To be sure, failure to use the best scientific data available violates the APA. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 975 (9th Cir. 2014). "The standard does not, however, require an agency to conduct new tests or make decisions on data that does not yet exist." *Id.*

As noted, the FWS's 2018 BiOp noted the challenges drought conditions placed upon the Jack Creek frog population, but ultimately concluded the project's mandatory requirements would minimize any danger to the frog population. FWS 1446, 1473-75, 1493-95. Although Plaintiffs argue the FWS did not use the best available science, they fail to point to any study that the FWS 2018 BiOp should have consulted. In fact, the FWS previously concluded, in the public rule listing the spotted frog under the ESA, that the lack of any climate change studies on the Oregon spotted frog rendered any attempt to make predictions in this regard "uncertain." FWS 5270. As no studies at the time examined the effects of climate change on the Oregon spotted frog, any further discussion by the agency on this issue would have been speculative.

Plaintiffs also allege that the BiOp's reliance on the Biological Assessment "for the description of the proposed action" is inadequate because the BA "omits key details—like when, where, and how many cattle will graze each pasture annually." *Id.* A biological opinion must include "[a] summary of the information on which the opinion is based." 50 C.F.R. § 402.14(h)(1).

The FWS includes a summary of the information on which the BiOp is based by incorporating the agency's BA as well as referencing other sources. FWSR 1433, 1512. The BA addressed whether the proposed grazing is likely to adversely affect the spotted frog or its habitat in light of the utilization and bank alteration standards proposed by the Forest Service because those thresholds remain the same regardless of when, where, and how many cattle will graze each pasture annually. *See, e.g.*, FWSR 820, 826, 849. Thus, if the BA determined that those thresholds would not serve to protect the frog from jeopardy, the details of the grazing management scheme would be irrelevant.

Finally, Plaintiffs argue that the ITS "applied an improper surrogate to determine non-lethal take." Pls.' Mot. Summ. J. 33–34. Specifically, Plaintiffs argue that the 35% utilization standard, 20% bank alteration standard, and 13.5% trampling threshold do not "address a key threat and source of take—cattle causing disturbance and displacement of juvenile or adult frogs." *Id.* at 34.

In this case, the ITS's surrogate for non-lethal take was not improper and does adequately address key threats and sources of take for the spotted frog. An agency may use a surrogate for take, provided the agency:

> [1] Describes the causal link between the surrogate and take of the listed species,
> [2] describes why it is not practical to express the amount of anticipated take or to
> monitor take related impacts in terms of individuals of the listed species, and [3]

sets a clear standard for determining when the amount or extent of the taking has
been exceeded.

50 C.F.R. § 402.14(i)(1)(i).

The agency discussed how the 35% utilization and 20% bank alteration standard
represent "light to moderate grazing" that would "limit the duration of exposure of frogs to
trampling by cattle." FWSR 1509. The agency also notes that the 13.5% trampling rate is a
"more conservative estimate," especially for "adult/subadult frogs [that] are highly mobile and
capable of avoiding trampling." FWSR 1508–09. Relying on findings from the Forest Service,
the FWS determined that "adhering to the proposed 35% utilization standard and 20% bank
alteration standard is expected to minimize vegetation loss of riparian habitat or streambank
habitat; higher levels of use may negatively affect breeding and refugia habitat." FWSR 1491.

The ITS explained that monitoring take in terms of individual frogs was impractical
because "Oregon spotted frogs are small and cryptic, and detecting individuals subject to
incidental take will be exceptionally difficult." FWSR 1493. Thus, the BiOp identified the 35%
forage utilization and 20% bank alteration as "the most practical surrogates for measuring the
take of frogs," and the 13.5% trampling rate "a useful representation for take of frogs via
trampling." FWSR 1493.

The ITS established "terms and conditions" for ensuring compliance with the ITS's
limitations on taking. FWSR 1494. These measures include requiring the Forest Service to
"strictly adhere to the Monitoring and Adaptive Management Plan," which includes the  35%
forage utilization and 20% bank alteration standards, "pre- and post-season checks of each
allotment," and "three riparian photo points that are photographed at least once a year." FWSR
1494–95. "Trampling data will be collected based on survey efforts," and  "[u]pon locating a
dead, injured, or sick Oregon spotted frog specimen, prompt notification must be made to the

nearest [FWS] Law Enforcement Office." FWSR 1494, 1495. "The results of all monitoring . . . shall be reported to the [FWS] on a routine basis during the grazing season, and an annual report . . . submitted by March 31 of each calendar year." FWSR 1494–95.

## CONCLUSION

The Court grants Defendants' Motion for Summary Judgment (ECF No. 51).

IT IS SO ORDERED.

DATED this 5th day of June, 2022.

s/  Michael J. McShane
Michael J. McShane
United States District Judge